Lauren C. Regan, OSB # 970878
Email: lregan@cldc.org
Marianne Dugan, OSB # 932563
Email:  mdugan@cldc.org
Sarah Alvarez, OSB # 182999
Email: salvarez@cldc.org
CIVIL LIBERTIES DEFENSE CENTER
1430 Willamette Street, #359
Eugene, OR  97402
Telephone:  541.687.9180
Fax: 541.804.7391

          Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| BLACK UNITY; MARTIN ALLUMS; TYSHAWN FORD; AUSTIN JOHNS; and MYA LANSING,<br><br>              Plaintiffs,<br><br>      v.<br><br>CITY OF SPRINGFIELD, a municipal corporation; CHIEF RICHARD L. LEWIS; LT GEORGE CROLLY # 307; LT MATTHEW NEIWART; LT TOM RAPPE; SGT DAVID GRICE; SGT PETE KIRKPATRICK; SGT KEITH SEANOR # 297; A.A. AMUNDSON # 343; T.J. BAZER # 390; B.K. BRAGG # 380; JOSEPH BURKE # 365; DANIEL CASAREZ # 215; R.J. CONRAD # 286; B.P. DUNN # 205; BRONSON DURRANT # 382; J. GARCIA-CASH # 397; T.J. MURRAY # 398; J.J. MYERS # 355; C.J. O'LEARY # 395; JARED QUINONES # 363; R.A. ROSALES # 225; E.A. SORBY # 376; M.J. THOMSEN # 310; L.E. TURNER # 328; J.M. WILSON # 344; DETECTIVE ROBERT WEAVER # 4854; and JOHN DOE, in their individual capacities,<br><br>          Defendants. | Case No. 6:21-cv-346<br><br>**COMPLAINT**<br>Civil Rights and Conspiracy -- 42 U.S.C. Sections 1983, 1985, and 1986<br><br><br>REQUEST FOR JURY TRIAL |

PLAINTIFFS, by and through their attorneys, CIVIL LIBERTIES DEFENSE CENTER, for their Complaint against Defendants, allege as follows.

## INTRODUCTION

**A.      The Ku Klux Klan Act, Now Known as the Civil Rights Act of 1871**

1.       This is a civil rights action arising under Title 42 of the United States Code, Sections 1983, 1985, and 1986. Plaintiffs bring this action for damages against Defendants for violating their First, Fourth, and Fourteenth Amendment rights on July 29, 2020, in the Thurston area of Springfield, Oregon.

2.       On April 20, 1871, Congress enacted the "Ku Klux Klan Act," now known as the Civil Rights Act of 1871, to support and enforce the Fourteenth Amendment to the Constitution (ratified in 1868), which purported to guarantee the full rights of citizenship to the recently-freed slaves.

3.       The 1863 Emancipation Proclamation, the end of slavery, and dissolution of the Ku Klux Klan around that time proved to be insufficient to bring an end to discrimination, vigilantism, and other forms of violence by the ingrained white supremacist system against newly freed Black people; and the remnants of the Union forces and understaffed Freedmen's Bureaus were inadequate to protect Black people from white terrorist organizations.

4.       Slave patrols were an early form of policing in the United States.  According to historian Gary Potter, slave patrols served three main functions: "(1) to chase down, apprehend, and return to their owners, runaway slaves; (2) to provide a form of organized terror to deter

slave revolts; and, (3) to maintain a form of discipline for slave-workers who were subject to summary justice, outside the law."[1]

5.      Racial profiling of African Americans, including their deliberate murder, has given rise to organizations like the Black Lives Matter Movement. However, tensions between the Black community and police extend to the very beginning of organized policing in 1704. One could argue the reasons for the tension; nevertheless, the one consistent recurring and logical reason would be the system of racism and White Supremacy in the U.S.

6.      Closing in on the 150-year anniversary of the Civil Rights Act/Ku Klux Klan Act, the Act has now been expanded to recognize a cause of action for constitutional violations that are not race-based.  But that central and original purpose of the Act -- protection of Black people from racial violence and intimidation -- has not lost its importance.  White supremacist vigilantism and other forms of terrorism are not only still with us as a nation, but have increased in recent years, and are "on the rise and spreading" according to the U.S. State Department.[2]

7.      "The Proud Boys," "Patriot Front," and other white supremacist/neo-Nazi/racist groups[3] have terrorized and harassed Black, Indigenous, People of Color (BIPOC) and progressive activists both in Oregon and throughout the United States, with increasing virulence and violence, recently taking over the capitol buildings in both Oregon and Washington D.C.[4]

8.      Section 1 of the Ku Klux Klan Act became 42 U.S.C. 1983, the best-known provision of the law, cited almost daily throughout the country in lawsuits claiming police

---

[1] Gary Potter, The History of Policing in the United States, EKU School of Justice Studies. https://plsonline.eku.edu/sites/plsonline.eku.edu/files/the-history-of-policing-in-us.pdf.
[2] https://www.forbes.com/sites/carlieporterfield/2020/06/25/white-supremacist-terrorism-on-the-rise-and-spreading/?sh=5e1e5f8e5a0f.
[3] https://www.splcenter.org/states/oregon
[4] *See, e.g.*, https://www.wweek.com/news/2021/01/06/were-not-going-home-proud-boys-and-pro-trump-protesters-fight-leftists-and-police-outside-oregon-capitol/.

excessive force, false arrest, and other misconduct.  Under Section 1983, the plaintiff need not be a member of a particular race or identifiable class of people.

9.      Other sections of the Act became 42 U.S.C. 1985 and 1986.  Section 1985 provides a civil cause of action against forces or individuals who conspire to deprive someone of their constitutional rights.  Since its enactment, the U.S. Supreme Court has interpreted Section 1985 to apply to both public and private actors, where the conspiracy targets a certain race or identifiable class of people.

10.      Section 1986 provides a civil cause of action against anyone who, having knowledge that a Section 1985 conspiracy is about to be committed, and having power to prevent or aid in preventing that harm, neglects or refuses so to do.

11.      All three of these statutes apply to the events alleged in this complaint.  In addition to the more common Section 1983 police misconduct (excessive force, false arrest, and interference with First Amendment activity), Plaintiffs allege that the named Defendants conspired to deprive them of their constitutional rights, and failed to prevent those harms, based upon Plaintiffs' 1) race; 2) support of Black rights and Black lives; 3) statements critical of the police and the criminal punishment system that is in place in this country and locally; and/or 4) First Amendment activity and status as Black Unity and Black Lives Matter marchers/protesters.

**B.      2020 Actions in Support of the Movement for Black Lives**

12.      On May 25, 2020, George Floyd, an African-American, was murdered by a Minneapolis police officer, Derek Chauvin, who knelt on Mr. Floyd's neck for eight minutes and forty-six seconds. During that time, at least four other officers stood around and watched as Mr. Floyd begged for his life and cried out for his mom. Mr. Floyd's last words were, "Please, please, please, I can't breathe."

13.     Several weeks before Mr. Floyd was killed by police, Breonna Taylor, a Louisville, Kentucky, EMT (also African-American), was shot dead by plain-clothes police who broke into her home to execute a no-knock warrant.

14.     The killing of Mr. Floyd and Ms. Taylor, among scores of other Black people killed by police in recent times, unleashed a torrent of anger and frustration from people across the United States and the world. Millions have protested and demonstrated, calling for an end to white supremacy and the legal, social, political, and economic institutions that uphold and benefit from systemic racism, as well as calling for an end to State violence against all people.

15.     During 2020, demonstrations took place throughout the United States for weeks and months, often met by violent assaults by police and right-wing mobs and individuals.

16.     Like most cities in the U.S., the Eugene-Springfield area was home to several protests and demonstrations in the days, weeks, and months after Mr. Floyd was murdered by police.

17.     In response to these gatherings, the Springfield Police Department (SPD), like many police departments around the U.S., took steps to restrict and stifle the First Amendment rights of protesters critical of police, with its officers often expressing animus against those First Amendment activities and beliefs, which are inextricably linked to race and race-related violence at the hands of law enforcement.

18.     On July 29, 2020, members of the SPD, including Defendants, engaged in several unconstitutional actions to punish, prevent, or chill Plaintiffs' First Amendment activities. These actions included  unlawful detention, colluding with and informing violent counter-protestors about Plaintiff's plans; encouraging, alerting, and conspiring with violent counter-protestors to amass and use force against Plaintiffs; roadblocks that prevented a lawful protest march;

unconstitutional uses of force and threats of force; unconstitutional arrests and threats of arrest; and allowing violent counter-demonstrators to attack, threaten, harass, intimidate, or otherwise engage in unlawful actions against protestors, including Plaintiffs. Defendants failed to provide equal protection under the law to protestors, including Plaintiffs, based on their viewpoints or perceived viewpoints, as well as the status of some of them as people of color and their support of the movement for Black lives. Defendants allowed counter-demonstrators to engage in violent acts against protestors, including Plaintiffs, and by permitting such violence, encouraged and emboldened the attacks against Plaintiffs.

19.    Further, this was not the only time SPD and Defendants had engaged in unconstitutional actions to prevent and chill Plaintiff's first amendment activities by preventing and blocking Plaintiffs from lawfully marching in public forums. SPD took similar actions on June 26, 2020, when Plaintiffs marched in the Thurston neighborhood, and later that same evening, in downtown Springfield.

## JURISDICTION AND VENUE

20.    This civil action arises under the Constitution and laws of the United States (42 U.S.C. §§ 1983, 1985, and 1986), and this Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1342(a).

21.    Venue is properly vested in the Court pursuant to 28 U.S.C. § 1391(b), because the actions giving rise to this complaint took place in the City of Eugene, Oregon, which is in this District, and Defendants are subject to personal jurisdiction in this District.

## PARTIES

22.    Plaintiff Black Unity (BU) is a domestic nonprofit corporation, whose principal place of business is Lane County, Oregon. At the time of the events described herein, Black Unity was an unincorporated association.  Black Unity and its members are primarily engaged in advocating for racial justice.  Black Unity seeks equal treatment of Black lives through education, awareness and policy change, and strives for equal opportunities for Black lives through protest, engagement and abolition.  Black Unity provides support, resources, safety and community service to the Black community.

23.    Plaintiff Martin Allums was, at the time of filing and all relevant times, a resident of Lane County, Oregon, and a member of Black Unity. Mr. Allums identifies as a BIPOC (Black, Indigenous, Person of Color,[5]) person.

24.    Plaintiff Tyshawn Ford was, at the time of filing and all relevant times, a resident of Lane County, Oregon, and a member of Black Unity. Mr. Ford identifies as a BIPOC person.

25.    Plaintiff Mya Lansing was, at the time of filing and all relevant times, a resident of Lane County, Oregon. Ms. Lansing identifies as a BIPOC person.

26.    Plaintiff Austin Johns was, at the time of filing and all relevant times, a resident of Lane County, Oregon.

27.    Defendant City of Springfield is a political subdivision of the State of Oregon. The Springfield Police Department is a department or division of the City. Upon information and belief, each of the individual Defendants was an agent or employee of the City of Springfield at the time of the events described herein.

---

[5] https://www.merriam-webster.com/dictionary/BIPOC

28.     Defendant Richard L. Lewis is the chief of SPD and, was at all relevant times, employed by SPD.

29.     Defendants Lieutenants George Crolly, Matthew Neiwart, and Tom Rappe are, and were at all relevant times, police lieutenants employed by SPD.

30.     Defendants Sergeants David Grice, Pete Kirkpatrick, and Keith Seanor, are, and were at all relevant times, police sergeants employed by SPD.

31.     Defendants A.A. Amundson, T.J. Bazer, B.K. Bragg, J.N. Burke, Daniel Casarez, R.J. Conrad, B.P. Dunn, Bronson Durrant, J. Garcia-Cash, T.J. Murray, J.J. Myers, C.J. O'Leary, Jared Quinones, R.A. Rosales, E.A. Sorby, M.J. Thomsen, L.E. Turner, and J.M. Wilson are, and were at all relevant times, police officers employed by SPD.

32.     Defendant Detective Weaver is, and was at all relevant times, a police detective employed by SPD.

33.     Defendant John Doe is an unidentified sworn law enforcement officer who assaulted and used excessive force against plaintiff Martin Allums.  Plaintiffs do not currently know the true name of Defendant John Doe, and therefore initiate this suit against Defendant John Doe by use of a fictitious name. Plaintiffs will amend this complaint to allege his or her true name when ascertained.

34.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted within the course and scope of their employment.

35.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under color of law.

36.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, or employee, and/or in concert with, each of the other Defendants.

## BACKGROUND

37.    On July 29, 2020, Plaintiff Black Unity organized a peaceful protest in the Thurston area of Springfield, Oregon.

38.    In addition to the ongoing protests in the wake of nationwide protests against police brutality and systemic racism, Black Unity specifically sought to protest a noose hanging in a tree at Bluebelle Way in Springfield.

39.    A Black resident of the Thurston Hills neighborhood reasonably felt threatened by the noose in her neighbor's yard, given the historical racist and violent usage of nooses to intimidate Black people.[6]

40.    The significance, to a Black person, of seeing a noose in their neighbor's yard, is particularly acute in a state like Oregon, whose racist roots have been spotlighted in the past few years.[7]

41.    At that time, the home with the noose also displayed a Gadsden Flag (the "Don't Tread on Me" flag), which has increasingly been associated with racist and anti-government beliefs.[8]

### Officer Burke's One-Hour Encounter with a Black Unity Organizer July 28, 2020

42.    On July 28, 2020, one day before the protest, the Black woman from the Thurston Hills who felt threatened by the noose hanging from her neighbors' tree (along with a "Don't Tread on Me" flag) asked for support and counsel from her friend, a female Black Unity

---

[6] *See* https://www.cnn.com/2020/06/23/us/noose-hate-symbol-racism-trnd/index.html; https://www.adl.org/education/educator-resources/lesson-plans/noose-incidents-and-their-historical-context.
[7] *See, e.g.*, https://www.opb.org/news/article/oregon-white-history-racist-foundations-black-exclusion-laws/.
[8] *See* https://www.newyorker.com/news/news-desk/the-shifting-symbolism-of-the-gadsden-flag; https://en.wikipedia.org/wiki/Gadsden_flag.

member. After meeting, and while parked in front of the friend's home on Bluebelle Way, the women were approached by Defendant Burke in police uniform. Much of the interaction was filmed by the Black Unity member.

43.     During an approximately one-hour interaction, the Black Unity member repeatedly informed Defendant Burke that the two women and Black Unity saw the noose and flag as racist symbols, and Burke repeatedly informed the women that their concerns were "ridiculous"; that he perceived BU as a threat to the community; and that he believed that they and Black Unity were coming to make trouble for the neighborhood.

44.     At the outset of the encounter, Defendant Burke told the Black Unity member that dispatchers had told him there were "associations" with her vehicle, "and people involved with this vehicle," with Black Unity events, and referred to Black Unity as a "mob."

45.     Burke stated, "I notice that you're here, you don't live here, my dispatcher says you live in Eugene."  The BU member noted that her friend lived there, and they were parked in front of her home.

46.     Burke commented, "You seem to have a particular interest in this house."  The BU member commented, "There's a noose hanging in front of that house."  Burke responded, "Well, I've heard that social media [sic] probably has some intention of 'canceling' this guy and possibly destroying his livelihood. . . . Because that's what you do."

47.     The Black Unity member commented repeatedly that it seemed he was implying Black Unity was violent, and that she was being targeted specifically, and noted -- accurately -- that the Black Unity events to date had been peaceful.

48.     Upon information and belief, Burke proceeded to use his cellphone to call the noose-hanging neighbor (the phone number apparently already stored in his cellphone),

addressing him by his first name only, throughout the call.  He stated on the phone, "There's a car outside your house that's associated with the BLM movement, Black Unity movement, what have you. . . . I'm guessing they're part of the group attaching [sic] stuff all over social media, going to meet at Jesse Maine [Park] and probably going to protest your decorations -- it's ridiculous."

49.    Burke repeatedly told the noose-hanging neighbor he did not know why BU cared about the neighbor's "Halloween decorations," despite the fact that this call took place in July of 2020.

50.    Burke stated to the neighbor on the phone, "The Black Unity group is hell-bent on making an example of the noose that's hanging around that skeleton's neck.  They don't care -- they're intent on canceling you."

51.    Burke then told the two women in the car, "You'd like to create a false narrative for your own propaganda efforts," and when they responded in surprise, "Do you mean Black Lives Matter?" he retorted, "My feeling is all lives matter."

52.    By July 2020, it was common knowledge and certainly a Springfield police officer knew, or should have known, that stating "all lives matter" in response to the Black Lives Matter protests was (and is) a statement intended to diminish, disrespect, and provoke; and was explicitly adopted by President Trump and other right-wing speakers, in direct opposition to the Movement for Black Lives.[9] To say "all lives matter" during a somewhat heated discussion while

_____

[9] *See:*  https://en.wikipedia.org/wiki/All_Lives_Matter;
-https://www.cbsnews.com/news/all-lives-matter-black-lives-matter;
- https://www.cnn.com/2020/06/23/opinions/all-lives-matter-misses-the-big-picture-baker/index.html;
- https://www.nytimes.com/2016/07/16/us/all-lives-matter-black-lives-matter.html;
- https://www.goodhousekeeping.com/life/a3274051/what-black-lives-matter-means/;
- https://www.sportsnet.ca/basketball/nba/explaining-lives-matter-actually-means-say/.

standing across the street from a tree with a noose hanging from it – and with a young Black

woman who organizes protests in support of the Movement for Black Lives -- was offensive and

demonstrated animus.

53.     When the Black Unity member in the vehicle again asked Defendant Burke about

his statement that he thinks her car is part of a Black Unity "mob," Burke nodded.  She noted

again that BU has been largely peaceful, and Burke responded "No, it has not been 'largely' (with

air quotes) peaceful," again showing animus.

54.     In response to the women's repeated attempts to calmly explain why a noose

carries racist connotations, Burke stated to the women that he didn't believe her statement that

there have been nooses hung up recently in Oregon, and says, show me one.  She offered at least

twice to email him evidence and educational information, to which he did not respond.

55.     A quick search of news stories makes clear that noose-hangings were indeed

rampant in Oregon during the first half of 2020, in stark contrast to previous years -- something

the SPD could easily have educated itself about, or should already have known about had they

been reasonably aware and properly trained in current racist and hate crime issues relevant to

their jobs as law enforcement officers.[10]

56.     At one point, Burke stated to the women, "There has been a push and pull with

police.  We'd like you to stay within the boundary and the boundary gets broken.  When we see

---

[10] - https://www.oregonlive.com/portland/2020/06/image-of-nooses-posted-in-ohsu-chatroom-report-says.html (June 8, 2020 --  nooses at Oregon Health Sciences University)
- https://www.koin.com/news/oregon/stuffed-monkey-with-noose-found-near-rainier/ (June 9, 2020 -- noose in Columbia County, Rainier)
- https://www.oregonlive.com/portland/2020/06/noose-found-at-downtown-portland-construction-site-officials-denounce-disgusting-act-of-racism.html (June 23, 2020 -- Portland)
- https://www.statesmanjournal.com/story/news/2020/06/23/oregon-sheriff-investigating-report-noose-hanging-outside-yurt-campground/3242383001/ (June 23, 2020 -- Roseburg).

frozen water bottles and rocks . . . . "  The women responded that there had been no such assaults at BU events.  Burke acknowledged, "I haven't seen water bottles or rocks at your events."

57.     Shortly thereafter, a white female neighbor approached and asked Burke why he was there; and he responded "My dispatcher called me. . . . Remember me explaining the fact that it's all over social media?"  -- to which the neighbor interrupted with "Yeah."  Burke continued, "There's going to be a thing -- the fact that this guy's decoration -- part of that thing is instigating this response at Jessie Maine Park tonight."

58.     Upon information and belief, Burke and/or one or more other SPD Officers had indeed gone door to door telling Thurston residents that Black Unity was planning a huge protest and that the SPD would be overwhelmed and would need the residents' help in resisting that protest (inciting racist mob violence similar to Trump's "You've gotta fight like hell.").

59.     Burke stated to the women in the vehicle, "Your presence is an unfortunate or fortunate circumstance.  I was called here because of the protests scheduled tonight, specifically stating this guy's decorations as the reason."

60.     About 45 minutes into the encounter, Burke told the women they should go online and look at the recent "STOP" statistics ("Statistical Transparency in Policing"), representing that those numbers show that there is no racism in the Springfield Police Department.

61.     In fact, the 2020 STOP data for Springfield shows that 4.18% of police stops are of Black people; whereas the 2019 census data shows only 1% of Springfield residents are Black and similarly 1.6% of Eugene residents are Black.[11]

---

[11] https://www.oregon.gov/cjc/CJC%20Document%20Library/STOP_Report_2020_FINAL.pdf;
- https://www.census.gov/quickfacts/fact/table/springfieldcityoregon/PST045219;
- https://www.census.gov/quickfacts/eugenecityoregon

**Other SPD Planning Before the July 29 Black Unity March**

62.     As noted above, upon information and belief, in addition to Defendant Burke's "investigation," Springfield Police Officers went out into the neighborhood a day or two before the Black Unity march to "warn" neighbors that the march was coming and that the police department believed it was going to be outnumbered, and asked for neighbors to assist them in keeping the BU marchers out of the neighborhood during the march.

63.     Upon information and belief, SPD made a pretextual plan ahead of the march on July 29 to set up traffic barriers and otherwise limit Plaintiffs' exercise of their First Amendment rights.

64.     People and groups opposed to the march, and opposed in general to the concept of "Black Lives Matter" (hereinafter "Anti-BLM harassers") were in contact with SPD before the protest. During the BU march, many of them repeatedly yelled "All Lives Matter," echoing Defendant Burke's thinly veiled dog-whistle white supremacist/racist sentiments.[12]

**The Black Unity March on July 29, 2020 -- "The Noose is a Nuisance"**

65.     The Black Unity march to protest the racist neighborhood noose and flag was scheduled to start at 7 PM at Jesse Maine Memorial Park, near the 600 block of South 69th Place in Springfield, Oregon.

66.     Prior to marching, Plaintiffs and other protestors gathered at Jesse Maine Park.

67.     Black Unity activists immediately were drawn into conversations with local residents and members of an Anti-BLM mob that had gathered in advance and had been clearly alerted and enflamed by SPD, among others.

---

[12] *See* https://en.wikipedia.org/wiki/Dog_whistle_(politics)

68.     The harassing mob insisted, without evidence, that Black Unity organizers intended to be violent during their march. Black Unity attempted to assuage those concerns to no avail.  Upon information and belief, the Anti-BLM harassers relied on baseless conspiracy theories — like those which fueled the violence at the U.S. Capitol on January 6, 2021 — to support their accusations that Black Unity, Black Lives Matter, and generally those critical of police, are "violent terrorists." Relying on these conspiracy theories as well as the SPD prior door-knocking, the Anti-BLM harassers, as well as Defendant members of SPD, upon information and belief stated and implicitly indicated their intent to violently interfere with Plaintiffs' exercise of their First Amendment rights.

69.     Video footage taken by one member of the harassing group, Geena Shipman, demonstrates that on the day of the protest, SPD Defendants were aware of the intent of the Anti-BLM harassers to do violence and commit crimes against Plaintiffs and others who they perceived to share the same or similar viewpoint as Plaintiffs.

70.     Defendant Kirkpatrick directed Shipman (who later assaulted a protestor and made a false report to police about it) to a specific location that police were trying to "push" the protestors toward. Defendant Kirkpatrick offered this information after Shipman (as heard on her video, and within earshot of Defendant Kirkpatrick) discusses weapons she planned to bring to the protest and "taking America back."

71.     In another livestream posted by Ms. Shipman she is heard encouraging others to "just fucking hit" the protestors and that "the cops don't care, they're on our side."

72.     When the march started, BU organizers explained to the Anti-BLM harassers that they would be willing to speak with them one-on-one but that "we are protesting in this area

because it is our right — our constitutional right. We will not touch your property. We will not come onto anyone's property . . . . We are Black Unity and we are peaceful."

73.     During the march, Plaintiffs were peaceful, and did not engage in trespass, property destruction, or violence. They chanted slogans, held signs, made speeches, and engaged in other forms of activity protected by the First Amendment.

74.     Plaintiffs travelled on the following route after meeting at Jesse Maine Memorial Park: West on Forsythia Street, South on South 68th Place, West on Glacier Drive, then South again on South 67th Street.

75.     Plaintiffs did not obstruct traffic during the course of their peaceful march.

76.     As the march progressed, people expressing anti-BLM views continued to harass and intimidate Plaintiffs and other protest attendees, including but not limited to menacing marchers with sticks and chemical weapons like bear mace and wasp spray, as well as other weapons.

77.     Defendants Rappe, Lewis, Crolly, and Neiwart were "command staff" with SPD for the July 29, 2020 protest, and made the decision to place barricades at Dogwood and South 67th Street. The placement of the blockade was not a reasonable time, place, and manner restriction upon Plaintiffs' constitutional right to march on public streets.

78.     Defendants Durrant, Murray, Myers, O'Leary, and Weaver, with the help of other Defendants, set up the barricades at the intersection of Dogwood Street and South 67th Street.

79.     Plaintiffs were unable to continue their peaceful march because Defendants set up a blockade at the intersection of Dogwood Street and South 67th Street.

80.    At some point other Defendants also set up cones to prevent the march at the intersection of Dogwood Street and South 68th Street. Defendants' barricades are noted as the red lines in this diagram:



81.    Plaintiff Tyshawn Ford was among the first of the BU organizers to approach the barricade on 67th and Dogwood. Other anti-racist protestors stopped marching and stood about 75 feet away from the barricade while organizers like Mr. Ford asked police why they were preventing him and others from continuing the march.

82.    While Defendant members of SPD clearly heard Mr. Ford, they ignored him. Mr. Ford then asked for a supervisor. Another organizer for Black Unity also asked to speak with a supervisor. Again, they were ignored. Mr. Ford then left the barricade and went back to the

larger group of protestors. Anti-BLM mob members menaced and attempted to provoke protestors from behind the police barricade on South 67th.

83.     Around this time, some members of the Anti-BLM mob utilized the information provided by Defendant Kirkpatrick, and drove around Springfield yelling and informing passersby that they knew the protestors were being blocked by police and that they were on their way to "go fuck them [protestors] up."

84.     Meanwhile, at the police barricade, Black Unity organizers and protestors questioned Defendants about the lawful basis of the barricades and, as before, they were ignored. National Lawyers Guild Legal Observers witnessed these attempts.

85.     The protesters did not pass the barricade.

86.     The protestors asked Defendants whether they could walk past the barricades, why the Anti-BLM counter-protesters were allowed to be on the other side of the barricades, and again why the barricades were set up. Again, they were ignored.

87.     At about 8:48 PM, Plaintiff Mr. Ford again joined the protestors at the barricades. He and other protestors did not cross the barricades.

88.     Shortly after Plaintiffs' futile attempts to ascertain why the barricade was erected, and while protestors continued to chant anti-racist, abolitionist, and BLM slogans, SPD appeared to bring out an old-fashioned PA system. While protestors chanted, Defendant Lewis and other Defendants stated indistinctly over the PA that the march was an "unlawful assembly" and ordered everyone to disperse. Upon information and belief, only a few people near the front could hear this statement.

89.     Defendant Lewis's order to disperse lacked a lawful basis, as the activities of Plaintiffs and other protestors was protected by the First Amendment. Defendant Lewis began

his "unlawful assembly" announcement before the crowd had gathered at the barriers SPD had erected; in fact, only a handful of protestors stood close or near to the barricades as the Defendants declared the Plaintiffs' First Amendment activities to be unlawful.

90.    Defendants' order was enforced based on perceived content-based discrimination and was not enforced against members of the Anti-BLM harassers, many of whom congregated and moved freely behind the police line, with Defendants taking no action against them; these Anti-BLM people are circled below:







91.     Defendants' order was met with several additional queries from Plaintiffs and other protestors as to how and why the assembly was unlawful. As before, the Defendants ignored Plaintiffs' questions.

92.     There was no lawful basis for the declaration of an unlawful assembly, the order to disperse, threats of arrest, or threats of force.

93.     At about 8:52 PM, Mr. Ford and other BU organizers were attempting to verbally and directly engage with one SPD officer, Defendant Durrant.

94.     According to police records, Defendant Rappe directed Defendant Durrant and other Defendants at the front of the police line to arrest Mr. Ford, a known BU leader, in response to the content of his speech.

95.     Defendant Durrant suddenly, without any lawful basis or warning, violently attacked Mr. Ford. After the sudden attack by Defendant Durrant, other Defendants rushed toward the crowd, pushing, punching, and striking Plaintiffs and other protestors without any lawful basis.

96.     No probable cause existed to arrest or detain Mr. Ford for his conduct.

97.    Mr. Ford was violently pulled out of the crowd and away from the crowd by

Defendant Durrant and other Defendants, including Defendants Garcia-Cash, Bragg, and Rappe.

Defendants Rappe and Bragg dragged Mr. Ford by his feet/ankles.



98.    Defendant Durrant kneeled over Ford and punched him twice in the head and face

while Defendant Rappe and other Defendants had control of Mr. Ford. In his report regarding his

justification for this use of force, Defendant Durrant wrote, falsely, "Ford audibly told me that he

would not comply." Each photo below represents an individual strike from Defendant Durrant's

raised fists:





99.     Even if true, verbal protest about being arrested does not justify such an excessive and violent act by law enforcement.

100.    Defendant Durrant lied in stating he punched Mr. Ford in order to gain his compliance. In fact, Mr. Ford was already complying. Defendant Rappe was sitting on Mr. Ford's lower body at the time Durrant assaulted Mr. Ford in retaliation for the words Mr. Ford spoke.

101.    Defendant Rappe dragged Mr. Ford further to the side while Mr. Ford had his hands clasped over his chest in plain view. Rather than reach for his hands or exert any other less-violent measure, Defendant Durrant again punched Mr. Ford in the head and face, as seen below:



102.    As a result of Defendant Durrant's and other Defendants' actions, Mr. Ford suffered physical and emotional injuries.

103.    Upon information and belief, Defendant Durrant was motivated to attack Mr. Ford because he was offended and angered by Mr. Ford's and other Plaintiffs' protected speech.

104.    Chants such as "All Cops Are Bastards" and "Fuck the Police" may not be pleasant for public servants serving as law enforcement to hear. Indeed, in a June 12, 2020, interview with local station KEZI 9 News, Defendant Weaver acknowledged that protestors' First Amendment activity " . . . does hurt morale when we are inundated with people saying all sorts of bad stuff about us."[13] However, these chants and statements by protestors are constitutionally protected speech, particularly when expressed by BIPOC people like Mr. Ford, protesting repeated acts of police violence. Properly trained and supervised public servant law enforcement are expected to tolerate criticism and/or insults in the line of duty.

105.    Defendant Durrant falsely stated in his report that Mr. Ford was "instigating and agitating the crowd to become bolder and move past the barricade." This false statement was clearly a *post hoc* rationalization intended to justify Durrant's agitated reactive use of illegal excessive force.

106.    Mr. Ford did not disobey a lawful command, and his speech and speech activity were protected under the First Amendment to the U.S. Constitution.

107.    Defendant Durrant also falsely stated in his report that "several members of the crowd beg[a]n to lift the barricades and advance toward us and our patrol cars with the barricades in hand." There is no evidence this occurred.

108.    Plaintiff Martin Allums, a BU leader, was at some point struck in the face by Defendant John Doe, while Mr. Allums was trying to assist a protester up from the ground, who was in danger of being trampled. After Mr. Allums quickly explained the situation, Defendant

---

[13] https://www.kezi.com/content/news/Police-are-being-blamed-for-something-they-have-no-control-over-man-says-571231501.html

Doe nodded at Mr. Allums; however, as Mr. Allums helped the person up, Defendant Doe struck Mr. Allums in the face, breaking his nose and causing other injuries.

109.    Several other protestors were hit in the face by members of SPD, who thrust their batons into the crowd repeatedly and indiscriminately.

110.    The Defendants selectively enforced the laws depending whether they thought a person supported or opposed Black Unity and/or Black Lives Matter -- in essence whether they were for or against anti-racist and/or abolitionist ideology. For example, Defendant Quinones stated in his report: "Under normal circumstances [Geena] Shipman's behavior would have constituted Disorderly Conduct II but her behavior was not isolated [sic] enough to mandate arrest."

111.    In addition to injuring Plaintiffs, and providing information to Anti-BLM harassers -- many of whom clearly wished to injure, provoke, and intimidate Plaintiffs -- Defendants repeatedly allowed those harassers, and others they perceived to be anti-BLM or "pro-cop," to traverse and remain behind police barricades, while violently enforcing the barricade against Plaintiffs. As had occurred prior to July 29, SPD overtly demonstrated apparent bias and disparate treatment between the two distinct groups present on July 29, 2020.

112.    Body camera footage worn by Defendant Conrad on July 29, 2020, records Conrad, and upon information and belief, Defendant Conrad's partner, Defendant Casarez, discussing the march and Plaintiffs. Defendant Casarez made the following statements indicating animus towards plaintiffs:

      A.   Casarez: "I want that fat bitch to go to jail." [referring to a Black Unity

          supporter].

B.  Casarez: "These fuckers, I wanna lock even more of em' up." [statement made after Plaintiff Ford and other BU supporters were arrested.].

C.  Casarez: "Finally, we did something though! Finally! Fuck yeah, dude! When they fucking took that thing off, both things -- you good? -- and they were trying to shove it back on us . . . and it was comin' over and I fuckin grabbed it and just chucked it back, that stupid 12 year old [inaudible] took it right in the fuckin face [laughter] like just right [inaudible]. . . . At least we fuckin' took a stand, just once [laughter]."

D.  Casarez: "Five of em', baby! Five down, how many to go? As many as we need."[14]

E.  A female voice on dispatch stated: "There are a couple of MMA[15] fighters with white pride shirts trying to start fights in the back," to which Casarez retorted, "Jesus Christ [inaudible]. . . . Let's minimize that a little bit, Jesus Christ." A male voice on dispatch also referred to the Anti-BLM mob as "patriots."

113.    At a minimum, these statements demonstrate that Defendants were aware the Anti-BLM mob were racially motivated to engage in violence, and that they had some training and experience in fighting techniques designed to injure others.

114.    In one instance, as Defendant Conrad left the intersection of 67th and Dogwood Streets, he informed Anti-BLM harassers that the protestors were headed "east."

---

[14] It is unclear if it was Conrad or Casarez who said "as many as we need."
[15] https://www.britannica.com/sports/mixed-martial-arts

115.    In another instance, as Defendant Conrad approached the police blockade at 68th and Dogwood Streets, a person standing on the street approached Defendant Conrad and said: "I wanna say something, can I just say something? Two blocks over, four trucks of people hopped in their trucks with guns and they rolled up and said were goin' shoot these fuckin niggers."

116.    Defendant Conrad responded: "Okay, okay, what am I supposed to do about it?" The person responded "So you don't care . . . ?" To which Defendant Conrad said "I can't do anything about it right now." Defendant Conrad then appeared to try to turn his body-camera off, but the interaction was recorded. Defendant Conrad then proceeded to stand at the 68th and Dogwood barricade with numerous other officers for about nine minutes; he did not inform any other officers of what he had heard, and in his written report did not document the threat of racially motivated violence.

117.    In yet another instance, a Black woman, acting as press and wearing a shirt clearly marked in large letters "PRESS," asked Defendant Seanor why she was not permitted to walk past a barricade at 68th and Dogwood, where apparent Anti-BLM harassers were walking through and congregating behind the barricade. Defendant Seanor told the woman that the members of the Anti-BLM mob were allowed to go where they please because they "don't hate all cops."

118.    In another clear instance of discrimination, animus, and selective enforcement by Defendants, Defendants casually watched without intervention, indicating tacit approval, as Plaintiffs Mya Lansing and Austin Johns were beaten and harangued by Anti-BLM harassers in the immediate vicinity of ample police presence.

119.    Plaintiffs Mya Lansing and Austin Johns were at the protest not as protestors but in order to film and document the police, activity protected under the First Amendment.

120.     At least three members of the Anti-BLM mob attacked Mya Lansing and Austin Johns in full view of some of the Defendants.

121.     One of the Anti-BLM harassers, Richard Dwayne Elce, struck Austin Johns in the face, with the end of a 6- to 8-foot-long flagpole, in plain view of several Defendants, including Defendant Turner.  Elce has a prior conviction for assault.

122.     When Johns and Lansing explained to Defendant Turner that they had just been assaulted, Defendant Turner pushed Plaintiffs Johns and Lansing with his baton and ordered them to keep moving. As Defendant Turner was pushing Johns and Lansing away, another member of the Anti-BLM harassers ran up and grabbed Austin Johns' camera and threw it toward a nearby fence. Mr. Johns attempted to retrieve his camera, but the man pushed Mr. Johns to the ground and attempted to pin him there. Again, this was in full view of Defendant Turner and other Defendants.

123.     Mya Lansing and Austin Johns then asked Defendant Turner and other Defendants if the police were going to do anything about the man who had just assaulted them and stolen their camera. Defendant Turner then grabbed Austin Johns by his shirt, pulling Johns toward him while using his baton to jab Mr. Johns in the chest. While this was occurring, Defendant Turner chastised Mr. Johns for even being present at the event.

124.     Neither Mr. Elce, nor any of Plaintiffs' other attackers, were arrested at that time, despite breaking the law in front of police, with victims present who wanted to pursue charges. Mr. Elce was captured on video later in the evening continuing to threaten and attack people with his flagpole, allowed by police to continue to assault with impunity. Below is a photo of Mr. Elce

threatening someone with his flag pole after he assaulted Plaintiffs Lansing and Johns:



125.    Defendant Turner omitted from his report any mention of the assault and harassment of Ms. Lansing and Mr. Johns by the Anti-BLM harassers he had observed. He wrote that Ms. Lansing and Mr. Johns were "protestors," when in fact both were present as documentarians to film the police; neither had done anything to express their political affiliation other than not clearly being a part of the Anti-BLM harassing mob and, in Plaintiff Lansing's case, being BIPOC.

126.    Despite having just witnessed the intimidation and violence directed at the plaintiffs, Defendant Turner and other Defendants pushed the Plaintiffs farther down 67th Street where members of the Anti-BLM mob had gathered *en masse* -- in part at the behest of Defendants. Plaintiffs, including but not limited to Ms. Lansing and Mr. Johns, continued to face intimidation, threats, and harassment as they fled the area.

127.    Defendants chose to selectively enforce laws, turn a blind eye to person-crimes against BLM marchers, and discriminate against those they disagreed with, while allowing members of the Anti-BLM mob to engage in violence without consequence. The actions and inactions of the Defendants demonstrate that members of the mob were correct when they repeatedly stated that "the cops don't care" if they assaulted the Plaintiffs or that the "cops are on our side" -- a phrase that was also stated by white supremacists who stormed the U.S. Capital on January 6, 2021.

128.    As the police-created chaos at the blockade subsided, law enforcement barricades forced protestors, including Plaintiffs, to turn around and walk back toward where a number of the Anti-BLM harassers had assembled in a gauntlet-like manner. This mob consisted of well-known neo-Nazis such as violent felon Corey Wyatt and other known members of violent far-right groups such as the Proud Boys and The American Patriot Society.

129.    Defendants knew or should have known some of the harassers' propensity for violence, based on their actions during Plaintiffs' march, as well as the harassers' actions in the past toward BLM supporters and, for some of them, past convictions for violent crimes. In addition, many of the Anti-BLM mob were openly carrying weapons, including firearms, as

further acts of intimidation.



      130.    Despite that knowledge, Defendants pushed Plaintiffs and other protesters into

that mob of harassers. The results were predictable: Black Unity members and other protestors

were violently attacked. These attacks included but were not limited to verbal intimidation and

threats, menacing and blatant display of weapons, and actual physical assaults by the harassers,

including striking, pushing people to the ground, and spraying them with wasp spray.[16] Upon information and belief, some of the Defendants observed these assaults, while others left the harassers to their work, intentionally leaving the area.

131.    Defendant Wilson stated in his report that the Anti-BLM mob "worked with police to assist" law enforcement after the protest.

132.    The harassers heartily thanked their boys in blue as the Black Unity vehicles departed, choosing to avoid further injury and confrontation. At that time, a supporter of the BLM march was evacuated by ambulance after she was violently shoved to the ground by one of the harassers, forcefully striking her head on the pavement.  This disturbing assault was captured on video.  The assailant was not arrested by Defendants at the time.

133.    The message from Defendants to Plaintiffs and other BLM supporters was clear: If you protest racist symbols (the noose) and/or the police treatment of Black lives in our town, we will not only attack you, but we will also allow and even encourage you to be attacked by Anti-BLM harassers.

134.    This was not the first time that the Defendants sought to prevent and chill Plaintiff's speech. On June 26, 2020, Plaintiff's attempted to peacefully protest in the Thurston neighborhood.

135.    During the June 26 protest, numerous unknown SPD officers formed a line at the intersection of 66th Street and E Street, arbitrarily cutting off the march, preventing Plaintiffs from exercising their First Amendment rights. No known arrests were made during this preemptive foreclosure of First Amendment activities.

---

[16] *See* https://www.patriotheadquarters.com/waspsprayasdefense-survival/.

136.    Later in the evening of June 26, 2020, Black Unity Plaintiffs marched peacefully in downtown Springfield. A truck containing a PA system drove slowly ahead of the march with BU leadership in the truck's bed.

137.    SPD officers again formed a line on Sixth Street, under the Springfield Public Library's parking structure, in order to keep Plaintiffs and their supporters from marching.

138.    At one point, an unknown SPD officer reached inside the Black Unity truck and removed the keys from the ignition. The truck remained stuck in the middle of the road until an SPD officer eventually returned the key. No arrests occurred during this incident.

139.    Defendants' prior unconstitutional foreclosures of Plaintiffs' protected First Amendment rights to assemble and march in nonviolent protest illustrate Defendants' animus and intent to prevent and chill Plaintiffs from conveying their political message.

140.    Further, as Geena Shipman noted with glee in her video on July 29, the police were on the "side" of the Anti-BLM mob — that was clear to the members of the harassing mob on July 29, 2020, and it was clear to Plaintiffs and the general public.

141.    Upon information and belief, in addition to what is alleged *supra*, the participation of each of the named Defendants during the July 29, 2020, incident was as follows:

LEADERSHIP

Chief Lewis -- Planning; was physically present, assisting in the barricading and arrests at 67th and Dogwood.

Lt G.J. Crolly -- Planning; moved up behind the crowd control line at 67th and Dogwood and held back barriers after Tyshawn Ford's arrest.

Lt Matthew Neiwart -- Planning; physically present.

Lt Rappe - Planning; present at 67th and Dogwood- enforced the barricade; ordered and assisted in the unlawful arrest and force used against Mr. Ford.

Sgt D.C. Grice -- Planning; made a public statement at 67th and Dogwood improperly asserting an unlawful assembly. On information and belief Defendant Grice was SPD's internal affairs sergeant at the time of this incident and would have been responsible for investigating police misconduct.

Sgt P.P. Kirkpatrick -- Planning; provided the Anti-BLM harassers protection and information about where the protesters were going to be corralled; helped enforce the barricades on 67th and Dogwood; responded to S. 68th for "traffic control."

Sgt Keith Seanor -- told a Black videographer that she could not go past the barricade, but that the Anti-BLM harassers could, because "they don't hate all cops."

OFFICERS

A.A. Amundson -- Enforced the barricade at 67th and Dogwood and assaulted/pushed protestors back with his baton.

T.J. Bazer -- Enforced barricades at 67th and Dogwood; delivered "focused blows."

B.K. Bragg – Enforced the barricade at 67th and Dogwood; struck protestors; assisted in the arrest and unlawful use of force against Mr. Ford.

Joseph N. Burke -- Heavily involved pre-event, as discussed *supra*; made racist statements while on duty, has apparent personal associations with racist residents; went back and forth between enforcement at the barricades at 67th and 68th.

D.L. Casarez -- Enforced the barricade on 67th and Dogwood; responded to 68th and Dogwood with Defendant Conrad after Tyshawn Ford was arrested; upon information and belief he heard numerous armed Anti-BLM harassers saying "they would shoot these fucking niggers," but took no action.

R.J. Conrad -- Enforced the barricades at 67th and 68th; his body-worn camera indicates he also heard of numerous armed Anti-BLM harassers saying "they would shoot these fucking niggers" but did not mention that in his report or take any action; based upon information and belief, told the Anti-BLM harassers where the march was being pushed.

B.P. Dunn -- Enforced the barricade at 67th and Dogwood; pushed protesters.

Bronson Durrant - See *supra*.

J. Garcia-Cash -- Enforced the barrier on 67th and Dogwood and "fought" protestors according to his report; assisted in arresting Tyshawn Ford.

T.J. Murray -- Set up barricades; filmed events.

J.J. Myers -- Enforced the barricade at 67th and Dogwood; jabbed at protestors, deployed

a pepper ball launcher "as a visual deterrent towards future riotous behavior" after Tyshawn Ford was arrested.

C.J. O'Leary -- Enforced barricades at 67th and Dogwood; pushed marchers.

Officer Jared Quinones -- did not state any specific involvement but was present to help enforce; stated in his report, "Under normal circumstances [Geena] Shipman's behavior would have constituted Disorderly Conduct II but her behavior was not isolated [sic] enough to mandate arrest."

R.A. Rosales -- Used a pushed-over barricade to push protestors back at 67th and Dogwood; also went to 68th and Dogwood to enforce that barricade.

E.A. Sorby -- Enforced the barricades at 67th and Dogwood; struck protestors.

M. J. Thomsen -- Enforced the barricades at 67th and Dogwood; made numerous arrests; assaulted protesters.

L.E. Turner -- Went back and forth between enforcement on 67th and 68th, but mostly appeared to enforce the barricade on 68th; pushed Mya Lansing and Austin Johns, and other events as alleged *supra*.

J.M. Wilson -- Enforced the barricade at 67th and Dogwood; stated:  "Also in the area was an equally large group of pro-police protestors who responded to the area to protect the neighborhood and stand up for [sic] the national riots"; "The pro police protestors positioned themselves at S 69th Place and Bluebelle Way, but worked with police to assist Black Unity with leaving the area."

Detective Weaver # 4854 -- Upon information and belief assisted with placing barricades; engaged in undercover surveillance of a political group engaged in lawful First Amendment activities.

## CAUSES OF ACTION

### FIRST CLAIM
### FIRST AMENDMENT -- UNCONSTITUTIONAL RESTRAINT

#### Count 1
#### *Monell*/Municipal Liability -- 42 U.S.C. § 1983
#### First Amendment
#### Unconstitutional Restraint of Marches and Protests
#### by all Plaintiffs against the City of Springfield

142.    Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth

here.

143.    Defendant City of Springfield has failed to properly train its officers, agents, and employees on how to constitutionally respond to marches and protests; and/or has an official practice, policy, or custom of allowing and/or ratifying unconstitutional restraint of marches and protests. The City of Springfield has arbitrarily declared marches and protests and other activity protected by the First Amendment to be "unlawful assemblies," and has allowed individual officers to do so, based on their own personal political opinions and/or the degree in which they are offended by the opinions of protestors (particularly abolitionists), and to therefore blockade, redirect, and "kettle" (corral)[17] crowds, thereby interfering with and halting marches and protests when SPD officer(s) disagree with the viewpoint of those First Amendment activities.

144.    The policy, practice, and custom of Defendant City of Springfield, as well as its failure to train and supervise employees and agents, regarding the declaration, implementation, and enforcement of such "unlawful assemblies," amounts to deliberate indifference to the rights of Plaintiffs and caused violations of Plaintiffs' rights to equal protection under the laws.

145.    On July 29, 2021, such unconstitutional activity included

a)    arbitrarily and unlawfully designating Plaintiffs' protest as an "unlawful assembly";

b)    unlawfully and preemptively preventing Plaintiffs' exercise of protected First Amendment activity, without notice, by blockading and kettling, after tacitly approving the march without the need for a permit;

c)    chilling and interfering with Plaintiffs' lawful exercise of their First Amendment rights through intimidation, show of force, and use of force; and

---

[17] *See* https://en.wikipedia.org/wiki/Kettling.

d)       rerouting the march so that the marchers were forced into the ranks of the violent

Anti-BLM mob.

146.    Plaintiffs were engaged in activity protected by the First Amendment -- assembly,

protest of racism, abolitionist and other expression, and presentation of grievances against the

government.

147.    Defendants retaliated against Plaintiffs for engaging in protected speech activity.

By retaliating against Plaintiffs for their protected speech activity, Defendants, acting under color

of state law, also caused Plaintiffs to be deprived of their First Amendment rights.

148.    Defendants' creation, defense, and enforcement of barricades that preemptively

circumvented a lawful and peaceful march, as well as the use of arrests, threats of arrest,

excessive force, and threats of force, prevented Plaintiffs' lawful protest and assembly activity

from continuing, and were an unreasonable time, place, and manner restriction on Plaintiffs' First

Amendment rights, violating Plaintiffs' rights under the First Amendment by prohibiting their

lawful protest, assembly, and other speech activity; and chilling or attempting to chill the First

Amendment activity of Plaintiffs and other reasonable people from engaging in such activity in

the future.

149.    In addition, Defendants' use of force, threats of force, arrests, and threats of arrest

were acts that would chill a reasonable person from continuing to engage in constitutionally

protected activity.

150.    Plaintiffs' protected activity and the beliefs they expressed were a substantial or

motivating factor in the Defendants' conduct.

151.    Defendant City is directly liable to Plaintiffs for its unconstitutional policies,

customs, or practices; and/or for failing to properly train, supervise, or discipline its officers.

152.    As a direct and proximate result of the actions and omissions described in this complaint, plaintiffs incurred noneconomic damages, in an amount to be determined at trial.

153.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count 2
### by All Plaintiffs against all Individual Defendants

154.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

155.    By their actions as described herein, each of the individual Defendants, under color of statute, ordinance, regulation, custom, or order, subjected all Plaintiffs to the deprivation of rights, privileges, or immunities secured by the Constitution, namely, Plaintiffs' First Amendment rights to assemble, protest against racism, call for abolition, and other political expression, and present grievances against the government.

156.    As a direct and proximate cause of the actions described herein, Plaintiffs sustained noneconomic damages in an amount to be ascertained according to proof at trial.

157.    The actions of the individual Defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted against Plaintiffs. As a result of this intentional conduct, Plaintiffs are entitled to punitive damages against the individual Defendant, in an amount sufficient to punish them and to deter others from like conduct.

158.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM**
**EXCESSIVE FORCE**
**Fourth and Fourteenth Amendment**

**Count 1**
***Monell*/Municipal Liability – 42 U.S.C. 1983**
**by all Plaintiffs against City of Springfield**

159.    Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

160.    Defendant City of Springfield has an official policy, practice, or custom of allowing its officers to use an unconstitutional level of force when effectuating arrests and when dealing with marchers and protesters; and/or has failed to properly train officers to use an appropriate level of force; and/or has allowed numerous other similar incidents; and/or has encouraged or acquiesced in this unlawful behavior, and/or failed to adequately supervise or discipline their officers regarding the unconstitutional use of force, thus evincing deliberate indifference to Plaintiffs' constitutional rights, sufficient to support a verdict that the City caused the use of excessive force against Plaintiffs.

161.    Defendant City is directly liable to Plaintiffs for its unconstitutional policies, customs, or practices; and/or for failing to properly train, supervise, or discipline its officers.

162.    Such unconstitutional policies and failure to train, supervise, and discipline violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to be free from the use of excessive force by police officers.

163.    As a direct and proximate result of the actions and omissions described in this complaint, plaintiffs were physically injured, causing economic and noneconomic damages, in an amount to be determined at trial.

164.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Count 2**
**by Plaintiffs Ford, Allums, Lansing, and Johns,**
**against Defendants Turner, Durrant, Garcia-Cash, Bragg, Rappe, and Doe**

165.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

166.    By their actions as described herein, Defendants Turner, Durrant, Garcia-Cash, Bragg, Rappe, and Doe, under color of statute, ordinance, regulation, custom, or order, subjected Plaintiffs Allums, Ford, Lansing, Johns, to the deprivation of rights, privileges, or immunities secured by the Constitution, namely, Plaintiffs' rights to freedom from excessive force or threat of force.

167.    As a direct and proximate cause of the actions described herein, Plaintiffs sustained economic and noneconomic damages, including physical pain and suffering; loss of liberty; damage and/or loss of property, and wage loss, all in an amount to be ascertained according to proof at trial.

168.    No reasonable officer would believe that such conduct was lawful or constitutional.

169.    The actions of Defendants Durrant, Turner, Garcia-Cash, Bragg, Rappe, and Doe, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted against Plaintiffs. As a result of this intentional conduct, Plaintiffs are entitled to punitive damages against those Defendants, in an amount sufficient to punish them and to deter others from like conduct.

170.     Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM**
**FOURTH AND FOURTEENTH AMENDMENT RIGHTS**
**WRONGFUL ARREST**

**Count 1**
*Monell*/**Municipal Liability – 42 U.S.C. 1983**
**by Plaintiff Ford against City of Springfield**

171.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

172.     Defendant City of Springfield has an official policy, practice, or custom of allowing its officers to wrongfully arrest people for speaking, marching and protesting, where there is no probable cause to believe a crime has been committed; and/or has failed to properly train officers to refrain from making such arrests; and/or has allowed numerous other similar incidents; and/or has encouraged or acquiesced in this unlawful behavior, and/or failed to adequately supervise or discipline their officers regarding such unconstitutional arrests, thus evincing deliberate indifference to Plaintiff Ford's constitutional rights, sufficient to support a verdict that the City caused the wrongful arrest of Plaintiff Ford.

173.     Defendant City is directly liable to Plaintiff Ford for its unconstitutional policies, customs, or practices; and/or for failing to properly train, supervise, or discipline its officers.

174.     Such unconstitutional policies and failure to train, supervise, and discipline violated Plaintiff Ford's right to be free from wrongful arrest, under the Fourth and Fourteenth Amendments.

175.    As a direct and proximate result of the actions and omissions described in this complaint, Plaintiff Ford was wrongfully arrested, causing economic and noneconomic damages, in an amount to be determined at trial.

**176.**    Plaintiff Ford was required to hire attorneys to represent him in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Count 2**
**by Plaintiff Ford, against**
**Defendants Durrant, Rappe, Garcia-Cash, and Bragg**

177.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

178.    Defendants' conduct described in this Complaint violated the clearly established rights of Plaintiff Ford to be free from unreasonable seizure, including a right to be free from arrest or detention without reasonable suspicion or probable cause under the Fourth and Fourteenth Amendments to the U.S. Constitution.

179.    The unconstitutional declaration of an "unlawful assembly" and order to disperse, described herein, formed the purported basis for the arrest of Plaintiff Ford. In addition, Defendants retaliated against the content of Mr. Ford's speech and targeted him as a known leader of Black Unity.

180.    Defendant Durrant and other Defendants who assisted with the arrest of Plaintiff Ford lacked probable cause to arrest him.

181.    Defendants knew or should have known that arresting Plaintiff Ford would deprive him of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

182.    As a direct and proximate cause of the actions described herein, Plaintiff Ford sustained economic and noneconomic damages, including loss of liberty, all to his damage in an amount to be ascertained according to proof at trial.

183.    The actions of the individual Defendants were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff Ford, such that an award of punitive damages is appropriate.

184.    Plaintiff Ford was required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FOURTH CLAIM**
**VIOLATION OF 42 U.S.C. § 1983**
**CONSPIRACY TO DEPRIVE CIVIL RIGHTS**
**by all Plaintiffs, against all Individual Defendants**

185.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

186.    By their actions in preparation for, and during, the July 29, 2020, march, the individual Defendants conspired, and acted in concert, with each other and with the Anti-BLM mob, to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1983.

187.    The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to the acts alleged *supra*.

188.    The Defendants met and planned before the march, formulating a plan to limit and/or quell, and/or chill the marchers' First Amendment activity, and to foment the Anti-BLM harassers, who would violently interfere with BU's march and/or activities; and were engaged in a joint venture, assisting each other in the performance of the various actions described herein, lending their physical presence and support and authority of their office to each other during these events.

189.    The conspiracy targeted and harmed the Plaintiffs' rights protected under the First, Fourth, and Fourteenth Amendments, as described in detail herein.

190.    The individual Defendants are liable to Plaintiffs under 42 U.S.C. § 1983 for the damages Plaintiffs sustained, as alleged herein.

191.    The actions of the individual Defendants were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiffs, such that an award of punitive damages is appropriate.

192.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FIFTH CLAIM**
**VIOLATION OF 42 U.S.C. § 1985(3)**
**CONSPIRACY TO DEPRIVE CIVIL RIGHTS, BASED UPON RACE OR CLASS**
**by all Plaintiffs, against all Individual Defendants**

193.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

194.    By their actions in preparation for, and during, the July 29, 2020, march, the individual Defendants conspired, and acted in concert, with each other and with the Anti-BLM mob, to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3).

195.    The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to the acts alleged *supra*.

196.    This conspiracy targeted Black people, and/or their supporters, and/or abolitionists, and/or civil rights marchers, all of which groups are protected classes under 42 U.S.C. § 1985(3).

197.    The Defendants entered into the conspiracy to take these actions because of animus against one or more identifiable groups -- Black activists, abolitionists, civil rights

marchers, and their supporters; the Defendants had a meeting of the minds between themselves and the Anti-BLM mob; and each of the Defendants acted in concert and/or participated in, advised, supported, and/or helped advance the conspiracy, with the specific intent to cause harm to the Plaintiffs.

198.    The Defendants met and planned before the march, formulating a plan to limit and/or quell, and/or chill the marchers' First Amendment activity; and were engaged in a joint venture, assisting each other in the performance of the various actions described herein, lending their physical presence and support and authority of their office to each other during these events.

199.    The conspiracy targeted Plaintiffs' rights to be free from interference with their First Amendment activities, from excessive force, and from false arrest, as alleged herein, and Defendants' actions directly and unlawfully interfered with these rights.

200.    In addition, as alleged *supra*, Defendants' conspiracy targeted and violently interfered with Plaintiffs' right to be free from racial violence by private parties, as protected by the Thirteenth Amendment of the United States Constitution, and in fact facilitated the Anti-BLM mob's harassment, violent assaults, and other hate crimes upon the Plaintiffs and supporters.

201.    The individual Defendants are liable under § 1985(3) for Plaintiffs' noneconomic damages.

202.    The actions of the individual Defendants were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiffs, such that an award of punitive damages is appropriate.

203.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### SIXTH CLAIM
### VIOLATION OF 42 U.S.C. § 1986
### FAILURE TO PREVENT A CONSPIRACY TO DEPRIVE CIVIL RIGHTS
### by all Plaintiffs, against all Individual Defendants

204.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

205.    The individual Defendants violated 42 U.S.C. § 1986 by failing to meet their duty to prevent or aid in preventing conspiracies to deprive civil rights.

206.    Defendants knew that a violation of 42 U.S.C. § 1985(3) was about to occur or was occurring, had the power to prevent or aid in preventing it, and neglected or refused to prevent or aid in preventing it.

207.    Law enforcement's failure to stop unlawful violence by a Section 1985(3) conspiracy when they know it is about to occur is a quintessential Section 1986 violation.

208.    As discussed in detail *supra*, the conspiracy to harm and restrain Plaintiffs' civil rights, carried out by Anti-BLM harassers as well as law enforcement, consisted of barricading, kettling, threatening violence, using violence, and arresting peaceful civil rights activists. Further, Defendants informed Thurston residents that a march was planned in the neighborhood, inciting fear and animus while also seeking the "help" of civilians to suppress and violate Plaintiffs' constitutional rights.

209.    Defendants knew or should have known that such violence was planned, and could have taken actions to stop or limit that violence. Defendants willfully or negligently took no such action, and in fact the evidence shows Defendants incited and encouraged the Anti-BLM mob to engage in terrorizing violence and threats of violence.

210.    Defendants could and should have refused to comply with unlawful orders, refused to use force or arrest the Plaintiffs, and/or refused to order or allow officers under their command to carry out unlawful acts; and instead could and should have affirmatively ordered officers under their command to shield Plaintiffs from unlawful acts, protected Plaintiffs from the Anti-BLM mob, and/or attempted to appeal to superiors to take a different course of action.

211.    As a result of Defendants' failure to prevent or aid in preventing the Section 1985 conspiracy, Plaintiffs were injured, and their rights were violated, as alleged herein, and Plaintiffs suffered noneconomic damages.

212.    The individual Defendants are liable under § 1985(3) for damages.

213.    The actions of the individual Defendants were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiffs, such that an award of punitive damages is appropriate.

214.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court:

(a)    Exercise jurisdiction over Plaintiffs' claims and grant each of them a jury trial;

(b)    Award Plaintiffs economic and non-economic damages, in an amount to be ascertained according to proof, and interest on said sums from the date of judgment;

(c)    Award Plaintiffs punitive damages against the individual Defendants in an amount sufficient to punish them and deter others from like conduct;

(d)    Award Plaintiffs' reasonable attorney's fees and costs as provided by 42 U.S.C. § 1988; and

(h)        Based upon the pattern of misconduct displayed by City of Springfield and its

officers as alleged herein, grant the following declaratory and injunctive relief:

(1) order a five-year plan[18] to reform the Springfield police department, including

the implementation of an independent monitor to oversee and address systemic racism,

failures within the recruitment, hiring, training, promotion, supervision and disciplinary

practices that result in civil rights violations;

 (2) mandate community policing reforms; including emphasis on impartial

policing, and investigation and enforcement of hate crimes; and

(3) mandate use of force policy reforms, including but not limited to banning the

use of force against nonviolent people exercising constitutional rights as well as adequate

training regarding the constitutional rights of the people to assemble and exercise those

rights.

(i)        Grant Plaintiffs such other and further relief as this Court deems just and

appropriate.

DATED:  March 8, 2021.

  /s/  Lauren Regan
Lauren Regan, OSB # 970878
Email: lregan@cldc.org

  /s/  Marianne Dugan
Marianne Dugan, OSB # 932563
Email:  mdugan@cldc.org

  /s/  Sarah Alvarez
Sarah Alvarez, OSB # 182999
Email:  salvarez@cldc.org

---

[18] Such relief has been ordered in other lawsuits against police departments. *See,* e.g.,
http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/09/Illinois-v.-Chicago-Final-Consent-Decree-with-signatures.pdf.

CIVIL LIBERTIES DEFENSE CENTER
1430 Willamette Street #359
Eugene, OR  97402
Telephone:  541.687.9180
Fax: 541.804.7391