IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| BLACK UNITY; MARTIN ALLUMS; TYSHAWN FORD; AUSTIN JOHNS; MYA LANSING; JAZMINE JOURDAN, | **OPINION & ORDER** |
| Plaintiffs, | Civ. No. 6:21-cv-00346-AA |
| v. | |
| CITY OF SPRINGFIELD; CHIEF RICHARD LEWIS; LIEUTENANT TOM RAPPÉ; SGT. DAVID GRICE; SGT. PETE KIRKPATRICK; BRIAN K. BRAGG #380; JOSEPH BURKE #365; DANIEL CASAREZ #215; ROBERT J. CONRAD #286; BRONSON DURRANT #382; CONNOR J. O'LEARY #395; ERIC A. SORBY #376; L.E. TURNER #328; DETECTIVE ROBERT WEAVER #4854; KODY LANE; TINA PARDEE, in their individual capacities, | |
| Defendants. | |

_____

AIKEN, District Judge:

Plaintiffs Black Unity, Martin Allums, Tyshawn Ford, Austin Johns, Mya Lansing, and Jazmine Jourdan (collectively "Plaintiffs") bring claims under 42 U.S.C. §§ 1983, 1985(3), and 1986 against the City of Springfield ("the City") and members of the Springfield Police Department, Chief Richard Lewis, Lieutenant Tom Rappé, Sgt. David Grice, Sgt. Pete Kirkpatrick, Brian K Bragg, Joseph Officer Burke, Daniel Casarez, Robert J. Conrad, Bronson Durrant, Connor J. O'Leary, Eric A. Sorby, L.E.

Page 1 – OPINION AND ORDER

Turner, Detective Robert Weaver, Kody Lane, and Tina Pardee, in their individual capacities, for violations of Plaintiffs' First, Fourth, and Fourteenth Amendment rights. *See* Second Am. Compl. ("SAC"), ECF No. 59. Defendants and the City move for summary judgment on all claims. ECF Nos. 103, 104, 111. Plaintiffs move for partial summary judgment on sixteen of Defendants' affirmative defenses. ECF No. 109. For the reasons explained below, Defendants' Motions, ECF Nos. 104 and 111, are DENIED; the City's Motion, ECF No. 103, is DENIED; and Plaintiffs' Motion, ECF No. 109, is GRANTED in part and DENIED in part.

## BACKGROUND

This case arises in the context of the nationwide civil rights demonstrations that erupted after the May 25, 2020 police killing of George Floyd. SAC ¶¶ 12–15. "Like most cities in the U.S., the Eugene-Springfield area was home to several protests and demonstrations in the days, weeks, and months after Mr. Floyd's [death.]" *Id.* ¶ 16.

During the spring and summer of 2020, Black Unity was formed by a group of "like-minded people" in the Eugene-Springfield area who "were out in the streets frequently[]"and who "wanted to create a group that was more organized and had . . . a similar vision [or] understanding that protest is a part of activism to make a change[.]" Dugan Third Decl., Ex. X, Reyna Dep. 10:09–22, ECF No. 144-22.

In July 2020, Black Unity planned a street march to take place in Springfield on July 29, 2020. SAC ¶¶ 39, 40. Though one in a series of civil rights marches conducted by the group, the July 29 march was aimed mainly to protest a noose that

had been hung from a tree in a yard on Bluebelle Way in Springfield's Thurston Hills neighborhood, a house located across the street from a Black neighbor. *Id.*; Dugan Fourth Decl. ¶ 2(a), Video Ex. T, (Haug Video), ECF No. 147, 159; Weaver Decl., Ex. 1, ('Noose is a Nuisance' poster), ECF No. 112-1; Henderson Decl., Ex. 529, Allums Dep. 43:10–18, ECF No. 124-2. The Springfield Police Department ("SPD") learned about the march "a couple days prior[]" because SPD had been monitoring Black Unity's social media. Dugan Third Decl., Ex. C, Lewis Dep. 27:10–28:20, ECF No. 144-2; Ex. K, Monroe Dep. 17:17–18:09, ECF No. 144-10; Ex. G, Rappé Dep. 17:06– 18:04, ECF No. 144-6. Plaintiffs testified that the march was planned to start and end at Jesse Maine Park and "was intended to be within the [Thurston Hills] neighborhood[.]" Allums Dep. 41:04–21, 43:05–18, ECF No. 124-2; Dugan Third Decl., Ex. L, Lane Dep. 25:06–17, ECF No. 144-11.

Defendants testified that, without prior knowledge of the marchers' route, they decided to erect a barricade at the intersection of 67th Street and Dogwood Street, on the perimeter of the Thurston Hills neighborhood. Def. Mot. at 5; Lewis Dep. 25:01– 08, 39:18–40:04; Rappé Decl. at 4, ECF No. 106; Rappé Decl., Ex. 505, (Lieutenant Thomas Rappé, Springfield Police Dep't, Supp. Incident Rep. 20-05350,) at 1, ECF No. 106-1. Defendants did not advise Black Unity in advance that they intended to erect a barricade at 67th and Dogwood. Lewis Dep. 41:13–42:09.

On July 29, the marchers gathered at Jesse Maine Park in Springfield and began marching west toward 67th Street. Def. Mot. at 6, 18 (Google map screenshot). When the marchers reached 67th Street, they turned north and continued along the

perimeter of the Thurston Hills neighborhood. *Id.* When the marchers reached the intersection of 67th and Dogwood, they encountered a barricade manned by SPD officers in SWAT gear. Allums Dep. 42:09–43:24; 73:20–77:05, ECF No. 124-2; Lewis Dep. 32:09–13. The police barricade brought the march to a halt. One of Black Unity's leaders, Mr. Allums, testified:

> [T]here was so much stress that was caused by having the police there, that the leaders were stopping to talk—because I believe that the route that was planned was planned to go a little bit further past that barricade through a later exit of the neighborhood.
>
> And so one of the things that I had mentioned that we were going to do was we could have had a sit-in and just, like, sat there at—sat there in front of the barricade. . . . But at the same time, because there was— because it was so distressing, there was just a lot of confusion, a lot of chaos going on in the moment because nobody was expecting them to be there.

Allums Dep. 44:09–45:01, ECF No. 124-2.

> We had never gotten to a deciding point [about what we were going to do] because by the time—by the time we were discussing, folks had walked up to the barricade, and we had started hearing the cops say it was an unlawful protest. . . . [I]t turned into, like more of a crisis situation[.]

*Id.* at 74:08–18. The video footage shows that about ten minutes after the first marchers reached the barricade, two of the early-arriving marchers pushed the two eastern-most barricades forward a couple feet. *See* O'Leary Decl., Video Ex. 501 (O'Leary body worn camera ("BWC")), ECF Nos. 120, 158; O'Leary Decl., Video Ex. 502, (Detective Murray video), ECF Nos. 120, 158. The footage shows that marchers moved in and out of the gap between the barricades to talk to the officers, mainly to ask officers why the road was blocked. The officers ordered the marchers to stay

behind the barricades, then declared the march an unlawful assembly, and ordered the marchers to disperse.  Mr. Ford, who had moved through a gap in the barricades to the police side of the barricade to talk to the officers, was arrested.  During that arrest, officers moved to the marchers' side of the barricade, and a melee ensued. Video Ex. 501 at 16:24; Video Ex. 502 at 14:56.  About five minutes after SPD secured Ford and moved him to the police side of the barricade, Allums directed the marchers to turn east on to Dogwood Street to return to the park.  Video Ex. 501 at 21:30; Video Ex. 502 at 20:58.

This suit arises out of the events that occurred during the July 29 march and during the days and weeks that led up to it.  Plaintiffs allege that SPD and the City used a number of impermissible tactics to "restrict and stifle the First Amendment rights of protesters critical of police . . . and [critical of] race-related violence at the hands of law enforcement."  SAC ¶ 17.

## LEGAL STANDARD

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of establishing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. v. Fritz Cos.*,

210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)).

A court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). But "[c]redibility determinations [and] the weighing of the evidence" are jury functions, not those of a judge, ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

Organizational Plaintiff Black Unity and individual Plaintiffs Allums, Ford, Johns, Lansing, and Jourdan bring § 1983 claims against members of the Springfield Police Department (collectively, "SPD Defendants") and the City. Plaintiffs allege that Defendants and the City violated their First Amendment rights by implementing an unconstitutional prior restraint on speech and by retaliating against them for the content of their speech (First and Eighth Claims) and that Defendants violated their

Fourteenth Amendment procedural due process rights by collecting and maintaining information about their political views, associations, or activities absent criminal investigation or reasonable suspicion of criminal conduct in violation of ORS 181A.250 (Seventh Claim).

Individual Plaintiffs Allums, Ford, Johns, Lansing, and Jourdan allege that specific members of the SPD and the City violated their Fourth and Fourteenth Amendment rights for use of excessive force against them under 42 U.S.C. § 1983 (Second Claim). Individual Plaintiffs Ford and Jourdan have dismissed their false arrest claims (Third Claim).

All Plaintiffs allege that Defendants conspired to deprive them of their civil rights under 42 U.S.C. §§ 1983, 1985(3), and 1986 (Fourth, Fifth, and Sixth Claims).

Plaintiffs seek declaratory and injunctive relief, punitive damages, and reasonable attorney's fees and costs. SAC ¶ 253. Plaintiffs Allums, Ford, Johns, Lansing, and Jourdan seek economic and non-economic damages, as well as reasonable attorney's fees and costs, on their excessive force claims.

Defendants move for summary judgment on all of Plaintiffs' claims.[1] *See* Def. Mot., ECF No. 104; BW Mot., ECF No. 111; City Mot., ECF No. 103. Plaintiffs move for partial summary judgment on sixteen of Defendants' affirmative defenses. *See* Pl. Mot., ECF No. 109.

---

[1] Three summary judgment motions were filed. SPD Defendants' motion is designated "Def. Mot." Two SPD Defendants, Officer Burke and Detective Weaver, filed a separate summary judgment motion, which is designated "BW Mot." The City's summary judgment motion is designated "City Mot."

I.    *Standing*

As a preliminary matter, Defendants and the City assert that Black Unity lacks standing.[2]  Def. Mot. at 35; BW Mot. at 8; City Mot. at 7.  Neither Defendants nor the City dispute the standing of individual Plaintiffs—Allums, Ford, Lansing, Johns, and Jourdan.

Article III standing "is a necessary component of subject matter jurisdiction." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011).  "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

To satisfy Article III's standing requirements, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  An organization may assert associational standing to sue on behalf of its

---

[2] Defendants assert, as an affirmative defense, that "Black Unity has no legal capacity to sue."  Def. Answer ¶ 11, Seventh Defense; Weaver Answer ¶ 89, Fifth Defense.  Standing is not an affirmative defense; standing is a subject matter jurisdiction issue.  *Compare* Fed. R. Civ. P. 8 (affirmative defenses) *with* Fed. R. Civ. P. 12 (negative defenses including lack of jurisdiction); *see also Hernandez v. Cnty. of Monterey*, 306 F.R.D. 279, 289 (N.D. Cal. Apr. 14, 2015 ("[L]ack of standing is not in fact an affirmative defense[.]").

members or organizational standing to sue on behalf of itself.  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (citations omitted).  Black Unity asserts that it has both associational and organizational standing.  Pl. Resp. at 10, ECF No. 142.[3]

Defendants contend that Black Unity lacks standing because "at the time of the protest that forms the basis of this lawsuit, it did not legally exist."  Def. Mot. at 35; *see also* BW Mot. at 15l (same), City Mot. at 8 (same).

"The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint."  *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citing *Lujan*, 504 U.S. at 569 n.4); *see also Satanic Temple v. Labrador*, 149 F.4th 1047, 1053 (9th Cir. 2025) (quoting *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 803 (9th Cir. 2020) ("[W]e assess [a plaintiff]'s standing for prospective injunctive relief as of the time when [the plaintiff] commenced suit, relying on the allegations in the operative amended complaint.")).

Here, Black Unity filed its Complaint on March 8, 2021.  *See* Compl., ECF No. 1.  Claire Reyna, one of Black Unity's leaders, testified that the organization incorporated in November 2020.  Reyna Dep. 16:01–12; Reilly Decl., Ex. 1, Black Unity Nonprofit Articles of Incorporation, ECF No. 114-1; *see also* Dugan First Decl. ¶ 4, ECF No. 110 ("At the time Black Unity filed the complaint . . . the organization

---

[3] Plaintiffs first filed a Response to Defendants' Motion, ECF No. 141.  Plaintiffs then filed a "Corrected Response" to Defendants' Motion.  ECF No. 142.  This Opinion cites the Corrected Response, ECF No. 142, as "Pl. Resp."  Plaintiffs' Response to the Burke/Weaver Motion is designated "Resp. to BW."  Plaintiffs' Response to the City's Motion is designated "Resp. to City."

had incorporated."). Defendants do not dispute that Black Unity existed as an incorporated entity at the time it filed the Complaint.

### A.    *Associational Standing*

"The doctrine of associational standing permits an organization to 'sue to redress its members' injuries, even without a showing of injury to the association itself.'" *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (quoting *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). If an association satisfies the criteria, it "[may] pursue its members' claims, without joining those members as parties to the suit." *Id.*

Defendants argue that Black Unity lacks associational standing because Black Unity has "neither pled, nor can they prove their [standing] burden" and because "Black Unity has not brought this suit on behalf of its members, but rather in addition to its members[,]" thus subjecting defendants to "duplicate liability." BW Mot. at 9.

Black Unity has the burden to meet the three *Hunt* prongs. As to the first prong, Black Unity "must show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*,

713 F.3d 1187, 1194 (9th Cir. 2013). An organization must make "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). Black Unity brings claims against Defendants and the City—(1) First Amendment prior restraint for barricading the July 29 march route; (2) First Amendment retaliation against its members for expressing views critical of police mistreatment of Black people; (3) Fourteenth Amendment Procedural Due Process violation for collecting and maintaining data about its members' political views, associations, or activities in violation of ORS 181A.250—and, against Defendants, (4) conspiracy to deprive its members of their civil rights in violation of §§ 1983, 1985(3), and 1986.

Black Unity meets the first *Hunt* prong. Black Unity contends that two of the named plaintiffs, Martin Allums and Tyshawn Ford, are Black Unity members. SAC ¶¶ 23, 24. Claire Reyna and Sophia/Kinaya Haug, whose names arise in this suit, are also Black Unity members but are not named plaintiffs. Dep. 9:08–10, 11:09–18, ECF No. 144–22. Ford and Allums allege that Defendants and the City used excessive force and took other steps to chill the exercise of their First Amendment rights, SAC ¶¶ 168–79, 151–67, and to retaliate against them for the exercise of those rights, *id.* ¶¶ 241–53, and as part of a conspiracy to deprive them of their civil rights, *id.* ¶¶ 195–224. Allums and Ford each alleges that their First and Fourteenth Amendment injuries are fairly traceable to Defendants and the City (by policy, practice, or custom) and are redressable by the requested relief. *See* SAC ¶ 253(h) (seeking declaratory and injunctive relief and institution of policing reforms). Black

Unity member Reyna also attended the July 29 march and was allegedly deprived of her First and Fourteenth Amendment rights. And both Reyna and Haug were allegedly deprived of their liberty interests by Defendants and the City (by policy, practice, or custom), which collected and maintained information about their political views, associations or activities in violation of ORS 181A.250. Black Unity alleges that Defendants entered Haug's license plate data into an SPD database that tracked vehicles associated with Black Unity marches. SAC ¶¶ 43–46, 54, 230; Pl. Resp. at 29; Dugan Third Decl., Ex. Q, (Officer Joseph Burke, Springfield Police Dep't, Incident Rep. 20-05312,) at 6, ECF No. 144-16. And Black Unity alleges that Defendants "infiltrated Black Unity and joined the march undercover, pretending to be supporters of the march, and while doing so, collected and maintained information" about members including Plaintiffs in violation of ORS 181A.250. SAC ¶ 230. The evidence reveals that one of the undercover detectives filmed Reyna giving a speech during the July 29 march absent criminal investigation or reasonable suspicion of criminal conduct. Dugan Third Decl., Ex. M, Weaver Dep. 56:25–57:09, ECF No. 144-12.

The second *Hunt* prong requires a plaintiff to show that "the interests it seeks to protect are germane to the organization's purpose." *Hunt*, 432 U.S. at 343. Black Unity meets the second *Hunt* prong. Black Unity brings claims for violation of its members' First and Fourteenth Amendment rights, civil rights, and due process rights. Black Unity alleges that it is "primarily engaged in advocating for racial justice[,]"and that it "seeks equal treatment of Black lives through education,

awareness[,] and policy change . . .  through protest, engagement[,] and abolition." SAC ¶ 22.  Plaintiffs contend that "[t]he rights and claims asserted by [them]—equal and fair treatment by Springfield police—are essential to Black Unity's racial justice mission."  Pl. Resp. at 14 (citing First Dugan Decl., Black Unity mission statement, Ex. A at 4, ECF No. 110-1; Reyna Dep. at 10:04–22, 17:07–22, ECF No. 144-22). Defendants do not challenge Black Unity's racial justice mission nor do they challenge the means (protest, education, and engagement) used to carry out that mission.  The Court concludes that Black Unity's defense of its members' First Amendment rights, civil rights, and due process rights is core to its mission and the methods it uses to effect that mission.

The third *Hunt* prong requires that Black Unity show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt*, 432 U.S. at 343.  The third prong is not a constitutional requirement but is instead prudential.  *United Food*, 517 U.S. at 557.  The third prong asks a court to focus on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution."  *Id.*  "[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."  *Hunt*, 432 U.S. at 342–43.

Black Unity meets the third *Hunt* prong.  Generally, associational standing is precluded where an organization seeks monetary damages on behalf of its members.

*United Food*, 517 U.S. at 554.  This is so because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975).  But associational standing is not precluded where an organization seeks declaratory and injunctive relief because such prospective relief does not require "individualized proof from the members[.]"  *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. California*, 159 F.3d 1178, 1181 (9th Cir. 1998).  Here, Black Unity does not seek monetary damages for its members.  It seeks to institute policing reforms to correct "the pattern of misconduct displayed by City of Springfield and its officers." SAC ¶ 253(h).  Such prospective declaratory and injunctive relief will inure to the benefit of Black Unity's  members.

Black Unity also seeks punitive damages from Defendants for alleged "malicious, deliberate, [and] intentional" violations of its members' First Amendment rights, civil rights, and due process rights in relation to the July 29 march "in an amount sufficient to punish [Defendants] and to deter others from like conduct." SAC ¶¶ 1, 166, 201, 212, 223, 239, 252.  Black Unity does not require individualized proof from its members to support punitive damages and, if awarded, the resulting deterrence will inure to the benefit of Black Unity's members.

Defendants contend that Black Unity's claims subject Defendants to "duplicate liability" because "Black Unity has not brought this suit on behalf of its members, but rather in addition to its members."  BW Mot. at 9.  Defendants rely on *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1091 (9th Cir. 2012), in which a district court

dismissed an identically worded claim filed by the same plaintiff in two different cases. BW Mot. at 10. Here, Black Unity and Ford and Allums are not the same plaintiff. Black Unity has sufficiently alleged standing on behalf of its members. Allums and Ford have sufficiently alleged standing on behalf of themselves. Although Allums and Ford are Black Unity members, their claims are not identical to those of the membership. For example, Allums and Ford bring excessive force claims for economic and noneconomic damages, claims that are "peculiar" to them. *Warth*, 422 U.S. at 515–16. The interests and the injuries of the Black Unity membership are broader and more diverse than those of any one or two members. And any declaratory or injunctive relief afforded to Black Unity will benefit all of its members, not just Allums and Ford. Finally, "[g]iven that the third prong of the *Hunt* test is a prudential consideration," the ability to avoid presenting "duplicative and redundant [evidence] counsels in favor of granting associational standing in the interests of judicial economy." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 544 (S.D.N.Y. 2008), *aff'd*, 651 F.3d 218 (2d Cir. 2011), *aff'd sub nom., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 133 (2013).

For the above reasons, Black Unity meets the three *Hunt* prongs and has standing to bring the First Amendment claims, the due process claim, and the civil rights conspiracy claims on behalf of its members.

B.    *Organizational Standing*

Black Unity contends that it also has organizational standing.  Pl. Resp. at 12.
"[O]rganizations are entitled to sue on their own behalf for injuries they have
sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982); *FDA v.
All. for Hippocratic Med.*, 602 U.S. 367, 369 (2024).  The organization must meet the
traditional Article III standing requirements: (1) injury in fact; (2) causation; and (3)
redressability.  *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025)
(citing *Lujan*, 504 U.S. at 561).  Organizational standing "can be satisfied if the
organization alleges that a defendant's actions 'directly affected and interfered with
[its] core business activities.'"  *Id.* (quoting *All. For Hippocratic Med.*, 602 U.S. at
395).  Organizational standing can also be satisfied if the organization alleges that a
defendant's actions "frustrated its mission and caused it to divert resources in
response to that frustration of purpose." *Id.* (quoting *E. Bay Sanctuary Covenant*,
993 F.3d at 663).  But "an organization . . . cannot spend its way into standing simply
by expending money to gather information and advocate against the defendant's
action." *All. for Hippocratic Med.*, 602 U.S. at 370.

To assert organizational standing, an organizational plaintiff must allege, in
its complaint, factual grounds to support that the organization itself has suffered an
injury-in-fact.  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083, 1088 (9th Cir. 2010).  Here, Black Unity lacks organizational standing
because it failed to allege factual grounds to support organizational injury-in-fact in
its operative complaint.  The SAC alleges various constitutional injuries to Black

Unity's members but, as in *La Asociacion*, "[n]owhere in the complaint. . . does [Black Unity] assert [an injury] that would allow the Court to conclude that [the organization] had pleaded organizational standing on its own behalf." *La Asociacion de Trabajadores*, 624 F.3d at 1089.  Black Unity did not allege facts to support that "defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant*, 993 F.3d at 663.  Nor did Black Unity allege facts to support that Defendants' actions "directly affected and interfered with [its] core business activities." *All. For Hippocratic Med.*, 602 U.S. at 395.  Black Unity may not now "rais[e] a new theory of standing in its response to a motion for summary judgment." *La Asociacion de Trabajadores*, 624 F.3d at 1089.  For this reason, Black Unity lacks organizational standing.

In sum, Black Unity has associational standing to sue on behalf of its members, but it does not have organizational standing to sue on behalf of itself.

## II.  *Affirmative Defenses*

Plaintiffs seek partial summary judgment on eleven affirmative defenses asserted by SPD Defendants,  SPD Answer ¶¶ 6, 7, 11, 12, 15, 19, 20, 21, 23, 25, 31, ECF No. 64; three affirmative defenses asserted by Detective Weaver, Weaver Answer ¶¶ 88, 90, 94, ECF No. 63; and two affirmative defenses asserted by the City, City Answer ¶¶ 13, 15, ECF No. 62.

Under Rule 56, "a party may move for summary judgment [on] each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).  The movant bears the burden to show that "that there

is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Partial summary judgment under Rule 56 is a proper method to dispose of meritless affirmative defenses. *EEOC v. Fred Meyer Stores, Inc.*, 954 F. Supp. 2d 1104, 1112 (D. Or. 2013), *on reconsideration in part* (Sept. 19, 2013) ("[A] motion that attacks the substance of defendant's affirmative defenses rather than the form of the pleading should be treated as a motion for summary judgment, allowing the court to consider facts outside the pleadings.").

### A.    *Standing*

Defendants assert, as an affirmative defense, that Black Unity lacks standing. SPD Answer ¶ 11; Weaver Answer ¶ 89. As discussed, Black Unity has associational standing to sue on behalf of its members. Further, standing is not an affirmative defense. The Court GRANTS Plaintiffs' Motion as to SPD's seventh defense and Weaver's fifth defense.

### B.    *Issue Preclusion/Collateral Estoppel*

Defendants assert that "Plaintiffs' claims are barred by the doctrines of res judicata, claim preclusion, issue preclusion, and/or collateral estoppel." SPD Answer ¶ 25. Defendants seek to estop Ford (and three individuals who are not parties to this suit) from "contend[ing] that [they] w[ere] arrested without probable cause." SPD Resp. at 2–4, ECF No. 129.

First, the Court need not address issue preclusion as to the non–parties. Second, as to Ford, during the July 29 march, he was arrested and cited with Disorderly Conduct in the Second Degree. Henderson Decl., Ex. 534, at 9, ("Municipal

court record"), ECF No. 124-7.  Ford pleaded no contest, and the charges were dismissed after he successfully completed a diversion agreement.  *Id.*  Ford initially brought a wrongful arrest claim against Defendants but voluntarily dismissed it. SAC ¶¶ 186–194; Dugan Third Decl. ¶ 1, ECF No. 144.  Defendants contend that they are entitled to estop or preclude Ford from contending that he was arrested without probable cause because he pleaded no contest to the disorderly conduct citation.  SPD Resp. at 2–3.  Plaintiffs argue that issue preclusion does not apply here because "no lawsuit involving [probable cause to arrest Ford] was decided on the merits."  Pl. Mot. at 3.

Issue preclusion bars a court from re-litigating an issue that was already "actually litigated" in a prior suit and "resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (internal quotation marks omitted) (citing *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).  In Oregon, issue preclusion requires, among other things, that "[t]he issue in the two proceedings is identical;" that "[t]he issue was actually litigated and was essential to a final decision on the merits in the prior proceeding;" and that "[t]he party sought to be precluded has had a full and fair opportunity to be heard on that issue[.]"  *Nelson v. Emerald People's Util. Dist.*, 318 Or. 99, 104 (1993).

Plaintiffs maintain that the municipal court did not actually litigate whether there was probable cause to arrest Ford for disorderly conduct or make a final determination on the merits because it dismissed the charges after Ford completed a

diversion agreement.  Pl. Reply at 2, ECF No. 135; Dugan Second Decl., Ex. B, ECF No. 136-1.  Defendants offer no argument or evidence that the municipal court litigated the issue, that Ford had a full and fair opportunity to be heard, and that the no-contest plea and court dismissal was a final decision on the merits.

The Ninth Circuit has declined to say whether a no contest plea has preclusive effect in this context.  *See Flores-Haro v. Slade*, 686 F. App'x 454, 457 n.2 (9th Cir. 2017) ("We do not reach whether issues raised in the factual basis of a no contest plea . . . are 'actually litigated.'").  But, in the *Heck* context,[4]  the Ninth Circuit recently joined other circuits in holding that where a plaintiff pleads no contest and satisfies "the conditions of [a] [diversion] agreement . . . and the criminal charges are dismissed without entry of conviction," that plaintiff is not barred from bringing a § 1983 claim because the matter did not reach a final determination as to guilt.  *Duarte v. City of Stockton*, 60 F.4th 566, 572 (9th Cir. 2023).  To obtain an order of conviction, a matter must have been litigated and a final determination on the merits must have been made.  *Id.*  In contrast, "[a] 'dismissal' is 'the termination of an action, claim, or charge without further hearing'" and "[is] the opposite of conviction."  *Id.* (quoting *Dismissal*, Black's Law Dictionary (11th ed. 2019)).

---

[4] Under *Heck v. Humphries*, 512 U.S. 477, 486 (1994), § 1983 claims must be dismissed if they would "necessarily require the plaintiff to prove the unlawfulness of his conviction."

The Court finds *Duarte* persuasive as to whether a dismissal based on a no contest plea and completion of diversion is a final determination on the merits. By the *Duarte* court's reasoning, it is not. Without a final determination on the merits as to whether officers had probable cause to arrest Ford for disorderly conduct, the no-contest plea, and the dismissal of charges after satisfaction of a diversion agreement can have no preclusive effect. The Court GRANTS Plaintiffs' Motion as to SPD's twenty-first affirmative defense.

C.    *Failure to Mitigate*

Defendants assert that "[t]o the extent Plaintiffs suffered damages at all, Plaintiffs failed to take reasonable steps to mitigate their damages, and/or unreasonably enhanced their damages." SPD Answer ¶ 20; Weaver Answer ¶ 94 (substantially the same). Plaintiffs originally asserted that mitigation was not a valid § 1983 affirmative defense, Pl. Mot. at 6, but now concede that it is, Pl. Reply at 6. The Court DENIES Plaintiffs' Motion as to SPD's sixteenth affirmative defense and Weaver's tenth affirmative defense.

D.    *Not Affirmative Defenses*

"Affirmative defenses plead matters extraneous to the plaintiff's *prima facie* case, which deny plaintiff's right to recover, even if the allegations of the complaint are true." *G & G Closed Cir. Events, LLC v. Nguyen*, No. 10–CV–00168–LHK, 2010 WL 3749284, at *5 (N.D. Cal. Sept. 23, 2010) (citations omitted). In contrast, "defenses that negate an element of the plaintiffs' proof are not affirmative defenses because they serve only to controvert an element of the plaintiffs' *prima facie* case."

*Hernandez v. Cnty. of Monterey*, 306 F.R.D. 279, 289 (N.D. Cal. Apr. 14, 2015); *see also Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir.2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."). Further, an affirmative defense shifts the burden from the plaintiff to the defendant. *Barnes v. AT & T Pension Ben. Plan-Non-Bargained Program*, 718 F. Supp. 2d 1167, 1174–75 (N.D. Cal. 2010) (citing *Kanne v. Connecticut General Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988)). "[I]t is curious that defendant asserts as affirmative defenses that which it need not prove." *Id.* at 1174.

The Court GRANTS Plaintiffs' Motion on the following defenses as a matter of law because they are not affirmative defenses to the claims in this case:

(1) Comparative Fault, SPD's eleventh and seventeenth affirmative defenses, Weaver's sixth affirmative defense, and the City's fifth and seventh affirmative defenses;

(2) Officer Safety/Good Faith, SPD's third and fifteenth affirmative defenses and Weaver's fourth affirmative defense;

(3) No duty to retreat, SPD's twenty-seventh affirmative defense;

(4) Claims arose out of riot, SPD's nineteenth affirmative defense;

(5) Exercises of valid authority, SPD's eighth affirmative defense;

(6) No viewpoint or race discrimination, SPD's second affirmative defense.

Comparative fault is not an affirmative defense to § 1983 claim. "[C]ourts in this Circuit have declined to apply the apportionment of fault defense to Section 1983 claims." *Fair v. King Cnty.*, No. 2:21-CV-01706-JHC, 2025 WL 1207721, at *7, n.9 (W.D. Wash. Apr. 25, 2025); *see also Miller v. Schmitz*, No. 1:12-CV-0137 LJO SAB, 2013 WL 5754945, at *5 (E.D. Cal. Oct. 23, 2013) ("Concepts of comparative fault . . .

are not applicable in actions filed under 42 U.S.C. § 1983."). "While defendants to [S]ection 1983 actions may argue that other people are responsible for the plaintiff's injuries, defendants may not ask the jury to apportion fault among parties and non-parties, including other defendants, under state comparative fault and apportionment laws." *Est. of Moreno by & through Moreno v. Corr. Healthcare Cos., Inc.*, No. 4:18-CV-5171-RMP, 2019 WL 10733237, at *2 (E.D. Wash. Aug. 5, 2019).

Neither "officer safety" nor "good faith" are affirmative defenses to a § 1983 claim. Defendants cite *Forrett v. Richardson*, 112 F.3d 416, 419 (9th Cir. 1997) and *Scott v. Henrich*, 978 F.2d 481, 483–84 (9th Cir. 1992) for the proposition that police officers have a right "to use force in self-defense and to protect themselves during encounters with citizens." SPD Resp. at 3. Like this case, *Forrett* and *Scott* are § 1983 cases. But the *Forrett* and *Scott* defendants did not assert officer safety or good faith as affirmative defenses to the excessive force claims against them. Instead, they attacked plaintiffs' *prima facie* case by arguing that the force they used was "objectively reasonable" under *Graham v. Connor*, 490 U.S. 386. 397 (1989). *Forrett*, 112 F.3d at 419–20; *Scott*, 978 F.2d at 484–85. Defendants here may choose to do the same, but such an attack is not an affirmative defense.

"No duty to retreat" is not an affirmative defense to a § 1983 claim. Defendants cite *Reed v. Hoy*, 909 F.2d 324, 330–31 (9th Cir. 1989) for the proposition that officers have no duty to retreat. SPD Answer ¶ 31. In *Reed*, the Ninth Circuit held that, under ORS 161.219 and Oregon case law, any duty to retreat "involve[s] situations in which the user of deadly force [i]s an ordinary citizen[]," not a police officer. *Reed*,

F.2d at 331. Accordingly, the Ninth Circuit affirmed the district court's denial of a duty to retreat jury instruction in a § 1983 excessive force claim and concluded that "[u]nder *Graham v. Connor,* excessive force claims . . . must [instead] be analyzed under the [F]ourth [A]mendment's reasonableness standard." *Id.* at 331–32.

"[C]laims arose out of riot," "valid exercises of lawful authority," and no "viewpoint [or] race" discrimination, SPD Answer ¶¶ 23, 12, 6, are not affirmative defenses but instead are arguments that controvert Plaintiffs' *prima facie* claims.

In sum, the Court GRANTS Plaintiffs' Motion as to SPD's second, third, seventh, eighth, eleventh, fifteenth, seventeenth, nineteenth, twenty-first, and twenty-seventh affirmative defenses; as to Weaver's fourth, fifth, and sixth affirmative defenses; and as to the City's second, fifth, and seventh affirmative defenses. The Court DENIES Plaintiffs' Motion as to SPD's sixteenth and Weaver's tenth affirmative defenses.

III.    *Section 1983 Claims*

SPD Defendants move for summary judgment on Plaintiffs' § 1983 claims, which include a First Amendment prior restraint claim, a Fourth Amendment excessive force claim, a Fourteenth Amendment procedural due process claim, and a First Amendment retaliation claim.

To prevail under 42 U.S.C. § 1983, a plaintiff must prove: (1) that the plaintiff was "deprived of a right secured by the Constitution or laws of the United States," and (2) "that the alleged deprivation was committed under color of state law." *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012) (citing *Am. Mfrs. Mut. Ins.*

*Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).  The parties do not dispute that SPD Defendants were acting under color of state law.  At issue is whether Defendants deprived Plaintiffs of their constitutional rights, and, if so, whether they are entitled to qualified immunity.

A.     *Section 1983 First Amendment Prior Restraint*

Plaintiffs' First Claim alleges that SPD Defendants, not including Detective Weaver and Officers Lane and Burke,[5] engaged in an unconstitutional prior restraint of their First Amendment right to speak and assemble by, among other things, "blockading" the march at the corner of 67th Street and Dogwood Street; "unlawfully" designating the march an unlawful assembly and issuing a dispersal warning; chilling "their First Amendment rights through intimidation, show of force, and use of force[;]" and "rerouting the march so that the marchers were forced into the ranks of the violent [counter protesters]."  Pl. Resp. at 14; SAC ¶¶ 163–67.

The First Amendment, which applies to the states through the Fourteenth Amendment, prohibits governments from making laws that "abridge[] the freedom of speech" or "the right of the people peaceably to assemble."  U.S. CONST. amend. I, XIV. Courts have long recognized the importance of spontaneous political speech. "[T]iming is of the essence in politics. . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring).

---

[5] *See* Pl. Resp. at 14 n.3 (dismissing First Amendment prior restraint claim against Detective Weaver and Officers Lane and Burke).

1. *Constitutionality*

"A prior restraint is an administrative or judicial order that forbids certain communications issued before those communications occur." *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 430 (9th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 549–50 (1993)). "Prior restraints on speech are disfavored and carry a heavy presumption of invalidity." *Id.* "[P]rior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). But "[n]ot all injunctions that may incidentally affect expression . . . are prior restraints." *Greater Los Angeles Agency on Deafness*, 742 F.3d at 431 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 n.2 (1994)). "[C]ontent-neutral injunctions that do not bar all avenues of expression are not treated as prior restraints." *Id.* (internal quotation marks omitted) (quoting *Maldonado v. Morales*, 556 F.3d 1037, 1047 (9th Cir. 2009)).

Defendants contend that they are entitled to summary judgment on Plaintiffs' prior restraint claim because the march "was not lawful from the outset." Def. Mot. at 14. Defendants assert that the march violated the Governor's COVID-era Executive Order, EO 20-25, which prohibited outdoor gatherings of more than 100 in Lane County in July 2020, *id.* at 11, and, that Plaintiffs failed to "apply for or obtain a [parade] permit" from the City of Springfield, *id.* at 12; Def. Reply at 15, ECF No. 155.

Whether Plaintiffs' march violated a COVID-era EO or was unpermitted is irrelevant because the prior speech restraint at issue, the barricade, was not connected to either of the alleged violations. Defendants concede that "SPD did not cite or arrest any participant in the protest on either of th[o]se grounds." Def. Mot. at 14. More importantly, Defendants state that "[t]he barricades were placed specifically to prevent the march from taking a particular route . . . that would lead it to Main Street and cause unreasonable risks to the safety of both protesters and motorists on Main Street's 5-lane high-speed thoroughfare." *Id.* Defendants did not state that the barricade was placed because the march violated the Governor's EO or because it was not permitted. And Defendants' barricade did not stop the march (and any ongoing violations), it simply re-routed the march. Defendants' rationale for placing the barricade is thus an after-the-fact justification and does not entitle them to summary judgment.

Defendants next contend that the barricade was a "reasonable time, place, and manner restriction aimed solely at protecting the safety of everyone involved." *Id.*

The question is whether the barricade was in fact an unlawful prior restraint on First Amendment activity or whether it was a reasonable time, place, and manner restriction. The parties do not dispute that Plaintiffs' march was protected speech nor that the public park, sidewalks, and streets where the march took place are traditional public fora. The First Amendment "applies with particular force" to a "march and other protest activities." *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999). "The quintessential traditional public forums are sidewalks, streets,

and parks." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1099 (9th Cir. 2003); *see also Camenzind v. Cal. Exposition & State Fair*, 84 F.4th 1102, 1108 (9th Cir. 2023) ("The First Amendment affords special protection to 'places which by long tradition or by government fiat have been devoted to assembly and debate.'") (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

The government's ability to permissibly restrict expressive conduct in a public forum is very limited. *United States v. Grace*, 461 U.S. 171, 177 (1983). This is especially true where the government seeks to restrain speech in advance of expression. *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 180–81 (1968); *Baugh*, 187 F.3d at 1042. But a municipality may issue reasonable time, place, and manner restrictions on expressive conduct in a public forum. *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009). "To pass constitutional muster, a time, place, or manner restriction must meet three criteria: (1) it must be content-neutral; (2) it must be 'narrowly tailored to serve a significant governmental interest;' and (3) it must 'leave open ample alternative channels for communication of the information.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "The government bears the burden of justifying the regulation of expressive activity in a public forum." *Id.* at 1035 (citing *Perry Educ. Ass'n*, 460 U.S. at 45).

Defendants maintain that they placed the barricade at the intersection of 67th and Dogwood to prevent the marchers from continuing along 67th Street to Main Street, a busy five-lane road with a 45-mph speed limit that "has experienced numerous vehicle-versus-pedestrian crashes resulting in fatalities." *Id.* at 14; Rappé

Decl. at 3.  Plaintiffs contend that the barricade was not a reasonable time, place, and manner restriction because it was "unannounced" and "random[ly] place[d]"; enforced against the marchers but not the counter protesters; not narrowly tailored to achieve Defendants' public safety objective because it was located two blocks from Main Street; and did not leave open ample alternative communication channels.  Pl. Resp. at 14–16.

a.  <em>Content neutrality</em>

"A municipal government . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  Speech restrictions "that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.*  A regulation or administrative order is content-based rather than content-neutral if "the main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006). Though "an improper censorial motive" is sufficient, such a motive is not necessary to render a regulation content based. *Reed*, 576 U.S. at 165–66 (quoting *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991)).  If a regulation "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed," it is content

based.  *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998) (internal quotation marks omitted).

Here, Defendants assert that the restriction was content neutral because "nothing about preventing marchers from accessing a particular dangerous stretch of roadway bears at all on the content of their speech or other expressive activity."  Def. Mot. at 15.  But Plaintiffs contend that barricade was not content neutral because it was not enforced against counter protesters.  Pl. Resp. at 25.

The video evidence shows that, unlike the marchers, counter protesters were permitted to speak and assemble on both sides of the barrier.  The evidence shows counter protesters filming from the police side of the barrier and even cheering on the officers.  *See* Video Exs. 501, 502; Lane Decl., Video Ex. 503, (marcher video), ECF Nos. 119, 158; Dugan Fourth Decl. ¶ 2(b), Video Ex. AA/CC, (officer BWC footage), ECF Nos. 147, 159; Dugan Fourth Decl. ¶ 2(c), Video Ex. DD, (Lansing video), ECF Nos. 147, 159; Dugan Fifth Decl. ¶ 3, Video Ex. BB, (Eugene Register-Guard video), ECF No. 159.  The "government may not favor speakers on one side of a public debate."  *Hoye v. City of Oakland*, 653 F.3d 835, 849 (9th Cir. 2011).  Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that there is a genuine issue of material fact as to whether the placement and enforcement of the barricade was content neutral.  On this record, a reasonable jury could find that the barricade was enforced only against the marchers, but not the counter protesters, because of the content of the marchers' speech.

Even assuming that the barricade was a content-neutral restriction, there are also disputes of material fact as to whether that restriction was "narrowly tailored" to serve the stated public safety goal and as to whether Defendants provided constitutionally adequate "alternative channels of communication."

### b.    *Narrow Tailoring*

"A narrowly tailored time, place, or manner restriction on speech is one that does not 'burden substantially more speech than is necessary' to achieve a substantial government interest." *Berger*, 569 F.3d at 1041 (quoting *Ward*, 491 U.S. at 799). "It must target and eliminate no more than the exact source of the evil it seeks to remedy." *Id.* (cleaned up). "If a less restrictive alternative would serve the Government's purpose, the [government] must use that alternative." *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1233 (9th Cir. 2025) (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)).

Defendants argue that the planned barricade placement was narrowly tailored to prevent marchers from reaching the five-lane portion of Main Street, "ensuring public safety and order[,]" a "significant government interest." Def. Mot. at 15 (quoting *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 376 (1997)). In his Declaration, Chief Lewis, who was Incident Commander for the event, stated: "SPD's plan was to prevent marchers from reaching a dangerous stretch of Main Street, for the safety of everyone involved, and to otherwise let [the marchers] have unrestrained access to the neighborhood they wished to demonstrate in." Lewis

Decl., Ex. 515 at 3, ECF No. 105.  Lieutenant Rappé, who was "Tactical Commander" for the event stated:

> We decided beforehand that the protestors would not be allowed to march on this area of Main St (sic) due to this being a safety issue for all parties. We were made aware of several hundred anti-protestors in the area and protecting the protestors from moving along this portion of Main Street we felt was too much of a risk. We made the determination early on to not allow them on Main St (sic).

Ex. 505, Rappé Rep. at 1.

Courts have long recognized that traffic and pedestrian safety are substantial government interests.  *See*, *e.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981) ("[T]raffic safety [is a] substantial governmental goal[.]"); *see also One World One Fam. Now v. City & Cnty. of Honolulu*, 76 F.3d 1009, 1013 (9th Cir. 1996) ("[C]ities have a substantial interest in assuring safe and convenient circulation on their streets.").

Plaintiffs contend that the barricade was not narrowly tailored to keep the marchers off Main Street because the barricade was placed two blocks from Main Street and "there was another street beyond the barricades" that Plaintiffs could have taken that would have allowed them to return to the park and complete the march without going onto Main Street.  Pl. Resp. at 15.  In his deposition testimony, Chief Lewis conceded: "[Y]eah. There's another street they could have turned off on [past the barricade]."

Plaintiffs also contend that the barricade did not "serve the safety interest" but instead "escalated tensions and confusion and created a dangerous bottleneck."  Pl. Resp. at 15.  *See* Allums Dep. 42:21–43:24; 73:20–77:05, ECF No. 124-2 (explaining

that the marchers did not discover the barricade until they came around the corner to 67th and saw it; describing how the barricade obstructed the planned march route and created "distress[,]" "confusion" and "chaos" among the leadership); *see also* Henderson Decl., Ex. 530, Ford Dep. 96:11–18; 99:25–100:03, ECF No. 124-3 (same); Henderson Decl., Ex. 531, Jourdan Dep. 46:07–10, ECF No. 124-4 (same); Weaver Dep. 39:14–24 (explaining that, as an undercover officer participating in the march, "[he] remember[ed] being kind of surprised that the barricades were there"); Video Exs. 501, 502 (showing that marchers were surprised and confused when they reached the barricade).

Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that genuine issues of material fact exist as to whether Defendants' time, place, and manner restriction—the barricade that was placed at 67th Street and Dogwood Street—burdened more speech than was necessary to achieve Defendants' public safety interest.  On this record, a reasonable jury could find that it did.

c.    *Ample Alternative Channels of Communication*

If the government uses a time, place and manner restriction to block one speech channel, it must "leave open ample alternative channels for communication of the information." *Berger*, 569 F.3d at 1036.  "[A]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Id.* at 1049.  Although "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired, . . . an alternative mode of

communication may be constitutionally inadequate if the speaker's ability to communicate effectively is threatened." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (upholding the lower court ruling that where the government prohibited protesters' water borne protest that was intended to reach an audience located on a pier but instead allowed protesters to pass out pamphlets on land to demonstrate at the pier's entrance, the government did not provide "viable [communication] alternatives because . . . the intended audience was not accessible from the pier's entrance.") (collecting cases); *see also Baugh*, 187 F.3d at 1044 (9th Cir. 1999) (a designated "First Amendment area" 150 to 175 yards from where the public gathered was not ample alternative communication channel).

Defendants maintain that, despite the barricade, "the protesters were allowed unrestricted access to nearly the entire Thurston Hills neighborhood aside from Main Street and a small section of road leading to it." Def. Mot. at 19.   But Defendants' map shows otherwise. *Id.* at 18 (Google Map of the area).   The map shows that by forcing the marchers to return to the park on Dogwood, Defendants blocked access to more than half of the Thurston Hills neighborhood, which was the marchers' intended audience.   Defendants concede that had the marchers been allowed to proceed one more block, they could have turned right (east), continued through the Thurston Hills neighborhood, and returned to the park.   Lewis Dep. 25:01–26:13.   Defendants thus contradict their assertion that the barricade foreclosed only "Main Street and a small section of road leading to it."

Plaintiffs maintain that the two remaining march routes, turning around and going back the way they came on 67th and turning east on Dogwood, were not viable alternative communication channels because both options forced marchers into the "arms of counter-protesters." Pl. Resp. at 15, 25. Plaintiffs allege that they were "kettled" or trapped between the police barricade and the counter protesters. Pl. Resp. at 14. Plaintiff Jourdan testified: "Those people that [Officers] were directing us to go towards had threatened and hurt a lot of our protesters before." Reilly Decl., Ex. 5, Jourdan Dep. 41:03–05, ECF No. 114-5. Plaintiff Ford testified: "From what I know, the police had given people from the other side—the right-wing counter protestors, whatever you want to call them—had already given them what our route was which was very dangerous. And that was the reason why a lot of people actually got hurt. And, yeah, I blame the police for that." Ford Dep. 28:02–11, ECF No. 124-3. Jourdan also testified: "We had kids with us, so we don't just stop and just spread out and disperse, especially when people were there with guns and threatening us." Jourdan Dep. 39:22–25, ECF No. 124-4. Before the march, Sgt. Kirkpatrick told counter protester Geena Shipman that SPD "w[as] going to stop [the marchers] at Dogwood and push them up Dogwood," information that counter protester Shipman then transmitted via her social media video. Dugan Third Decl. Ex. H, Sgt. Kirkpatrick Dep. 16:22–17:14, ECF No. 144-7. Shipman was later arrested for assaulting a marcher at the bottleneck created by the barricade on 67th at Dogwood. Lewis Dep. 47:09–25; *see also* Allums Dep. 69:22–70:07, ECF No. 124-2 (explaining that he considered himself part of the group's "security team" and tried to keep the

marchers together for safety); Officer Conrad Decl., Ex. 510, (Officer Robert Conrad, Springfield Police Dep't, Supp. Incident Rep. 20-05350,) at 1, ECF No. 117-1 (reporting the "large contingency of 'counter protesters' in attendance"); Weaver Decl., Ex. 2, (Detective Robert Weaver, Springfield Police Dep't, Incident Rep. 20-05434,) at 3, ECF No. 112-2 (reporting "heated yelling matches with counter protesters who were in the street[,]" as marchers attempted to return to the park); *id.* at 4–5 (reporting that he and Officer Lane "prevented at least half a dozen physical confrontations" by encouraging marchers not to engage the counter protesters); *id.* at 5 (reporting that "[he] specifically told dispatch about the pushing and shoving" and that he "heard protesters crying out, wanting to know where the police were"); *id.* (reporting that counter protesters "storm[ed] into the crowd, apparently looking to fight someone" and that a protester who attempted to film one of the counter protesters had his phone "smacked out of his hand"); *id.* (reporting that "many of the protesters appeared boxed in and couldn't leave"); *id.* (reporting that "a large group of residents and counter protesters were following the [protesters]" and that the counter protesters dispersed only after police told them to). Plaintiffs Lansing and Johns were assaulted by a counter protester who hit them in the chest area with the top end of a flagpole in an officer's full view. Video Ex. DD; Henderson Decl., Ex. 532, Lansing Dep. 28:10–29:05, ECF No. 124-5. And a different counter protester "ripped [their camera] off of the stick" and took it. Lansing Dep. 31:24–33:16.

Dispatcher Pardee testified that she exchanged text messages with undercover officers, Dugan Third Decl., Ex. J, Pardee Dep. 35:10–23, ECF No. 144-9, that she

passed information from those texts to the other officers via radio, *id.* 35:22–23, 39:25–40:11, and that she monitored Facebook and live stream feeds on unofficial channels on the night of the march, *id.* 31:07–32:11; 38:04–39:03. Officer Lane, who was working undercover texted to Dispatcher Pardee: "A couple of [mixed martial arts] fighters with white pride shirts trying to start[] fights in the back. Both have large knives on them." Dugan Third Decl., Ex. R, Lane-Weaver-Pardee Texts at 3, ECF No. 144-17. Officer Lane texted to dispatch: "[The marchers] are trying to get out of here but it's a shitshow." Ex. R, Lane-Weaver-Pardee Texts at 3. Dispatcher Pardee entered: "Counter protesters have armed themselves with bats and sticks." Pardee Dep. 31:04–32:15. Dispatcher Pardee testified that she couldn't remember whether she sent that message through dispatch to alert the officers or whether the SPD made "any efforts . . . to go to where those . . . potentially dangerous situations were happening with counter protesters." Pardee Dep. 32:16–33:01. Police Chief Lewis acknowledged that "counter protesters sprayed marchers with bear mace[,]" Lewis Dep. 44:23–25, and that counter protester Shipman assaulted the marchers that night, Lewis Dep. 47:09–25, but stated that he didn't learn about those events until later, that he doesn't remember whether the undercover officers alerted him to incidents with counter protesters but knew "there was some radio traffic regarding incidents . . . [at] Jesse Maine Park," 44:09–17, and he stated that "[he] didn't give any specific orders" to have officers go to where there might be conflicts, 47:09–22.

The evidence, viewed in the light most favorable to Plaintiffs, supports Plaintiffs' contention that they were kettled or trapped between the police barricade

and the counter protesters.  On this record a reasonable jury could find that Defendants failed to provide ample alternative channels of communication.

In sum, the Court concludes that there are genuine issues of material fact as to whether the barricade was a content-neutral time, place, and manner restriction or an unconstitutional content-based prior restraint; whether the barricade burdened more speech than was necessary to achieve Defendants' public safety goal; and whether Defendants provided constitutionally adequate alternative channels of communication.  For these reasons, Defendants are not entitled to summary judgment on Plaintiffs' First Amendment prior restraint claim.

### 2. *Qualified Immunity*

Defendants assert that they are entitled to qualified immunity on the First Amendment prior restraint claim.  Def. Mot. at 19; BW Mot. at 27.

To determine whether qualified immunity applies, a court must determine: "(1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017).  At the summary judgment stage, a court considers all the disputed facts in the light most favorable to the non-movant.  *Martinez v. City of Clovis*, 943 F.3d 1260, 1269–70 (9th Cir. 2019).  If reasonable jurors could find that the defendant violated the plaintiff's constitutional right, and the right at issue was clearly established, the case should proceed to trial.  *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008).

Here, the Court has already determined that a reasonable jury could find that Defendants violated Plaintiffs' First Amendment rights by imposing and enforcing an unconstitutional prior restraint on protected First Amendment activity. The question is whether the imposition and enforcement of an unconstitutional barricade on a street march was a clearly established constitutional violation at the time of the July 2020 march.

"For a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what [the actor] is doing violates federal law." *Shafer*, 868 F.3d at 1117. A case directly on point is not necessary to defeat qualified immunity, "but existing case law must have put 'every reasonable official' on notice that the conduct was unconstitutional." *Martinez v. High*, 91 F.4th 1022, 1031 (9th Cir. 2024); *Shafer*, 868 F.3d at 1118 ("[W]e do not require a case to be 'on all fours[.]'"). "In other words, 'immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Shafer*, 868 F.3d at 1117) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

It is clearly established that First Amendment protections "are nowhere stronger" than in streets and parks because they are traditional public fora. *Berger*, 569 F.3d at 1035–36 (citing *Perry Educ. Ass'n*, 460 U.S. at 45). "In such fora, the government's right 'to limit expressive activity [is] sharply circumscribed.'" *Id.* at 1036. (quoting *Perry Educ. Ass'n*, 460 U.S. at 45). Further, "[p]olitical speech is core First Amendment speech, critical to the functioning of our democratic system." *Long*

*Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009). And "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907, 102 (1982) (quoting *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981)). For this reason, the First Amendment applies with particular force to street marches and other protest activities in public fora. *Baugh*, 187 F.3d at 1042.

Prior restraints on street marches are especially disfavored. A large body of First Amendment law addresses the constitutionality of time, place, and manner restrictions of speech and assembly in public fora. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130–131 (1992) (collecting cases). The law is particularly vigilant about government officials' discretion to impose unguided (standardless) restrictions on street marches. *See, e.g., Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 799 (9th Cir. 2008) (striking down a parade permit scheme that afforded police "excessive discretion" to modify street march permits "in the interest of vehicular or pedestrian safety") (collecting cases); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019) ("To pass constitutional muster, . . . a [municipal parade] permit system must not delegate overly broad licensing discretion to a government official."); *NAACP v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) ("Unfettered discretion to license speech cannot be left to administrative

bodies" because "[s]uch discretion grants officials the power to discriminate and raises the spectre of selective enforcement on the basis of the content of speech.").

Here, Plaintiffs did not apply for a permit, so SPD's 2020 permitting scheme—which, as Plaintiffs contend, was likely unconstitutional—is not implicated.[6]  *See* Pl. Resp. at 16, 29–32.  But importantly, at the time of the event, precedent as to permissible time, place, and manner restrictions of street marches in public fora was clearly established.  And that precedent strictly cabins the authority of police officers and other government officials "to deny use of a forum in advance of actual expression."  *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)).

In sum, at the time of the July 29 march, precedent as to permissible time, place, and manner restrictions of street marches in public fora was clearly established.  And that precedent strictly cabins the authority of police officers and other government officials "to deny use of a forum in advance of actual expression." *Se. Promotions*, 420 U.S. at 553 (1975).

---

[6] SPD's 2020 permitting scheme was likely unconstitutional because it required a 30-day advance notice.  "[A]ll advance notice requirements tend to inhibit speech.  The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely.  By requiring advance notice, the government outlaws spontaneous expression. . . .  The only advance notice requirements to be upheld by courts have been dramatically shorter than 20 days." *NAACP v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) (citing *A Quaker Action Grp. v. Morton,* 516 F.2d 717, 735 (D.C. Cir. 1975) (upholding two-day notice requirement) and *Powe v. Miles,* 407 F.2d 73, 84 (2d Cir. 1968) (upholding two-day notice requirement)).

Defendants assert a public safety reason for restricting Plaintiffs' political speech in a public forum. Given the long-standing precedent on prior restraints of street marches, a reasonable officer would have known that blockading a street march in advance of actual expression without lawful process or sufficient justification would violate the First Amendment. "This is not a new area of law." *Lucha Unida de Padres y Estudiantes v. Green*, 470 F. Supp. 3d 1021, 1045–45 (D. Ariz. 2020).

For these reasons, Defendants are not entitled to qualified immunity on Plaintiffs' First Amendment prior restraint claim.

B.    *Section 1983 Excessive Force Claims*

Plaintiffs' Second Claim is a § 1983 Fourth Amendment excessive force claim. Plaintiffs Ford, Jourdan, Allums, Lansing, and Johns allege that Lieutenant Rappé, and Officers Bragg, Durrant, O'Leary, Sorby, and Turner used excessive force against them during the July 29 march. SAC ¶¶ 174–79.

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, prohibits unreasonable searches and seizures by law enforcement officials. U.S. CONST. amend. IV, XIV. Under the Fourth Amendment, force applied by law enforcement officials to effect a particular seizure must be "objectively reasonable" under the circumstances, without regard to an officer's underlying intent or motivation. *Graham*, 490 U.S. at 397.

To determine whether an officer's application of force was reasonable, a court must: (1) assess the severity of the intrusion on an individual's liberty interest; and

(2) the weight of the government's interest; and (3) balance the force used against the need for such force.  *Id.*  A court must consider the totality of the circumstances and judge an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.

"Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . .  summary judgment . . . in excessive force cases should be granted sparingly."  *Santos v. Cates*, 287 F.3d 846, 853 (9th Cir. 2002) (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.")).

       1.  *Plaintiff Ford*

Plaintiff Tyshawn Ford brings a § 1983 excessive force claim against Officer Durrant, Officer Bragg, and Lieutenant Rappé.  Ford alleges that Officer Durrant "suddenly, without any lawful basis or warning, violently attacked [him,]" SAC ¶ 96, that he was "violently pulled out of the crowd and away from the crowd" by Officers Durrant and Bragg, and Lieutenant Rappé, *id.* ¶ 98, that Officer Bragg and Lieutenant Rappé "dragged [him] by his feet/ankles[,]" *id.*, that "Durrant kneeled over [him] and punched him twice in the head and face while . . . [Lieutenant] Rappé and other Defendants had control of [him,]" *id.* ¶ 99, that "[he] had his hands clasped over his chest in plain view" and that "[r]ather than reach for his hands or exert any other less-violent measure, [Officer Durrant] again punched [him] in the head and face[,]" *id.* ¶ 102.  Ford also alleges that Officer "Durrant lied in stating he punched

[Ford] in order to gain his compliance[,]" and that "[i]In fact, [Ford] was already complying" because "[Lieutenant] Rappé was sitting on [his] lower body at the time Durrant assaulted [him] in retaliation for the words [he] spoke." *Id.* ¶ 101.

### a.    *Severity of Intrusion*

The parties do not dispute that Officer Durrant used his closed fist to deliver multiple "focused blows" to Ford's head and face with the help of Office Bragg, Lieutenant Rappé, and others and that Officer Bragg and Lieutenant Rappé dragged Ford by his feet across the ground and sat on him and physically held him down while Officer Durrant delivered the blows. *See* Def. Mot. at 24.

"The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to the 'type and amount of force inflicted.'" *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)). Focused blows or punches with a closed fist is a type of "intermediate force." *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013). While short of lethal force, intermediate force is "capable of inflicting significant pain and causing serious injury[.]" *Young*, 655 F.3d at 1161. The use of intermediate force "is a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest." *Id.* at 1162–63. Here, Officer Durrant delivered multiple focused blows to Ford's head while Ford was pinned to the ground by Officer Bragg and Lieutenant Rappé. Officer Durrant, Officer Bragg, and Lieutenant Rappé used intermediate force against Ford.

b.    *Government Interest*

To determine the government interest in the use of intermediate force, a court assesses: (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. These factors are not exclusive, and a court looks to the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). "[T]he most important single element of the three specified factors" is whether the suspect posed an immediate threat to the safety of the officer or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

The first factor used to determine the strength of the government interest is the severity of the crime. Ford was arrested and cited with Disorderly Conduct in the Second Degree, a misdemeanor, to which he pleaded no contest. That charge was dismissed after Ford successfully completed a diversion agreement. Henderson Decl., Ex. 534, at 10, Docket, Disorderly Conduct 2, ECF No. 124-7. Defendants maintain that they had probable cause to arrest Ford for Disorderly Conduct because he "engag[ed] in violent, tumultuous, or threatening behavior" and failed to obey a lawful order to remain behind the barricades. Def. Mot. at 20. In his incident report, Officer Durrant stated:

> I was notified that the plan was to arrest Ford as he had disobeyed a lawful command for him to remain on the other side of the barricade and was also instigating and agitating the crowd to become bolder and move past the barricades. . . . Ford was distinctively and blatantly moving past the barricades that were set in place. . . . I went to arrest Ford and audibly notify him as well of my intentions to take him into custody. As

> I grabbed onto Ford he attempted to dive back into the crowd while several other members of the crowd grabbed onto him and attempted to pull him away from my grasp.

Durrant Decl., Ex. 511, (Officer Bronson Durrant, Springfield Police Dep't, Incident Rep. 20-05350,) at 5, ECF No. 118-1. Disorderly Conduct in the Second Degree is a misdemeanor. The severity of the crime is not great. Further, whether officers had probable cause to arrest Ford was not determined because the issue was not litigated or subject to a final determination on the merits. And, as described below, the video footage shows no evidence that Ford engaged in "violent, tumultuous, or threatening behavior." The first factor favors Ford.

The second and most important factor used to determine the strength of the government interest, *Young*, 655 F.3d at 1163, is whether the suspect posed an immediate threat to the officers' or public's safety. *Graham*, 490 U.S. at 396. Defendants contend that Ford posed an immediate threat to the officers and to the public because he "incite[d] the crowd to push through the barricades, and the protesters were bearing down on the police." Def. Mot. at 9.

Ford disputes that he was an immediate threat to officer or public safety. The video footage shows that SPD had positioned a series of barricades across the road. *See* Video Exs. 501, 502. Two of the early-arriving marchers moved two of the eastern most barricades forward a couple feet. Video Ex. 501 at 8:38. Officers warned the marchers to remain behind the barricades and to not move them, then declared the march unlawful, and ordered the crowd to disperse. Officers used a bull horn to make the announcements, but the announcements were difficult to hear due to the noise

level.  *See* Video Exs. 501, 502, 503.  During this time, several marchers moved back and forth—into the gap between the barriers to talk with the officers and then out of the gap and back behind the barricades.  Jourdan testified that the barricades were "staggered" or "zigzagged" so there was "a barricade right in front of us" and also "another one that everyone was standing in front of."  Jourdan Dep. 116:13–19, ECF No. 124-4.  The video footage shows no evidence that the crowd was threatening the officers or intending to charge the barricades.  Ford testified that he raised his hand to "tell[] [the marchers who were still coming down 67th Street] to come down."  Ford Dep. 74:06–08, ECF No. 124-3.  The footage shows that the march was spread out over a long distance and that most of the marchers were still coming down the hill on 67th and had not yet arrived at the barricade.

Defendants point to Ford's deposition statements as evidence that Ford was inciting the crowd to storm the barricades:

> Q. [H]ad you met with any other people from Black Unity to make a decision on what you were going to do now that there's a barricade in the street?
> Ford: I don't remember at what point we had a conversation on what we were going do. I think I did—I think I talked to the protesters about what they wanted to do.
> Q. What was decided?
> Ford: That we are going to keep marching. . . .
> Q. How were you going to get through the barricade?
> Ford: By walking through it. I mean, it wasn't the strongest barricade, as you can see.
> Q. As far as you were concerned, at this point when you were at the barricade, did you have any concern that if you walked through the barricade you were going to get arrested?
> Ford: Any concern of that? Of course. Anytime the police are around I'm concerned I might get arrested.
> Q. And you heard them say if you pass the barricade you are going to

get arrested. Correct?
Ford: Correct.
Q: So is it fair to say you intended to get arrested?
Ford: No. That's not fair to say at all.
Q: Why not?
Ford: Because crossing the barricade wasn't illegal, so I shouldn't have been arrested for that.

Ford Dep. 70:08–72:16, ECF No. 124-3.

Defendants also point to a video filmed by a marcher in which you hear Ford talking to the crowd as it slowly moved down the hill and toward the intersection of 67th and Dogwood. *See* Video Ex. 503. The video footage shows that Ford invited the crowd, whoever "is willing," to continue the march with him through the barricade. Around 1:00 into the video, Ford is heard explaining to the crowd: "We gotta stay strong. We gotta stay non-violent." The marchers call out for sharpies to write the National Lawyers' Guild ("NLG") phone number on their arms. NLG observers were present to witness the march. SAC ¶ 85. Video Ex. 503, about 5:55, shows that after marchers wrote NLG numbers on their arms, the crowd calmly moved forward to gather in the intersection, chanting "peaceful protest."

"The law is . . . clear that the government may not prohibit angry or inflammatory speech in a public forum unless it is (1) 'directed to inciting or producing imminent lawless action' *and* (2) 'likely to incite or produce such action.'" *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) (emphasis in *Collins*) (quoting *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969)). "'Imminent lawless action,' as used in *Brandenburg*, means violence or physical disorder in the nature of a riot." *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (quoting *Brandenberg*, 395 U.S. at 447).

The footage shows no evidence that Ford's words were either directed to inciting or likely to incite the crowd. Ford is calm, and the crowd is calm; there is no evidence of violence or physical disorder in the nature of a riot. Further, "[p]eaceful speech, even speech that urges civil disobedience, is fully protected by the First Amendment." *White v. Lee*, 227 F.3d at 1228.

The video footage shows that after Ford spoke to the crowd, he approached the barricade and stepped through the gap to speak with Officer Durrant using a small megaphone or bull horn. The footage shows that Ford remained at the barricade and was stationary while he talked to Officer Durrant. He made no forward or other threatening movement or gesture. He was not speaking to the crowd, and he was not encouraging the marchers who watched him to move or charge forward or take any other action. He spoke to Officer Durrant, not to the crowd. Officer Durrant stated:

> Ford began to taunt Officers and attempt to agitate them which was amplified when he grabbed a bull horn and projected hostile messages towards Officers. Ford specifically singled me out, noting that I was of African descent. From only several feet away he used a loudspeaker to verbalize his hostile message. He explained that I was a traitor for being in the position I was in and also being of African descent.

Ex. 511, Durrant Rep. at 5. The parties agree that Ford was "insulting" or "taunting" Officer Durrant. Ford Dep. 74:16–22, 76:07–77:17, ECF No. 124-3; Reilly Decl., Ex. 6, Ford Dep. 44:07–09, ECF No. 114-6. "Speech that stirs passions, resentment or anger is fully protected by the First Amendment." *Collins*, 110 F.3d at 1371 (citing *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)). "Criticism of the police, profane or otherwise, is not a crime." *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 699 (9th Cir. 2023) (quoting *United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir.

2001)).  The video footage shows no evidence that Ford was a danger to the officers or the public.  Resolving disputed questions of fact in the light most favorable to the non-moving party, the Court concludes that the second factor favors Ford.

The third factor used to determine the strength of the government interest is whether the suspect was "actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  Ford testifies that he expected Officer Durrant to "grab" him, that Officer Durrant "kind of pushed [him] to the ground" and that he did not resist arrest.  Ford Dep. 88:04–25, ECF No. 124-3.  The footage shows that while Ford was talking to Officer Durrant, Officer Durrant suddenly jumped at Ford, causing both of them to fall backward into the crowd.  The footage does not show what happened after Durrant and Ford disappeared to the ground.

Defendants contend that Ford and other crowd members were "violently interfering [with Ford's arrest] for multiple minutes."  Def. Mot. at 24.   Jourdan testified that she was on the bottom of a pile of people that included Ford and Officer Durrant after she was pushed to the ground by at least one officer.  Jourdan Dep. 46:15–17, ECF No. 124-4; Jourdan Dep. 93:01–02, ECF No. 114-5.  She testified that Ford did not resist, move, or kick and that "Ford was under police officers, so he was . . . trying to protect his throat and—area, but he didn't really have anywhere to go." Jourdan Dep. 93:03–06, ECF No. 114-5.  When asked whether he "didn't move at all," she affirmed, "No.  He was trying to just protect himself, his body."  *Id.* at 93:09–12.

Defendants contend that other members of the crowd reached in to wrestle Ford away from the officers because they had been trained to "snatch 'em back."  Def.

Mot. at 8 (citing Video Ex. 503 at 37:00). Whether others in the crowd were interfering in the arrest by grabbing onto Ford is not seen in the video footage, in part, because Ford and Officer Durrant were on the ground. Resolving disputed questions of fact in the light most favorable to the non-moving party, the Court concludes that the third factor favors Ford.

c. <em>Balance of Factors</em>

"For the purposes of summary judgment, even in a qualified immunity case, we must assume the nonmoving party's version of the facts to be correct." *Liston*, 120 F.3d at 977. Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the factors weigh for Ford.

Ford contends that he was not committing a crime, that he was not a danger to officer safety or public safety, and that he was not actively resisting arrest or trying to flee. Ford states that he intended to move through the barricade because he believed the barricade to be unlawful. The footage shows that he invited the crowd to proceed down the hill and gather at the barricade in the intersection. But the footage also shows that Ford's demeanor and language were not directed to inciting nor likely to incite the crowd. Ford calmly told the crowd, "We gotta stay non-violent," and the crowd, chanting "peaceful protest," was calm. The footage shows no evidence of "imminent lawless action" such as "violence or physical disorder in the nature of a riot." *White v. Lee*, 227 F.3d at 1228. And speech inviting civil disobedience, as here, is protected First Amendment activity. *Id.*

Further, at the time that Officer Durrant moved to arrest Ford, Ford had ceased speaking to the crowd and had stepped between the staggered barricades to the police side of the barricade and was speaking to Durrant. Ford had his back to the crowd and was stationary. He made no threatening movements toward Officer Durrant or any other officer and his words and gestures were aimed solely at Officer Durrant, not at the crowd. Ford concedes that he was insulting Officer Durrant and that he refused to obey officers' orders to move back behind the barricades and to disperse. But the refusal to comply with officers' orders constitutes mere "passive resistance[,]" which does not justify the use of intermediate force. *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) ("[A] failure to fully or immediately comply with an officer's orders" does not "justif[y] the application of a non-trivial amount of force.").

Officer Durrant does not say whether he considered less intrusive tactics to arrest Ford, such as trying to handcuff Ford before taking him down or even trying to grab Fords hands to handcuff Ford after he was on the ground. "[P]olice are required to consider what other tactics if any were available, and if there were clear, reasonable, and less intrusive alternatives to the force employed, that militate against finding the use of force reasonable." *Id.* (internal citation and quotation marks omitted); *see also Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (*en banc*) (considering "alternative techniques available for subduing the [subject] that presented a lesser threat of death or serious injury").

Summary judgment is inappropriate where "[t]he version of events offered by [police officers] to the district court is materially contradicted by evidence in the record." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016); *see also Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014) (summary judgment for defendant police officers reversed where district court erred in ruling that only an unreasonable or speculative jury could disbelieve the officers' version of events given the "curious and material factual discrepancies" in the record); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 412 (9th Cir. 2003) (noting it was "unsurprising" that officers' versions of facts differed from plaintiff's). To the extent that a jury discounts the officers' testimony or believes that the officers lacked basis to detain or arrest Ford or that Officer Durrant, Officer Bragg, and Lieutenant Rappé failed to consider other less intrusive tactics than delivering multiple focused blows to Ford's head, dragging Ford, and delivering more focused blows while Ford was held down, a reasonable jury could find that the use of force was constitutionally unreasonable.

Accordingly, Officer Durrant, Officer Bragg, and Lieutenant Rappé are not entitled to summary judgment on Ford's § 1983 excessive force claim.

### d. *Qualified Immunity*

Officer Durrant, Officer Bragg, and Lieutenant Rappé are also not entitled to qualified immunity on Ford's excessive force claims.

In ruling on a qualified immunity claim, courts ask "whether, taken in the light most favorable to the party asserting the injury, do the facts alleged show [that] the officer's conduct violated a constitutional right?" *Ballentine v. Tucker*, 28 F.4th 54,

61 (9th Cir. 2022) (cleaned up).  "Summary judgment [based] on qualified immunity is not proper unless the evidence permits only one reasonable conclusion."  *Id.* (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000)). The Court has already determined that genuine issues of material fact preclude summary judgment on the question of whether Officer Durrant, Officer Bragg, and Lieutenant Rappé used excessive force against Ford.

Even assuming that Ford engaged in any resistance, the evidence supports that it rose only to the level of "passive resistance," or repeated refusal to move back behind the barricade or to disperse.  *See Nelson*, 685 F.3d at 881 ("failure to fully or immediately comply with an officer's orders" does not rise "to the level of active resistance"); *see also Young*, 655 F.3d at 1165–66 (repeated refusal to reenter vehicle at officer's command is not active resistance); *Bryan*, 630 F.3d at 829–30  (repeated failure to comply with officer's command to remain in vehicle was not active resistance); *Smith*, 394 F.3d at 703 (reentry of home and refusal to remove hands from pockets despite officers' orders to place hands on head and walk toward them was not active resistance); *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002), *as amended* (Jan. 30, 2002) (protesters who remained seated and linked themselves together using "black bear" devices despite officers' orders to disperse were not actively resisting).

"The principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest, was thus well-established in 2001[.]"

*Young*, 655 F.3d at 1168. "[T]he use of intermediate force in general . . . constitutes an excessive response to a suspect's commission of a misdemeanor and disobedience of a police order." *Id.* And, in 2013, the Ninth Circuit held that "the right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013); *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 478 (9th Cir. 2007) (denying defendant's summary judgment motion where officers used excessive force to gang-tackle a suspect after suspect refused to kneel down to be handcuffed and officers "did not try to handcuff [the suspect] before the three officers tackled him"). It was also clearly established, in July 2020, that the use of intermediate force is unreasonable where a suspect is already subdued. *See Smith*, 394 F.3d at 701–02 (applying intermediate force after officers "had [plaintiff] pinned to the ground" was constitutionally unreasonable).

Thus, in July 2020, a reasonable officer would have known that delivering repeated focused blows to the head of an individual, dragging, and sitting on that individual to deliver more focused blows to the head when that individual is not actively resisting arrest and does not pose a danger to officers or the public safety is a constitutionally unreasonable use of force.

For these reasons, Officer Durrant, Officer Bragg, and Lieutenant Rappé are not entitled to qualified immunity on Ford's § 1983 excessive force claim.

2.    *Plaintiff Jourdan*

Plaintiff Jazmine Jourdan brings a § 1983 excessive force claim against Officer Bragg for pushing her from behind and "tackling" her to the ground, and against Officer Durrant for delivering repeated focused blows to her head while she was on the ground.  SAC ¶¶ 111–112.

Jourdan alleges that she "was with Mr. Ford and other protesters who were at the very front of the crowd and approached the barricades at around 8:50 pm[,]" SAC ¶ 110, that "[w]hen the officers rushed the crowd, [her] back was to the police[,]" *id.* ¶ 111, and that Officer "Bragg shoved [her] in the back, from behind, into the crowd" so that she "ended up on the ground with Mr. Ford and [Officer] Durrant on top of her[,]" *id.*, and that "while [she] was on the ground, [Officer Durrant] repeatedly punched [her] with a closed fist in the face, resulting in facial hematomas and bruising, as well as a concussion[,]" *id.*

a.    *Severity of Intrusion*

Jourdan alleges that "[Officer] Bragg shoved [her] in the back, from behind, into the crowd[.]"   SAC ¶ 111.  And she testified that she ended up in a pile under one protester and three police officers, Jourdan Dep. 46:15–17, ECF No. 124-4, and that the officers on top of her and Ford "wouldn't let [them] out basically from under them[,]" Jourdan Dep. 88:14–15, ECF No. 114-5.  Jourdan also testified that "[she] was being brutally beat up" by Officer Durrant while she was in the pile of people. *Id.* at 88:16–21.  Officer Durrant stated that "[he] delivered several focused blows to Jourdan's head."  Ex. 511, Durrant Rep. at 5.

"A physical tackle that results in severe injury may constitute a significant use of force." *Andrews v. City of Henderson*, 35 F.4th 710, 716 (9th Cir. 2022) (explaining that a tackle or takedown maneuver may constitute intermediate force, most clearly when the plaintiff suffers injury because of the maneuver) (collecting cases). Here, Officer Bragg may have used intermediate force.

Focused blows are intermediate force. Officer Durrant used intermediate force because he delivered multiple focused blows to Jourdan's head and face and he did so while Jourdan was pinned to the ground. Each use of intermediate force "must be justified by a commensurately serious state interest." *Young*, 655 F.3d at 1162–63.

> b.    *Government Interest*

Jourdan was not charged with a crime at the time that Jourdan was tackled to the ground. Officer Durrant stated that "[he] did not use any force against Ms. Jourdan with the intent to arrest her." Durrant Decl. at 2, ECF No. 118. The first factor favors Jourdan.

The second and most important factor used to determine the strength of the government interest is whether the suspect posed an immediate threat to the officers' or public's safety. *Graham*, 490 U.S. at 396; *Chew*, 27 F.3d at 1441.

Officer Bragg provides no evidence or argument that the government had any interest in tackling and taking down Jourdan. At the time that he shoved her, she had her back to him. She posed no safety risk to the officer or the public. Officer Bragg did not file an incident report for this case. *See* Bragg Decl., ECF No. 115. In his declaration, Officer Bragg stated generally:

> I did not arrest anyone, use force against anyone, or otherwise take any
> action on the basis of any individuals' race, viewpoint, or any protected
> content of their speech. The only force I used was that which was
> reasonably necessary to effect the arrest of individuals who I had
> probable cause to arrest, to defend myself and other officers, and to
> maintain the police line at South 67th and Dogwood to prevent the
> protesters from overrunning the barricades and accessing Main Street.

*Id.* at 2. When Jourdan was asked whether she was "interfering with the police when [she] got involved in the altercation," she answered, "No. The police jumped on me. I was stuck under . . . four people." Jourdan Dep. 50:25–51:04, ECF No. 124-4.

Officer Durrant stated that after Jourdan was pushed to the ground "she was actively and violently interfering with" Ford's arrest because she "had a firm grasp around Ford" and that she "[was] biting [his] wrist." Ex. 511, Durrant Rep. at 5. He stated that first "he attempted to push underneath [Jourdan's] chin in hopes that it would cause her to relinquish Ford however it did not work." *Id.* He then "delivered several focused blows to Jourdan's head causing her to let go of [his] wrist with her teeth . . ." and to let go of Ford. *Id.* at 5–6.

Jourdan alleges that "[Officer] Durrant falsely claimed that the reason he punched [her] in the head repeatedly was because [she] bit his wrist[,]" SAC ¶ 114, and that "Officer Durrant failed to obtain any medical care, or follow Springfield Police Department policies regarding bites or other injuries that bear risk of biological contamination[,]" *id.* ¶ 115. Officer Durrant provided no documentation of the bite injury until August 26, 2020, nearly a month after it occurred when he filed a supplemental report. Durrant Decl., Ex. 511, (Officer Bronson Durrant, Springfield Police Dep't, Supp. Incident Rep. 20-05350,) at 14, ECF No. 118-1. Officer Durrant

filed the supplemental report at the request of the Lane County Deputy District Attorney. *Id.* In that report, Officer Durrant stated: "the mark was still visible on my wrist nearly a month later and the skin hadn't closed completely" and "created substantial pain." *Id.* at 14. The report includes a photo of the alleged injury which shows a single round pencil-sized puncture wound, partially healed, on the outer side of Officer Durrant's right lower forearm, just above his watch. *Id.* at 15. The Lane County District Attorney's office brought assault charges against Jourdan, but all charges against her were dismissed on June 23, 2022. SAC ¶ 117.

Before punching Jourdan in the head, Officer Durrant stated that he "attempted to push underneath [Jourdan's] chin in hopes that it would cause her to relinquish Ford however it did not work." Ex. 511, Durrant Rep. at 5. Even assuming that Jourdan did bite Officer Durrant, he does not state whether he gave her a "proper warning" or considered the less intrusive alternative of moving his hand away from her face. "[W]arnings should be given, when feasible, if the use of force may result in serious injury." *Glenn v. Washington Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011). And Officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Glenn*, 673 F.3d at 876 (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994)). Resolving disputed questions of fact in the light most favorable to the non-moving party, the second factor favors Jourdan.

The third factor used to determine the strength of the government interest is whether the suspect was "actively resisting arrest or attempting to evade arrest by

flight." *Graham*, 490 U.S. at 396.  The third factor favors Jourdan because the parties agree that Jourdan was not under arrest and Officer Durrant stated that "[he] did not use any force against Ms. Jourdan with the intent to arrest her."  Durrant Decl. at 2.

Another factor that weighs for the government is Officer Durrant's contention that Jourdan was interfering with Ford's arrest, a fact that Jourdan disputes.

        c.    *Balance of Factors*

Viewing the evidence and drawing all reasonable inferences in favor of the non-movant, the factors, on balance, weigh in Jourdan's favor.

Officer Bragg offers no reason for pushing Jourdan to the ground from behind. She was standing with her back to the barricade and was not a threat to officer or public safety.  The evidence raises issues of material fact as to whether Officer Bragg's use of force was constitutionally justified.  For this reason, Officer Bragg is not entitled to summary judgment on Jourdan's § 1983 excessive force claim.

As to Officer Durrant, the facts are unclear.  Officer Durrant contends that the intermediate use of force against Jourdan was reasonable because she both threatened his safety (by biting him) and was interfering in Ford's arrest.  But Jourdan disputes those facts.  Jourdan testified that neither she nor Ford were resisting or interfering with the officers and that they could not have because "[she] was stuck under one protester and three police officers, so I was not really going anywhere[,]" Jourdan Dep. 46:15–17, and that "Ford was under police officers, so he

was . . . trying to protect his throat and—area, but he didn't really have anywhere to go[,]" *id.* at 93:03–06.

In ruling on a summary judgment motion, a court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in her favor. Here, the evidence raises genuine issues of material fact as to whether Officer Durrant's use of intermediate force was justified. On this record, a reasonable jury could find that it was not.

For the reasons above, neither Officer Bragg nor Officer Durrant is entitled to summary judgment on Jourdan's § 1983 excessive force claim.

d.    *Qualified Immunity*

Neither Officer Bragg nor Officer Durrant is entitled to qualified immunity on Jourdan's excessive force claims. In ruling on a qualified immunity claim, the Ninth Circuit asks "whether, taken in the light most favorable to the party asserting the injury, do the facts alleged show [that] the officer's conduct violated a constitutional right?" *Ballentine*, 28 F.4th at 61 (cleaned up).

Officer Bragg offers no reason for pushing Jourdan to the ground. It was clearly established in July 2020 that the use of intermediate force "must be justified by a commensurately serious state interest." *Young*, 655 F.3d at 1162–63.

As to Officer Durrant, the Court has also already determined that there are genuine issues of material fact that preclude summary judgment for Officer Durrant on Jourdan's excessive force claim. Resolving disputed facts in the Jourdan's favor— that she was not a threat to officer or public safety and that she was not interfering

with Ford's arrest—Officer Durrant lacked justification to use intermediate force. It was clearly established in July 2020 that absent a serious state interest, the use of intermediate force is constitutionally unreasonable. *Id.*

For these reasons, neither Officer Bragg nor Officer Durrant is entitled to qualified immunity on Jourdan's § 1983 excessive force claim.

### 3. *Plaintiff Allums*

Plaintiff Martin Allums brings a § 1983 excessive force claim against Officer O'Leary or Officer Sorby for striking him in the face with a baton and breaking his nose. Allums alleges that "[he] was at some point struck in the face by (upon information and belief) [Officer] Sorby and/or [Officer] O'Leary, while [he] was trying to assist a protester up from the ground, who was in danger of being trampled." SAC ¶ 109. Allums alleges that "[a]fter [he] quickly explained the situation, [Officer] Sorby or [Officer] O'Leary nodded at [him,]" but that "as [Allums] helped the person up, [Officer] Sorby and/or [Officer] O'Leary struck [him] in the face, breaking his nose and causing other injuries." *Id.* Allums testified:

> I saw that those two people had fallen down onto the ground, and so I had looked up to that officer and talked to that officer saying, 'Hey, there are some people on the ground. This is, you know, kind of a crisis situation. Can I go down and pick them up?' . . . Then that officer said, 'Yes.' I had my hands up saying, like, Hey, I don't have anything in my hands. Went down to go pick them up. As I was down on the ground trying to pick them up, someone came at me with a swing and they hit me on the right side of my head.

Allums Dep. 59:03–18, ECF No. 124-2. Allums further testified that he was struck with a "blunt object" that swung across his head and hit both his head and his nose[,] *id.* at 59:04–25, that "[he] could not tell if its was a police baton" but thought that the

blow came from an officer because "when [he] was looking around, the main people who were swinging at the people were officers[,]" *id.* at 60:01–08.

### a.  *Severity of Intrusion*

A baton strike is intermediate force, a "significant intrusion upon an individual's liberty interest, that must be justified by a commensurately serious state interest." *Young*, 655 F.3d at 1162–63.

### b.  *Government Interest*

The government had no interest in hitting Allums in the head with a baton and breaking his nose.  The government does not show that Allums was committing a crime (first factor), that he posed an immediate threat to the officers' or the public safety (second factor), or that he was resisting arrest (third factor).  *Graham*, 490 U.S. at 396.

In his incident report, Officer O'Leary stated that "[he] moved forward into the crowd as [he] observed multiple people punching, kicking, and striking the officers who were on the ground[,]" and that "[he] pushed forward and utilized [his] baton in a horizontal fashion in order to push people back while loudly yelling 'BACK UP[,]'" and that "[a]t one point, a person had grabbed [his] baton and [he] had to physically wrestle it back from them."  O'Leary Decl., Ex. 513, (Officer Connor O'Leary, Springfield Police Dep't, Incident Rep. 20-05350,) at 1, ECF No. 120-2.  Officer O'Leary's BWC did not capture any of the action after Officer Durrant moved toward and took down Ford.  *See* Video Ex. 501.  Officer O'Leary's BWC appears to have been aimed away from the action.

Officer Sorby reported that "[m]ultiple protesters were punching and pulling at Officer Dunant during this time and the crowd was extremely hostile[,]" and that "[he] and other Officers attempted to push the crowd back, using [their] batons, to protect Officer Dunant while making the arrest." Sorby Decl., Ex. 514, (Officer Eric A. Sorby, Springfield Police Dep't, Incident Rep. 20-05350,) at 1, ECF No. 122-1. He also stated:

> I used my baton and attempted to push [a] female back to keep her away from Officer Durrant. The female then grabbed ahold of my baton, with both hands, and tried to take it from me. The female and I played "tug-a-war" over the baton for a moment. I feared if the female was able to take the baton from me[,] she would use it against myself or Officer Durrant who was attempting to effect the arrest. I attempted to pull the baton back and the female continued to hold onto it. At this point I delivered one strike to the females (sic) face (with my hand) to get her to let go of the baton. This was effective and the female immediately let go and fell backwards into the crowd. I could see this caused the female to bleed from the nose area, but once she disappeared into the crowd[,] I never saw her again.

*Id.* In his deposition, Officer Sorby affirms that he "turned the baton sideways at times to jab or poke certain individuals to get them off Officer Durrant and away from officers" but does not remember how many people he "poked" with his baton. Dugan Third Decl., Ex. W, Sorby Dep. 28:20–29:03, ECF No. 144-21.

In sum, neither Officer O'Leary nor Officer Sorby make any statements that refer to Allums. Officers O'Leary and Sorby contend, generally, that they used their batons in a "horizontal fashion" to control the crowd and to stop the crowd from interfering with Ford's arrest. The government has a public safety interest in crowd control and an interest in securing an arrest, but, here, the government offers no evidence that Allums was struck as part of a crowd control or arrest measure.

c.    *Balance of Factors*

On balance, the factors weigh in Allums' favor because when an officer struck Allums with a baton, Allums was not interfering with Ford's arrest, and Allums had explicitly received approval to bend down to help marchers on the ground.  "[A] gratuitous blow to the head with a blunt instrument would clearly constitute excessive force."  *Stauffer v. City of Newberg*, No. 3:17-CV-01295-YY, 2020 WL 1861675, at *13 (D. Or. Mar. 20, 2020) (quoting *Hodsdon v. Town of Greenville*, 52 F. Supp. 2d 117, 124 (D. Me. 1999)).  Where "'[t]he need for the application of force' was . . . nonexistent[,] the alleged force could only have been applied 'maliciously[.]'" *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (cleaned up) (cited with approval by *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001)).

The evidence supports that at least one of the defendants delivered intermediate force by striking Allums' head and nose with a baton swing (not a baton used in "horizontal fashion") immediately after Allums obtained approval to help marchers on the ground.  But Allums is not sure whether it was Officer O'Leary or Officer Sorby or both who used excessive force against him.  This material fact issue must be resolved, if possible, by a jury.  Accordingly, neither Officer O'Leary nor Officer Sorby is entitled to summary judgment on Allums' § 1983 excessive force claim.

d.    *Qualified Immunity*

Neither Officer O'Leary nor Officer Sorby is entitled to qualified immunity. The Court has already concluded that issues of material fact preclude summary judgment in either officer's favor because neither officer provided a serious state

interest sufficient to justify the use of intermediate force.  At the time of the July 2020 march, it was clearly established that "a commensurately serious state interest" was needed to apply such force.  *Young*, 655 F.3d at 1162–63.  For this reason, neither officer is entitled to qualified immunity on Allums' § 1983 excessive force claim.

### 4.     *Plaintiffs Lansing & Johns*

Plaintiffs Mya Lansing and Austin Johns bring a § 1983 excessive force claim against Officer Turner for shoving and poking them with a baton.  Lansing and Johns allege that they were "at the protest not as protestors but in order to film and document the police[.]"  SAC ¶ 128; Reilly Decl., Ex. 3, Lansing Dep. 14:05–23, ECF No. 114-3.  Lansing and Johns were filming from behind the police lines.  Video Ex. DD; Reilly Decl., Ex. 4, Johns Dep. 47:11–16, ECF No. 114-4.  They were not on the marchers' side of the barricade.

Lansing and Johns testify that, while filming behind the police lines, they were threatened by a specific counter protester who hit them with the end of a long flagpole in full view of Defendants, including Officer Turner.  Lansing Dep. 28:22–30:02, ECF No. 124-5; Hendeson Decl., Ex. 533, Johns Dep. 45:16–22, ECF No. 124-6; Video Ex. DD.   During her deposition, Lansing identified Officer Turner from the video.  Lansing Dep. 27:10–12, ECF No. 124-5.  Plaintiffs contend that after they were hit with the flagpole, they sought Officer Turner's help, but instead of helping them, he used his baton to push them into the street, "forcing them to stumble backwards."  Pl. Resp. at 25 (citing Lansing Dep. 31:13–17, ECF No. 124-5; Video Ex. DD).  Plaintiffs allege that "[a]s [Officer] Turner was pushing Johns and Lansing away, another

[counter protesters] ran up and grabbed [Johns'] camera and threw it toward a nearby fence[,]" and it was not ever recovered. SAC ¶ 131; Lansing Dep. 31:24–32:03, 32:10–11; 33:07–16, ECF No. 124-5. Johns alleges that "[he] attempted to retrieve his camera, but the man pushed [Johns] to the ground and attempted to pin him there[]" in full view of Officer Turner. SAC ¶ 131; Lansing Dep. 33:19–25, ECF No. 124-5. Johns alleges that "[Officer] Turner then grabbed [Johns] by his shirt, pulling Johns toward him while using his baton to jab [him] in the chest." SAC ¶ 132. Johns testified that officers "assaulted and pushed [them] out of the area[,]" Johns Dep. 38:02–09, ECF No. 124-6, and that "[s]ome of [the officers] physically put their baton in [his] chest and told [him] that [he] was on the wrong side[,]" *id.* at 38:18–21. The sequence of events was captured on video. *See* Video Ex. DD.

### a.    *Severity of Intrusion*

Lansing testified that Officer Turner pushed her backward into the street with enough force that she stumbled. Johns testified that an officer pushed and poked him with a baton, which is also seen on the video. Officer Turner states that he "softly push[ed] [Plaintiffs] back" with his baton. To be pushed with a baton to move a body requires some application of force—more force than a poke or a soft push. Officer Turner's use of his baton constituted an intrusion on Plaintiffs' liberty interest and on their bodily integrity, though minor.

### b.    *Government Interest*

The government has no interest in pushing Lansing or pushing and poking Johns with batons. Defendants do not dispute that Lansing and Johns were not

committing a crime, that they did not pose an immediate threat to the officers' or the public safety, and that they were not resisting arrest.

In his declaration, Officer Turner stated that he took actions related to two individuals he later learned were Lansing and Johns on the north (police) side of the barricade and that it was "not part of any intent or attempt to arrest or detain those individuals." Turner Decl. at 2, ECF No. 123. In his supplemental incident report filed two weeks after the event, Officer Turner stated:

> l focused my attention on the 2 protesters, a male and a female with cameras who were in their early 20's. I was holding my stick with both hands, around my chest area. I was advising to stay back as I was concerned for other officer's (sic) dealing with protesters trying to break through the barricade. I was softly pushing them back with the stick and after a short time, they left north on S. 67th.

Turner Decl., Ex. 508, (Officer Larry Turner, Springfield Police Dep't, Supp. Incident Rep. 20-05350,) at 1, ECF No. 123-1.

Plaintiffs approached Officer Turner to ask for his help because he had witnessed the counter protester assaults against them. The footage shows the assaults and Lansing's and Johns' appeal for help. It also shows that counter protesters were in the same immediate area, and that Officer Turner used his baton against Lansing and Johns but not against the counter protesters. *See* Video Ex. DD.

### c.   *Balance of Factors*

On balance, the factors favor Lansing and Johns. Officer Turner offers no justification for shoving and poking Lansing and Johns with his baton. "While baton blows are a type of force capable of causing serious injury, jabs with a baton are less intrusive than overhand strikes." *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir.

2018) (internal citation and quotation marks omitted). "[P]hysical pushes, including with batons" do not constitute excessive force where they are used "to disperse a violent and unlawful crowd and protect the safety of the officers and bystanders." *Sernoffsky v. Novak*, 773 F. Supp. 3d 988, 1021 (S.D. Cal. 2025). But, unlike in *Sernoffsky*, where officers used baton pushes to disperse a "violent and unlawful crowd," Officer Turner offers no justification for the use of his baton against Lansing and Johns. Though baton pushes and jabs are minor intrusions on liberty and bodily autonomy, they may constitute excessive force when used gratuitously. "When the circumstances show that there is no need for force, any force used is constitutionally unreasonable." *Acasio v. Lucy*, No. 14-CV-04689-JSC, 2017 WL 1316537, at *6 (N.D. Cal. Apr. 10, 2017) (citing *Fontana*, 262 F.3d at 880). "[A] totally gratuitous blow with a policeman's nightstick may cross the constitutional line and . . . we do not believe that a serious or permanent injury is a prerequisite to a claim under Section 1983." *McDowell*, 863 F.2d at 1307 (6th Cir. 1988). The Ninth Circuit has rejected the requirement that a plaintiff show a "significant injury" to establish an excessive force claim. *Wilks v. Reyes,* 5 F.3d 412, 416 (9th Cir. 1993).

Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that there are genuine issues of material fact as to whether Officer Turner used excessive force against Lansing and Johns. Officer Turner is not entitled to summary judgment on Lansing's and Johns' § 1983 excessive force claims.

### d.    *Qualified Immunity*

Officer Turner is also not entitled to qualified immunity on Lansing's and Johns' § 1983 excessive force claims.  The Court has already determined that issues of material fact preclude summary judgment for Officer Turner on Lansing and Johns' excessive force claims.  Officer Turner officers no justification for using his baton to shove and poke Lansing and Johns, and it was clearly established at the time of the July 2020 march that the use of gratuitous force is unreasonable.  *See Wilks*, 5 F.3d at 416 (upholding jury denial of qualified immunity where officer used gratuitous force against citizen); *see also McDowell*, 863 F.2d at 1307 ("[A] totally gratuitous blow with a policeman's nightstick may cross the constitutional line.").  For this reason, Officer Turner is not entitled to qualified immunity on Plaintiffs' § 1983 excessive force claims.

### C.    *Section 1983 Procedural Due Process Violation*

Plaintiffs' Seventh Claim alleges that Officers Burke and Lane, Detective Weaver, and Dispatcher Pardee deprived them of their liberty interest under ORS 181A.250 and thus violated their Fourteenth Amendment procedural due process rights.  SAC ¶¶ 225–40.  ORS 181A.250 provides that

> No law enforcement agency . .  may collect or maintain information about the political [or] social views, associations or activities of any individual, group, [or] organization . . . unless such information directly relates to an investigation of criminal activities, and there are reasonable grounds to suspect the subject . . . is or may be involved in criminal conduct.

ORS 181A.250, *former* ORS 181.575 (1981).

The Fourteenth Amendment's Due Process Clause provides that "No state shall . . . deprive any person of life, liberty, or property without due process of law[.]" U.S. CONST. amend. XIV, § 1.  A liberty interest may arise either from the Due Process Clause itself or from state law.  *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).  A state law "creates a protected liberty interest by placing substantive limitations on official discretion."  *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983).  The law must contain "particularized standards or criteria [to] guide the State's decisionmakers."  *Id.*  And "[it] must do more than merely channel administrative discretion; [it] must be 'explicitly mandatory.'"  *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

ORS 181A.250, *former* ORS 181.575, has been held to create a constitutionally protected liberty interest in being free from having information about one's political views, associations, or activities being collected and maintained by law enforcement absent (1) a direct relationship to a criminal investigation and (2) reasonable grounds to suspect that one is or may be involved in criminal conduct.  *Challis v. Katz*, No. CIV. 00-047-HA, 2001 WL 34043763, at *6 (D. Or. July 13, 2001).  The statute places "substantive limitations on official discretion" because it is mandatory and contains "particularized criteria[.]"  *Id.* (quoting *Olim*, 461 U.S. at 249, and citing *former* ORS 181.575); *see also Neal v. City of Portland*, No. CIV. 00-703-HA, 2002 WL 31488261, at *2 (D. Or. Sept. 13, 2002) (same).

Plaintiffs allege that Officers Burke and Lane, and Dispatcher Pardee violated ORS 181A.250 and deprived them of their constitutionally-protected liberty interest by collecting and maintaining Plaintiffs' "license plate numbers; the names of people

'associated' with those vehicles; [Black Unity] members' social and political views, associations, and activities; and social media posts regarding lawful planned protests and about concerns regarding the noose" and that this was done absent criminal investigation and reasonable suspicion of criminal conduct. SAC ¶ 230(a).

Plaintiffs also allege that Officer Lane and Detective Weaver violated ORS 181A.250 and their Fourteenth Amendment rights by "infiltrat[ing] Black Unity and join[ing] the march undercover, pretending to be supporters of the march, and while doing so, collect[ing] and maintain[ing] information about Plaintiffs' social and political views, associations, and activities[.]" *Id.* ¶ 230(d).

### 1.    *Officer Lane & Detective Weaver*

During the July 29 march, Officer Lane and Detective Weaver were assigned to work undercover in the crowd of marchers and took photos and videos of the marchers. Lane Dep. 18:16–19; Weaver Dep. 56:10–24. Both Officer Lane and Detective Weaver had worked undercover in prior Black Unity protests and events and had taken photos and videos of the participants during those prior events also. Lane Dep. 16:20–18:19; Weaver Dep. 30:15–18. While undercover, Officer Lane and Detective Weaver sent texts, photos, and videos to each other and to SPD Dispatcher Pardee. Lane Dep. 17:19–22; Weaver Dep. 29:20–30:03; *see also* Ex. R, Lane-Weaver-Pardee texts. Officer Lane testified that, while undercover, he texted on his personal phone and turned the texts over to Detective Weaver. Lane Dep. 17:23–18:12.

Officer Lane contends that he did not violate ORS 181A.250 because "[a]t no point during the July 29, 2020, protest did [he] collect or maintain information about

the social and political views, associations and activities of the Plaintiffs or any other person that was unrelated to any criminal activity." Def. Mot. at 32. Detective Weaver contends that he did not violate the statute because his "data collection was based upon either reasonable suspicion or probable cause as part of the investigation of criminal activities[.]" BW Reply at 7, ECF No. 156.

But Officer Lane's and Detective Weaver's deposition testimonies contradict their assertions. Officer Lane testified that he took the July 29 photos and recordings for "[n]o particular reason. I just took a lot of different pictures and videos." Lane Dep. 19:14–17. When asked whether he saw "any Black Unity people get violent" at prior protests, he answered, "No[,]" and when asked whether he was "in the [July 29] protest as an undercover officer looking to arrest somebody," he answered, "No." *Id.* at 40:14–20. Officer Lane testified that the purpose of his being undercover was "to be a witness in case something did happen[,]" and to give SPD directions about "where they were going" so SPD could "leapfrog them and block traffic so no one got hit by cars." *Id.* at 40:14–17, 41:21–41:15.

As to Detective Weaver, when asked whether he saw "anything being done by any of the protesters that gave rise to reasonable suspicion of a crime[,]" Detective Weaver answered no. Weaver Dep. 40:01–04. He also testified that when undercover:

> [S]ometimes I would take pictures depending on, like if we saw a problem—or someone that we thought was going to be a problem person, I would try to get a picture of them so we would be able to identify them. And honestly if—if there was something amusing, I would take a picture of it.

*Id.* at 56:15–24.  Detective Weaver could not explain why, for example, during the July 29 march, he took a video of Black Unity member Claire Reyna saying something through the microphone.  *Id.* at 56:25–57:09.

Plaintiffs provide evidence that Officer Lane and Detective Weaver participated in the collection and maintenance of information about the political views, associations, or activities of Black Unity members in the absence of any criminal investigation or reasonable suspicion of criminal activity.

### 2.    *Officer Burke*

On July 28, 2020, Officer Burke went to Bluebelle Way in the Thurston Hills neighborhood to visit the home with the noose and the "Don't Tread on Me" Gadson flag.  Ex. Q, Burke Rep. at 6; Video Ex. T.  In his incident report, Officer Burke stated that SPD had "received information regarding Halloween decorations displayed at [the Bluebelle Way home,]" that "[t]he decorations were an apparent target for either the Black Unity and/or Black Lives Matter political organizations[,]" and that "[he] was asked to personally contact the homeowner and discuss the possible removal of his decorations in an effort to keep the peace."  *Id.*  In his deposition, Officer Burke declined to say how the SPD had received information about the "Halloween decorations."  Dugan Third Decl., Ex. S, Burke Dep. 21:06–11, ECF No. 144-18.  At the Bluebelle Way call, Officer Burke wore a body camera and had an in-car video camera, but the video recordings from both cameras "were purged."  *Id.* at 20:03–16.

When Officer Burke arrived at Bluebelle Way, he discovered a Toyota Highlander parked in the road across from the house with the noose and that "two

African American female occupants [were] seated in the Highlander [and were] peering over at the house." Ex. Q, Burke Rep. at 6. Officer Burke called the Highlander's license plate information into SPD Dispatch and reported: "Dispatch advised [that] the vehicle has had prior associations with the local protests that have sprung up since the death of George Floyd in Minneapolis." *Id.*

One of the Highlander occupants was the vehicle owner and Black Unity member, Ms. Haug. Ex. Q, Burke Rep. at 6; Reyna Dep. 09:08–10. The other occupant lived in the house across the street from the house with the noose, Ms. Carr. Ex. Q, Burke Rep. at 6; Video Ex. T. The Highlander was parked in front of Ms. Carr's house. *See* Video Ex. T.

When asked why he ran the Highlander plate, Officer Burke testified that he did not run the plate, he had asked dispatch for a "motor vehicle return" or "MVR," which, he explained, showed that the vehicle had been "involved in riot activity in Eugene[,]" because "somebody had already documented that vehicle [at a protest] in Eugene." Burke Dep. 24:04–13. Officer Burke testified that he requested the MVR because Ms. Haug and Ms. Carr were "peering over at the house [with the noose] with interest[]" but that he did not have reasonable suspicion that they were committing a crime. *Id.* at 23:15–24:05.

After Officer Burke received information about the Highlander from Dispatch, he approached the vehicle and told Ms. Haug that "[he] knew her vehicle had associations with the local protests." Ex. Q, Burke Rep. at 6. Officer Burke then "investigated" the women for about an hour because "[he] gathered that they had

planned to protest[.]" Burke Dep. 35:11–36:06; Ex. Q, Burke Rep. at 7. Officer Burke reported: "My instinct in thinking the occupants of the Highlander may have something to do with the political organization's stated desire to protest in the Thurston area were accurate." Ex. Q, Burke Rep. at 7.

Plaintiffs provide evidence that Officer Burke participated in the collection and maintenance of the license plate data of Ms. Haug, a Black Unity member, although he lacked reasonable suspicion that Ms. Haug was involved in criminal activity, and that he used that information to discern Ms. Haug's political views, associations, or activities.

### 3.  *SPD Dispatcher Pardee*

On July 28, 2020, Dispatcher Pardee was working dispatch when Officer Burke called in the plate from Ms. Haug's Toyota Highlander. Pardee Dep. 19:17–20:16; Dugan Third Decl., Ex. I, Welch Dep. 10:11–13, ECF No. 144-8. She testified that she received Officer Burke's request for an MVR and that when she entered the license plate data, she received a "nature code" from the Computer-Aided-Dispatch ("CAD") software system used by SPD. Pardee Dep. 19:17–20:16. That code connected Ms. Haug's vehicle to prior protests. *Id.* Dispatcher Pardee testified that when officers call-in license plate data of cars at Black Unity protests, she enters that data into the database. *Id.* at 30:09–20. She testified that the license plate data is maintained in SPD databases "somewhere." *Id.* at 20:14–16.

On July 29, during the Black Unity march, Pardee was working dispatch. *Id.* at 35:10–13. She testified that she received texts, photos, and videos from undercover

Officer Lane and Detective Weaver on her personal phone and that she had also communicated with the undercover officers by text, photo, and video during prior marches. *Id.* at 35:10–21, 37:05–25; 39:04–17. She testified that when she received information from the undercover officers that she "felt like the officers working needed to know" that she "relayed that on the radio" and that those radio recordings still exist. *Id.* at 39:25–40:15. She also testified that with the help of two other dispatchers, she monitored a public livestream of the July 29 march that she found through one of her co-workers' Facebook pages. *Id.* at 31:07–32:02, 38:04–39:03. Dispatcher Pardee testified that she looked for a livestream from a particular streamer, and that, when she couldn't find it, she found a live feed from a different streamer that she and others in dispatch monitored. *Id.* at 35:24–37:04. She testified that during other Black Unity protests she is "sure" that they were watching livestreams and maybe Facebook pages. *Id.* at 41:22–25. Finally, Dispatcher Pardee testified that, during the July 29 march, she ran plates for officers including the car of Ford's family after they arrived at the march, and she entered that license plate data and notes about the vehicle's association into the database. *Id.* at 34:23–35:06.

SPD Project Analyst Monroe testified that SPD downloaded the livestreams "after the fact." Monroe Dep. 9:13–10:25. Monroe also testified that SPD took screen shots of public social media posts about Black Unity marches. *Id.*

Dispatcher Pardee contends that she did not violate the statute because she "did not collect or maintain information about the social and political views, associations and activities of the Plaintiffs or any other person that was unrelated to

any criminal activity." Def. Mot. at 34. But in her deposition, Dispatcher Pardee stated that the "purpose of the text messaging with the undercover officers" was "[t]o give us intel and to provide officer safety" and "[t]o make sure that everyone stays safe," rather than for criminal investigation purposes. Pardee Dep. 37:05–10.

Plaintiffs provide evidence that Dispatcher Pardee participated in collecting and maintaining a license plate database that tracked Plaintiffs' associations or activities without reasonable suspicion of criminal activity or connection to a criminal investigation and that, on July 29 and during other Black Unity marches, she monitored live streams, that were then downloaded, and she received and shared texts, photos, and videos of Black Unity protest participants.

### 4.   *Defendants' Arguments*

Defendants first contend that the statute provides no private right of action. Def. Mot. at 32. But Plaintiffs are not suing under ORS 181A.250; they are suing under § 1983, which provides a provide right of action to enforce one's constitutional rights. ORS 181A.250 creates the liberty interest that enables Plaintiffs to vindicate their Fourteenth Amendment rights under § 1983.

Defendants next contend that they cannot be held liable because they are individuals, not "law enforcement agencies." Def. Mot. at 32. ORS 181A.250 provides that "[n]o law enforcement agency . .  may collect or maintain information about the political [or] social views, associations or activities of any individual, group, [or] organization[.]"

"In a § 1983 action, the plaintiff must . . . demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Chaudhry v. Aragon*, 68 F.4th 1161, 1169–70 (9th Cir. 2023) (internal quotation marks omitted) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008)). "Such causation 'can be established' either 'by some kind of direct personal participation in the deprivation' or 'by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Id.* (quoting *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1044 (9th Cir. 1994)).

Defendants do not dispute that they are employees or agents of the SPD and were acting in the scope of their employment when they engaged in the allegedly unlawful actions. The evidence shows that Officer Lane, Detective Weaver, Officer Burke, and Dispatcher Pardee each either personally participated in the collection and maintenance of the proscribed information or that they each set in motion a series of acts which they knew, or reasonably should have known, would deprive Plaintiffs of their constitutional rights. But for their actions, the SPD would not have received and maintained the proscribed information.

Defendants next contend that they did not violate the statute on July 29 because they were "documenting illegal activity occurring during the protest so that police or prosecutors would have the option to follow up and pursue charges." Def. Mot. at 33. Defendants maintain that the march was unlawful because it was not permitted and it exceeded the governor's COVID-era restriction on outdoor gathering size. Def. Mot. at 32–33. Defendants also maintain that "criminal activity was

ongoing," and that, "[a]t times, a large majority of the protesters were engaging in conduct that constituted disorderly conduct in the second degree." SPD Reply at 14.

Defendants offer no evidence that they collected protesters' data because of permit status, crowd size, or any disorderly conduct. Officer Lane testified that he took photos and videos during the July 29 march "for no particular reason" and that he "wasn't actively investigating a crime to arrest somebody." Lane Dep. 19:07–23. Detective Weaver testified similarly. Weaver Dep. 39:02–05; 39:05–40:04. And Dispatcher Pardee testified that photos and videos were shared to "provide officer safety," not for a criminal investigation. Pardee Dep. 37:05–10.

Even assuming that municipal ordinance violations or misdemeanors constitute criminal activity under ORS 181A.250, Defendants provide no evidence to support that the data collection was "directly relate[d] to an investigation of criminal activities[.]" ORS 181A.250. The statute permits data collection only when it is "directly relate[] to an investigation of criminal activities" *and* there are "reasonable grounds to suspect the subject . . . is or may be involved in criminal conduct." *Id.* Finally, the evidence, viewed in the light most favorable to the non-movant, supports that the SPD data gathering project was not limited to the July 29 march but instead was part of a larger ongoing project.

In sum, the evidence, viewed in the light most favorable to Plaintiffs, supports that Officer Burke and Dispatcher Pardee personally participated in the collection and maintenance of a license plate database to track the political views, associations, and activities of Plaintiffs at the July 29 march and other Black Unity events; that

Officer Lane, Detective Weaver, and Dispatcher Pardee personally participated in the collection and maintenance of texts, photos, and videos of Plaintiffs at the July 29 march and other Black Unity events; and that Dispatcher Pardee personally participated in the collection and maintenance of social media posts and livestreams of the July 29 march and other Black Unity marches. On this record, a reasonable jury could find that Defendants violated ORS 181A.250 and Plaintiffs' due process rights. Defendants are not entitled to summary judgment on Plaintiffs' § 1983 procedural due process claim.

### 5.  *Qualified Immunity*

Defendants are not entitled to qualified immunity on Plaintiffs' procedural due process claim. Qualified immunity shields state officials "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Here, a statute, ORS 181A.250, is implicated.

The Court has already determined that there are genuine issues of material that preclude summary judgment for Defendants on Plaintiffs' Fourteenth Amendment claim. The question is whether the statutory right—the right to be free from having law enforcement collect and maintain data on one's political views, associations, or activities absent criminal investigation—was well-established at the time of the July 29, 2020 march.

Plaintiffs contend that the statutory rights created by ORS 181A.250 were clearly established at the time of the July 2020 march because the plain language of ORS 181A.250 provides fair notice of the proscribed conduct. That is, "ORS 181A.250 is plain in its language." Pl. Resp. at 36 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (fair notice provided by state department of corrections' regulations and government reports in addition to circuit court precedent prohibiting the alleged conduct) and *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017) (fair notice provided by "a pertinent state statute warn[ing] defendants in unmistakable language" that the alleged conduct would result in the loss of immunity for such conduct)).

ORS 181A.250, *former* ORS 181.575, was enacted in 1981 and is not new law. Its language is clear; it speaks directly to law enforcement officials and expressly proscribes certain types of data collection and record-keeping. In his deposition testimony, Chief Lewis stated: "I think I had training about [ORS 181A.250] in the past but I don't specifically remember when and where. . . . I'm aware of this statute because I worked narcotics for a number of years and you can't just keep—we knew you can't just keep a record on a group, whether it's democrats, republicans, or a biker gang unless there's criminal activity involved in that—an actual keeping a file." Lewis Dep. 59:19–24; 62:16–63:05. Dispatcher Monroe testified that she became aware of the statute "probably years ago" and stated, "I remember that we talked about it during all these protests." Monroe Dep. 11:12–12:05. Detective Weaver testified that, before this lawsuit, he was not familiar with "the specific ORS" but

"knew in general that law enforcement wasn't supposed to, like, maintain databases about, you know, people because, you know, this person's a democrat or whatever or because of political affiliations or political activity." Weaver Dep. 20:15–25.

On this record, the Court concludes that Defendants had actual notice that the alleged data collection was unlawful and that it violated their subjects' statutory rights. The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker,* 576 F.3d 979, 993 (9th Cir. 2009). Here, given Defendants' knowledge of the substance of ORS 181A.250, their violation of Plaintiffs' statutory rights was not a reasonable mistake. For these reasons, Defendants are not entitled to qualified immunity on Plaintiffs' § 1983 procedural due process claim.

D.     *Section 1983 First Amendment Retaliation*

Plaintiffs' Eighth Claim alleges that SPD "[D]efendants took action against them because of the message of the protests," which contained speech critical of police mistreatment of Black people. Pl. Resp. at 37–38; SAC ¶¶ 249–53. Plaintiffs allege that Defendants engaged in the following retaliatory acts:

> Barricading Plaintiffs' route and "kettling" the marchers;
> Failing to investigate and enforce the law against counter protesters;
> Surveilling and collecting data on Plaintiffs' lawful activities;
> Infiltrating the march with undercover officers;
> Declaring an unlawful assembly;
> Threatening arrest;
> Threatening the use of force;
> Using excessive force.

Pl. Resp. at 36–37.

Page 83 – OPINION AND ORDER

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "Governmental 'action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.'" *Mendocino Env't Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 464 (9th Cir. 1994) (quoting *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986), *cert. denied*, 479 U.S. 1054 (1987)). A plaintiff who alleges retaliatory state action intended to chill First Amendment activity "may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives." *Id.* at 464. But "where a plaintiff alleges discrete acts of police surveillance and intimidation directed solely at silencing her or him, a civil rights claim will lie." *Id.* (cleaned up).

To establish a First Amendment retaliation claim, a plaintiff "must show that (1) they were engaged in a constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1212 (W.D. Wash. 2020) (citing *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)).

### 1.    *Constitutionally Protected Activity*

First, Plaintiffs must show that they were engaged in a constitutionally protected activity. *Pinard*, 467 F.3d at 770. Plaintiffs contend that they were protesting police mistreatment of Black people and that they did so in a public forum.

Video footage shows that some of the marchers used obscene words and gestures and verbal taunting. Though Defendants may find such speech offensive, it "is fully protected by the First Amendment." *Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d at 1212–13 (quoting *Collins*, 110 F.3d at 1371). Indeed, the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill*, 482 U.S. 451, 461 (1987) (yelling obscenities and threats at a police officer, without more, is protected speech); *see also United States v. Poocha*, 259 F.3d 1077, 1080 (9th Cir. 2001) ("[T]he First Amendment protects verbal criticism, challenges, and profanity directed at police officers[.]"). "The law is also clear that the government may not prohibit angry or inflammatory speech in a public forum unless it is (1) 'directed to inciting or producing imminent lawless action' *and* (2) 'likely to incite or produce such action.'" *Collins*, 110 F.3d at 1371 (quoting *Brandenburg*, 395 U.S. at 447).

The parties do not dispute that Plaintiffs' expressive activity was conducted on a public street, a traditional public forum. And the video footage (reviewed above) shows no evidence that Plaintiffs' speech was either directed to inciting imminent lawless action or likely to incite or produce such action.

### 2. *Chilling Effect*

Second, Plaintiffs must show that Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity. *Pinard*, 467 F.3d at 770. "The mere threat of harm, without further action, can have a chilling effect." *Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d at 1213 (citing

*Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009)); *see also White v. Lee*, 227 F.3d at 1228 ("Informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment[.]" (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

Plaintiffs maintain that Defendants' actions would chill a person of ordinary firmness from engaging in a future street march in Springfield.  Pl. Resp. at 36–37. Resolving disputed facts in the light most favorable to the non-movant, the evidence shows that Defendants imposed and enforced an unlawful barricade on the marchers' route, declared the march unlawful, and ordered the marchers to disperse; enforced the barricade only against the marchers but not against the counter protesters; used excessive force including focused blows against marchers; indiscriminately used batons to push and strike marchers; informed counter protesters about the barricade and diversion plan but withheld that information from the marchers; forced the marchers to re-route via Dogwood Street—the only route back to the park—where Defendants knew that hostile and armed counter protesters waited; and infiltrated the march to collect and maintain data on marchers absent criminal investigation or reasonable suspicion of criminal conduct.

On this record, the Court concludes that a reasonable jury could find that Defendants' actions would chill a person of ordinary firmness from engaging in future street marches in Springfield.

### 3. *Retaliatory Motive*

Third, Plaintiffs must show that "the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard*, 467 F.3d at 770. Plaintiffs need not show that the only motivating factor for Defendants' actions was retaliation. "[T]here is a right to be free from retaliation even if a non-retaliatory justification exists for the defendants' action." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). But "[t]o prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman*, 547 U.S. at 259). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Id.* (emphasis in original). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399.

Defendants argue that "[n]one of [their] actions had anything to do with the viewpoint of the Plaintiffs." Def. Mot. at 35. They maintain that they acted "to ensure the safety of everyone present to the greatest extent possible." *Id.* at 34. They argue that they erected the barricades to "prevent the protest from proceeding onto a potentially deadly stretch of road[,]" *id.* at 34, that they ordered protesters to disperse after "observ[ing] several protesters defying lawful commands not to cross or tamper with the barricades" and "learning that the protesters intended to push through the police line" imminently, *id.* at 34–35, and that they ordered Ford's arrest because he was "the main participant in and agitator of the unlawful activity[,]" *id.* at 35.

First, Defendants fail to explain the evidence that suggests that they treated counter protesters favorably and to the marchers' detriment. Second, Plaintiffs provide evidence that Black Unity and its mission and message were well known to SPD and that the July 29 law enforcement response was indiscriminately aimed at the march itself, not at individual marchers. For example, Defendants allegedly imposed and enforced an unlawful barricade, diverted marchers into areas where hostile counter protesters waited, turned a blind eye to counter protester assaults, used force without justification, and surveilled marchers absent criminal circumstances. "As other district courts have noted, given that the protestors were specifically protesting police misconduct, it is reasonable to allege that the protestors' viewpoint was a substantial or motivating cause—even if not necessarily the sole cause—behind the defendants' conduct." *NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382, 399–400 (N.D. Cal. 2021). In the context of a march, an indiscriminate law enforcement response, as here, may permit an inference that the response was provoked by the marchers' message not by allegedly unlawful acts committed by individual marchers.

In sum, whether Defendants would have taken such actions "even in the absence of [any] animus or retaliatory motive arising from [Plaintiffs'] speech" is a jury question. *Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (citing *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020)). Resolving disputed facts in favor of the non-movant, the Court concludes that there is a genuine issue of material fact as to whether Defendants were substantially motivated to chill or limit Plaintiffs'

First Amendment activity because of the content of Plaintiffs' speech. On this record, a reasonable jury could infer that, absent animus or retaliatory motive, Defendants would not have taken the actions at issue here. For this reason, Defendants are not entitled to summary judgment on Plaintiffs' § 1983 First Amendment retaliation claim.

### 4. *Defendants Officer Burke & Detective Weaver*

Officer Burke and Detective Weaver maintain that they are entitled to summary judgment because Plaintiffs cannot show that they engaged in "improper conduct" or that either of them "desired to cause a 'chilling' effect that was a 'but-for' cause of their alleged deficient actions." BW Mot. at 13 (quoting *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006)).

Plaintiffs allege that Officer Burke's and Detective Weaver's retaliatory acts included surveillance of Black Unity members. The Court has already determined that the evidence supports that Officer Burke personally participated in the collection of license plate data connected to Plaintiffs' political views, associations, or activities. And the evidence supports that Detective Weaver personally participated in collecting and maintaining photos, videos, and other data connected to Plaintiffs' political views, associations, and activities. Further, Officer Burke and Detective Weaver provide no evidence that they surveilled Plaintiffs as part of a criminal investigation or based on any reasonable suspicion that the subjects were engaged in criminal activity. "[W]here a plaintiff alleges discrete acts of police surveillance and intimidation directed solely at silencing her or him, a civil rights claim will lie."

*Mendocino*, 14 F.3d at 464 (cleaned up).  The intent to deter speech "may be met with either direct or circumstantial evidence" and often "involves questions of fact that normally should be left for trial."  *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020) (citing *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002)).  Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that there is a genuine issue of material fact as to whether Officer Burke and Detective Weaver were substantially motivated to surveil Plaintiffs out of animus or retaliatory motive arising from the content of Plaintiffs' speech.  On this record, a reasonable jury could infer that, absent such motive, Officer Burke and Detective Weaver would not have surveilled Plaintiffs.

Officer Burke and Detective Weaver also maintain that they are entitled to summary judgment because Plaintiffs cannot "show that they were actually deprived of any of their rights to assemble or petition the government for redress of their grievances."  BW Mot. at 13.  They allege that "Plaintiffs participated in subsequent marches after July 29, 2020."  *Id.*  In other words, Officer Burke and Detective Weaver contend that Plaintiffs were not in fact deterred from continued First Amendment activity.  But "'[o]rdinary firmness' is an objective standard that will not 'allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.'"  *Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d at 1213 (quoting *Mendocino*, 192 F.3d at 1300).  That Plaintiffs persisted in their First Amendment activities despite Officer Burke's

and Detective Weaver's actions does not entitle Officer Burke and Detective Weaver to summary judgment on Plaintiffs' First Amendment retaliation claim.

     5.    *Qualified Immunity*

Defendants are not entitled to qualified immunity on Plaintiffs' § 1983 First Amendment retaliation claim.

The Court has already determined that there are genuine issues of material fact as to Defendants' retaliatory motive. "Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013), *abrogated on other grounds by, Nieves v. Bartlett*, 587 U.S. 391 (2019). The Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (citing *Cox v. Louisiana*, 379 U.S. 536, 550 (1965)). Indeed, "it has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008).

    For this reason, Defendants are not entitled to qualified immunity on Plaintiffs' § 1983 First Amendment retaliation claim.

IV.    *Conspiracy to Deprive Civil Rights*

Plaintiffs' Fourth, Fifth, and Sixth Claims allege that SPD Defendants conspired to deprive them of their civil rights under §§ 1983, 1985(3), and 1986.  SAC ¶¶ 195–224.

A.    *Section 1983 Conspiracy Claim*

Plaintiffs' Fourth Claim alleges that SPD Defendants conspired to deprive them of their First, Fourth, and Fourteenth Amendment rights under 42 U.S.C. § 1983.  SAC ¶¶ 195–202.

As in other § 1983 claims, § 1983 conspiracy claims can be brought only against state actors, not private parties.  *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010).  To establish a § 1983 civil rights conspiracy claim, a plaintiff must show: (1) a conspiracy; (2) to deprive the plaintiff of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) injury or deprivation of rights.  *Comm. for Immigr. Rts. of Sonoma Cnty. v. Cnty. of Sonoma*, 644 F. Supp. 2d 1177, 1203 (N.D. Cal. 2009) (citing *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992)).  "Conspiracy is not itself a constitutional tort under § 1983."  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012).  There must be an underlying constitutional violation.  *Id.*  "Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the [§ 1983] violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired."  *Id.*

The Court has already determined that a reasonable jury could find that each Defendant engaged in conduct that resulted in the alleged constitutional injuries, which satisfies the second and fourth elements of the conspiracy claim.

At issue are the remaining two conspiracy elements: "an agreement or meeting of the minds to violate [a plaintiff's] constitutional rights[]" and an overt act or acts in furtherance of that objective. *Mendocino*, 192 F.3d at 1301 (quoting *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (*en banc*)). "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached a[n] understanding to achieve the conspiracy's objectives." *Id. at* 1301 (cleaned up). The conspiracy must have as its "conscious objective" the impairment of the plaintiff's right. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993). And the plaintiff "must state specific facts to support the existence of the claimed conspiracy." *Burns v. Cnty. of King*, 883 F.2d 819, 821 (9th Cir. 1989); *see also Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1039 (9th Cir. 1991) ("A mere allegation of conspiracy without factual specificity is insufficient to support a claim.").

Here, Plaintiffs allege that Defendants met before and during the July 29 march to formulate a plan to chill and limit Plaintiffs' First Amendment activity. Plaintiffs allege that Defendants took steps to further that objective. Those steps include the actions already reviewed by the Court. Plaintiffs also allege that

Defendants "assist[ed] each other" to carry out those actions, "len[t] their physical presence and support and authority of their office to each other" and "foment[ed] the [counter protesters], who would violently interfere with [Black Unity's] march[.]" SAC ¶¶ 196–99.

Plaintiffs provide evidence that Defendants acted in concert to impair Plaintiffs' First Amendment activity. The evidence supports that, in addition to imposing a barricade, declaring the march unlawful, and issuing a dispersal order, Defendants enforced the barricade against the marchers but not the counter protesters; alerted a counter protester—with a social media channel and following—about SPD's plan to barricade and divert the march but failed to inform Plaintiffs; trapped Plaintiffs between the police barricade and armed hostile counter protesters; and were aware of—and in some cases directly witnessed—counter protester attacks against marchers including Plaintiffs, but failed to take appropriate action. And Plaintiffs provide evidence that each of the Defendants took some part in those actions.

An agreement or meeting of the minds to violate Plaintiffs' constitutional rights "need not be overt[] and may be inferred on the basis of circumstantial evidence such as the [Defendants'] actions[.]" *Mendocino*, 192 F.3d at 1301. "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* at 1302. "[A] showing that the alleged conspirators have committed acts that are unlikely to

have been undertaken without an agreement may allow a jury to infer the existence of a conspiracy." *Id.* (internal citation and quotation marks omitted).

Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that, on this record, a reasonable jury could find that Defendants had a meeting of the minds to limit and chill Plaintiffs' First Amendment activity and that Defendants engaged in some or all of the alleged acts to further that objective. For this reason, Defendants are not entitled to summary judgment on Plaintiffs' § 1983 civil rights conspiracy claim.

Officer Burke and Detective Weaver contend that they are entitled to summary judgment on Plaintiffs' conspiracy claims because Plaintiffs "failed to allege, and cannot offer evidence demonstrating . . . which [individuals] Officer Burke or Detective Weaver conspired with, . . . 'how they conspired and how the conspiracy led to a deprivation of [Plaintiffs'] constitutional rights,' 'the period of the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose[.]'" BW Mot. at 23 (quoting *Bonnette v. Dick*, No. 1:18-cv-0046-DAD-BAM, 2020 WL 3412733, at *4 (E.D. Cal. June 22, 2020) (citation omitted)).

Officer Burke collected and shared license plate data with Dispatcher Pardee on Black Unity member Haug's Toyota Highlander. In his report, Officer Burke stated, "My instinct in thinking the occupants of the Highlander may have something to do with the political organization's stated desire to protest in the Thurston area were accurate." Ex. Q, Burke Report at 3, 4.

Detective Weaver worked undercover with Officer Lane during the July 29 march and at other Black Unity marches to take and share photos and videos of Plaintiffs and other marchers.    He testified that he did so absent criminal investigation or reasonable suspicion of criminal conduct.  Weaver Dep. 56:10–24.

Officer Burke and Detective Weaver each took actions that violated Plaintiffs' Fourteenth Amendment right to be free of having one's political views, associations, or activities collected and maintained by law enforcement officers absent criminal investigation or reasonable suspicion of criminal conduct.  And they did so with the help of other Defendants.  On this record, a reasonable jury could infer that Officer Burke and Detective Weaver took those actions in furtherance of an agreement to chill or limit Plaintiffs' First Amendment rights.

B.    *Sections 1985(3) and 1986 Conspiracy Claims*

Plaintiffs Fifth and Sixth Claims allege that SPD Defendants conspired to deprive them of equal protection of the laws on the basis of race under 42 U.S.C. §§ 1985(3) and 1986.  SAC ¶¶ 203–13, 214–224.

Section 1985(3), the Ku Klux Klan Act of 1871, was enacted by the Reconstruction Congress to protect southern Blacks and their allies from conspiracies to deprive them of their legally protected rights under the Thirteenth and Fourteenth Amendments.  *Sever*, 978 F.2d at 1536; *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 833 (1983); *see also Briscoe v. LaHue*, 460 U.S. 325, 337 (1983) ("Hours of oratory [preceding the Act's passage] were devoted to the details of Klan outrages—arson, robbery, whippings, shootings, murders, and

other forms of violence and intimidation[.] . . . Proponents of the measure repeatedly argued that, given the ineffectiveness of state law enforcement and the individual's federal right to 'equal protection of the laws,' an independent federal remedy was necessary[.]").

> Section 1985(3) provides, in relevant part:
>
> If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, . . . [and] . . . if one or more persons . . . cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages  . . . against any one or more of the conspirators.

42 U.S.C. § 1985(3).

To establish a § 1985(3) violation, a plaintiff must allege and prove: (1) a conspiracy; (2) to deprive that plaintiff of equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) injury or deprivation of rights.  *Sever*, 978 F.2d at 1536.

As discussed above, Plaintiffs have raised genuine issues of material fact as to the first, third, and fourth elements.  To establish the second element, Plaintiffs must show that they are members of a protected class and that the deprivation of the right in question was motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus[.]"  *Id.* (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).  Here, Plaintiffs allege that they are members of a protected class of Black people and their supporters, SAC ¶¶ 206–07, and that Defendants were motivated by racial animus to deny them equal protection of the laws under the First,

Fourth, and Fourteenth Amendments and to deny them freedom from racial violence, *id.* ¶¶ 198–199, 208–210.

Plaintiffs also allege a § 1986 conspiracy claim.  Section 1986 provides, in relevant part:

> Every person who, having knowledge that any of the wrongs conspired to be done [under § 1985] are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented[.]

42 U.S.C. § 1986.

A § 1986 claim thus depends on a valid § 1985 claim.  *Trerice v. Pedersen*, 769 F.2d 1398, 1403 (9th Cir. 1985).  "Section 1986 imposes liability on every person who knows of an impending violation of section 1985 but neglects or refuses to prevent the violation."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) (citing 42 U.S.C. § 1986).

Unlike § 1983 conspiracy claims, § 1985(3) and § 1986 claims can be brought against private parties.  *Griffin*, 403 U.S. at 105.  Here, though Plaintiffs do not name private parties as defendants in this suit, they allege that Defendants conspired with private parties to deprive them of equal protection of the laws, including the "right to be free from racial violence by private parties[.]"  SAC ¶¶ 209–10.  Specifically, Plaintiffs allege that Defendants "facilitated the [counter protesters'] harassment, violent assaults, and other hate crimes" against them.  *Id.* ¶ 210.

To support their §§ 1985(3) and 1986 claims, including the allegation that Defendants' actions were motivated by racial animus, Plaintiffs cite, in addition to the evidence the Court has already recounted, the following:

1. On July 28, 2020, the day before the march, "Officer Burke made numerous statements evidencing extreme [racial] animus towards Black Unity." Pl. Resp. at 25 (citing Video Ex. T, Haug video).

   The video shows a discussion between Officer Burke and Ms. Haug and Ms. Carr, who lived across the street from the house with the noose and who explained to Officer Burke the fear she felt from seeing the noose. During that conversation, Officer Burke maintained that the noose was a Halloween decoration even though it was July and even after the women explained that the noose and the neighbor's Gadson flag were hate symbols associated with white supremacy and were used to instill fear in Black people. Burke stated that Haug and Carr just sought "to create a false narrative for [their] own propaganda[,]" asked them if they would also "cancel" a neighbor's Christmas decorations, and informed Haug and Carr that "all lives matter."

2. During the July 29 march, "[an] officer, when told by a protester that there were armed counter protesters that boasted of wanting to shoot 'N-word's, took no action and did not even report it." Pl. Resp. at 25 (citing Dugan Fourth Decl. ¶ 2(b), Video Ex. AA, ECF No. 147). The footage shows that a marcher approached an officer and said, "Can I say something? . . . Two blocks over, four people hopped in a truck with guns and they rolled up and they said 'we're gonna shoot those f'in n*****'s.'" The officer responded, "What am I supposed to do about it?" Video Ex. AA at 36:14–36:35.

3. During the July 29 march, "[w]hen a counter-protester grabbed the camera belonging to [P]laintiffs Mya Lansing and Austin Johns, in front of police, the police not only did nothing to assist, but began pushing Lansing and Johns, forcing them to stumble backwards as they pleaded for help." Pl. Resp. at 25 (citing Video Ex. DD).

4. During the July 29 march, after the protesters had left the barricade and were heading back to the park, "[an] officer told counter protesters where the protesters were heading[.]" Pl. Resp. at 25 (citing Dugan Fourth Decl. ¶ 2(b), Video Ex. AA, ECF No. 147).

Defendants contend that "it is undisputed that the counter protesters *were not* allowed to cross the barricades." Def. Reply at 11 (emphasis in original). But that fact is disputed, as the video footage shows otherwise.

Defendants also contend that "'people who hate all cops' [is] not a protected class under [42 U.S.C. § 1985(3)]." *Id.* It is true that "people who hate all cops" is not a protected class. Plaintiffs do not allege that they are a class of people who hate all cops. They allege that they are a protected class of Black people and their supporters, who were targets of a racially motivated conspiracy, including "racial violence" perpetrated by an "Anti-BLM mob[]" that was "facilitated" by Defendants. SAC ¶¶ 204–10. Plaintiffs also provide evidence that the main purpose of the July 29, 2020 march was to protest the noose, a white supremacist hate symbol. The Supreme Court has held that "[t]he predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters[]" and that Congress did not intend that § 1985(3) "forbid wholly non-racial, but politically motivated conspiracies[.]" *United Bhd. of Carpenters & Joiners of Am.*, 463 U.S. at 836.

To support their §§ 1985(3) and 1986 conspiracy claims, Plaintiffs provide distinct evidence of racial animus. That evidence includes Officer Burke's defense of white supremacist hate symbols and the racial slurs used by armed counter protesters who stated an intent to shoot the marchers.[7] "Direct evidence of improper

---

[7] In addition to Burke's statements and the counter protester racial slur, Jourdan testified that they were attacked by "white supremacists" some of whom Black Unity members had encountered in prior marches. Jourdan Dep. 115:03–05, ECF No. 124-4; 41:03–10, 44:14–23, ECF No. 114-5. And, on the night of July 29, Officer Lane texted that a group of counter protesters wearing white pride shirts and

motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available." *Mendocino*, 192 F.3d at 1302. "Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Id.* "Moreover, '[q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment.'" *Id.* (quoting *Braxton–Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.1985)). "The possibility that other inferences could be drawn that would provide an alternate explanation for the [defendants'] actions does not entitle [the defendants] to summary judgment." *Id.* at 1303.

Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that there are genuine issues of material fact that preclude summary judgment for Defendants on Plaintiffs' §§ 1983(5) civil rights conspiracy claim. There are also genuine issues of material fact as to whether Defendants knowingly neglected or declined to prevent racially motivated violence from being inflicted on Plaintiffs by counter protesters. On this record, a reasonable jury could find that Defendants violated § 1983(5) and § 1986.

C.    *Intracorporate Conspiracy Doctrine*

Finally, Defendants contend that they are entitled to summary judgment on Plaintiffs §§ 1983, 1985(3) and 1986 conspiracy claims because they were incapable of conspiring with each other since they are agents of a single entity, the SPD, and

---

carrying knives were trying to start fights with the marchers. Ex. R, Lane-Weaver-Pardee Texts at 3.

"[a] corporation cannot conspire with itself." Def. Mot. at 29–30 (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952), *cert. denied*, 345 U.S. 925 (1953)).

The intracorporate conspiracy doctrine ("ICD") originated from an anti-trust case brought under a Sherman Act provision that bars "[e]very contract, combination . . . or conspiracy[] in restraint of trade or commerce[.]" *Id.* at 913 (quoting the Sherman Act, 15 U.S.C. § 1). In *Nelson Radio*, a plaintiff had alleged that the president, sales managers, "officers, employees, representatives and agents" of a company had conspired with each other to restrain trade. In dismissing the complaint, the court explained that the defendants were agents who acted on behalf of their company, a single entity, and because a single entity cannot conspire with itself, a conspiracy was not possible. *Id.*

As to § 1983 conspiracy claims, only the Sixth and Eleventh circuits "have expressly held that the [intracorporate conspiracy] doctrine applies to § 1983 conspiracy claims, but its application in a particular case is subject to recognized exceptions." *Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 749 (8th Cir. 2022) (declining to apply the ICD in a § 1983 civil rights conspiracy case).

As to § 1985 conspiracy claims, which, unlike § 1983 conspiracy claims, can be brought against both state and private actors, the Second, Fourth, Sixth, Seventh, and Eighth Circuits have applied the doctrine to bar some § 1985 civil rights conspiracy claims. *See*, *e.g.*, *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972). However, the First and Third Circuits have expressly declined to apply the

ICD to bar § 1985 conspiracy claims. *See Stathos v. Bowden*, 728 F.2d 15, 20–21 (1st Cir. 1984) "We doubt that this 'intracorporate' exception should be read broadly. . . . The evil at which the [antitrust doctrine] is aimed . . . exists only when two different business *enterprises join* to make a decision, such as fixing a price[.] . . . But "[w]here 'equal protection' is at issue, . . . one cannot readily distinguish . . . between [the harm from] the individual conduct of one enterprise and the joint conduct of several."); *Novotny v. Great Am. Fed. Savings & Loan Assn.*, 584 F.2d 1235, 1257 (3d Cir. 1978), *rev'd on other grounds,* 442 U.S. 366 (1979) ("We see nothing in the policies undergirding § 1985(3) that would support [applying the ICD.]"). The Ninth Circuit has reserved the issue. *See Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 910 (9th Cir. 1993) ("This court has never directly addressed whether individual members of a single government entity can form a 'conspiracy' within the meaning of section 1985.").

Whether to apply the ICD to a civil rights conspiracy claim is a highly fact-dependent question. District courts in this circuit have applied the ICD to bar a civil rights conspiracy claim where the plaintiff is a current or former employee of a private business or public entity and alleges a conspiracy by others in the workplace to discriminate against the plaintiff. *See, e.g., Schmitz v. Mars, Inc.*, 261 F. Supp. 2d 1226, 1233, 1235 (D. Or. 2003) (ICD applied where Black employee brought § 1985(3) claim alleging that personnel managers "conspired to prevent [p]laintiff from prevailing on his [employment] retaliation claims"); *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055 (C.D. Cal. 2000) (ICD applied where former employee brought

§ 1985(3) claim alleging that the company's employees and retained counsel "conspired among themselves" to retaliate against plaintiff for whistleblowing).

But, outside the employment context, courts have generally declined to apply the ICD to bar civil rights conspiracy claims. In *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1327 (N.D. Cal. 1988), Black plaintiffs brought a § 1985(3) claim against agents, employees, and owners of a private store for allegedly conspiring to prevent Black people from shopping in that store. The court declined to apply the ICD, and explained that

> [the ICD's antitrust] rationale does not apply in the civil rights context. In the area of civil rights, a real danger exists from the collaboration among agents of a single business to discriminate. There is no reason to believe that discrimination by an individual business is less harmful than discrimination by multiple businesses.

*Id.* at 1326–27. The court also noted that "on its face, § 1985(3) simply requires that 'two or more persons' conspire[,]" and "[t]he legislative history of § 1985(3) provides no support for limiting the scope of this language by engrafting the intracorporate conspiracy doctrine onto [it]." *Id.* at 1327 (citing *Novotny*, 584 F.2d at 1257). In *Martinez v. City of Los Angeles*, No. 2:20-CV-10559-FWS-KS, 2023 WL 8686729, at *16 (C.D. Cal. Jan. 4, 2023), the court declined to apply the ICD where plaintiffs brought a § 1983 civil rights conspiracy claim against LAPD officers for allegedly conspiring to use improperly suggestive identification procedures and to fabricate evidence against them.

In the absence of Ninth Circuit guidance, the Court declines to apply the ICD here. The Court is persuaded by the reasoning of *Duty Free Shoppers* and finds the

facts here to be more like those of *Duty Free Shoppers* and *Martinez* than those of the employment discrimination cases.  Defendants are not entitled to summary judgment on Plaintiffs' §§ 1983, 1985(3), and 1986 civil rights conspiracy claims.

      D.    *Qualified Immunity*

Officer Burke and Detective Weaver assert that they are entitled to qualified immunity on Plaintiffs' civil rights conspiracy claims.  BW Mot. at 27–28.  The Court has already determined that Officer Burke and Detective Weaver are not entitled to qualified immunity on Plaintiffs' procedural due process claims because ORS 181A.250, which bars such actions, was clearly established at the time of the July 2020 events.  That Defendants may have conspired with others to violate clearly established law does not produce a different result.

## V.    *Monell Claims against the City*

Plaintiffs bring several *Monell* claims against the City: (1) First Amendment prior restraint, SAC ¶¶ 151–62; (2) excessive force, *id.* ¶¶ 168–73; (3) procedural due process violation of ORS 181A.250, *id.* ¶¶ 180–85; and (4) First Amendment retaliation or viewpoint discrimination, *id.* ¶¶ 241–48.

"Municipalities are 'persons' under 42 U.S.C. § 1983 and thus may be liable for causing a constitutional deprivation."  *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)).  "A municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents, however."  *Id.* (citing *Monell*, 436

U.S. at 690). "Instead, it is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible." *Id.*

To prevail on a *Monell* claim, a plaintiff must show that (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernadino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). "City policy 'causes' an injury where it is 'the moving force' behind the constitutional violation[.]" *Chew*, 27 F.3d at 1444 (quoting *Monell*, 436 U.S. at 694.).

The Court has already concluded that there are triable issues of fact as to the underlying constitutional violations connected to each of Plaintiffs' *Monell* claims.

The City contends, however, that it is entitled to summary judgment on Plaintiffs' First Amendment prior restraint, Fourteenth Amendment procedural due process, and First Amendment retaliation claims because Plaintiffs fail to establish (1) that the City had a policy or custom that was a "permanent and well settled" practice (2) that was the "cause in fact and proximate cause of the [alleged] constitutional deprivation." City Mot. at 4 (first quoting *Monell*, 436 U.S. at 691, then quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *modified on other grounds*, *Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001)). The City does not contend that it is entitled to summary judgment on Plaintiffs' excessive force *Monell* claim.

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a

violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). Existence of a municipal policy may be shown by (1) evidence of a formal policy or practice that constitutes the standard operating procedure of the governmental entity; (2) evidence that the constitutional tort was committed by an official with final policy-making authority; or (3) evidence that a subordinate's unconstitutional action and the basis for it was ratified by an official with final policy-making authority. *Trevino*, 99 F.3d at 918.

Plaintiffs base their *Monell* claims on lack of policy, failure to train, and ratification theories. Pl. Resp. to City at 2–4. Municipal liability can be based on any or a combination of these grounds. "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Oviatt*, 954 F.2d at 1477 ("There is no question . . . that the decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of § 1983 municipal liability."); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (where a plaintiff alleges a policy of inaction, the plaintiff must show that the lack of policy "amounts to deliberate indifference to the plaintiff's constitutional right and . . . that the municipality could have prevented the violation with an appropriate policy").

And municipalities can be liable for a failure to train employees "where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long*, 442 F.3d at 1186 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "The issue is whether the training program is

adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Id.* Further, "continued adherence" to policy or custom that has failed to prevent constitutional injury indicates deliberate indifference to constitutional rights. *Id.* And "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id.* (citing *City of Canton*, 489 U.S. at 407–08). Finally, deliberate indifference exists where the need "for more or different training is so obvious, and the inadequacy [of existing training] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

Finally, municipal liability can be based on ratification. Under this theory, "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (per curiam) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

A.    *First Amendment Prior Restraint*

Plaintiffs allege ratification as the basis for municipal liability on their First Amendment prior restraint claim. SAC ¶¶ 152–53; Pl. Resp. to City at 5–6. To show ratification, a plaintiff must show that "an official with final policy-making authority 'delegated that authority to, or ratified the decision of, a subordinate.'" *Price v. Sery*,

513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich*, 308 F.3d at 984–85). "The policymaker must have knowledge of the constitutional violation and actually approve of it." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "Ratification . . . generally requires more than acquiescence." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014). Policymakers must make "'a deliberate choice to endorse' the officers' actions." *Id.* (quoting *Gillette*, 979 F.2d at 1348).

Plaintiffs contend that during the July 29 march, Chief Lewis was "acting on-site as the incident commander." Pl. Resp. to City at 5; Lewis Dep. 23:17–24:08. Footage shows Chief Lewis among the officers at the barricade. Video Exs. 501, 502. Plaintiffs allege that Chief Lewis allowed and thus authorized "the behaviors he observed[,]" including the barricade location, the declaration that the march was illegal, the order that it disperse, the diversion of the march along a route where hostile counter protesters awaited, and the kettling. Pl. Resp. to City at 5.

Lieutenant Rappé testified that he was the person who ordered the barricade placement, declared the march unlawful, and notified officers to arrest marchers. Rappé Dep. 47:01–21. When he was asked whether "everything the officers did [at the barricade] was in conformance with their policy and training," he answered, "[Y]es." *Id.* at 45:22–46:02. He did not remember any post-event debriefing. *Id.* at 46:03–17.

Chief Lewis testified about the decision to place the barricade at the corner of 67th and Dogwood, Lewis Dep. 26:01–27:09, and the decision to use the SWAT team for "crowd control," *id.* at 31:18–32:13. He testified that he arrived at the barricade

and got out to join the other officers there, but not at the "front lines," *id.* at 40:05–41:05, and that he was aware of reports of counter protester attacks against marchers but "didn't give any specific orders [to direct officers to those locations,]" *id.* at 43:21–45:03.

The parties do not dispute that, at the time of the event, Chief Lewis was an official with final policy-making authority.  Given that he served as on-site incident commander, that he was present at the barricades and directly witnessed the events there, and that he declined to discipline any of the officers or initiate any policy or training changes in response to the actions that resulted in the alleged constitutional injuries, a reasonable jury could find that the Chief "set a tone which condoned and encouraged [the constitutional violations.]"  *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).

The City contends that Plaintiffs' claims fail because "[it] is well established that a single incident of alleged constitutional misconduct by a municipal employee is 'clearly insufficient' as a matter of law to prove the existence of municipal policy." City Mot. at 7 (quoting *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989)).  But "[l]iability based on custom is different from liability based on ratification or delegation where a single incident causally related to the constitutional deprivation may be sufficient for liability to attach." *Trevino*, 99 F.3d at 918 n.2.

Finally, the evidence shows that, after the July 29 march, Chief Lewis failed to address actions at the barricade and failed to take any corrective action.  When asked whether officers followed "training and policy" at the barricades, Chief Lewis

answered that he "observed" that officers "acted appropriately." *Id.* at 45:16–47:05. And when asked whether "any officers [were] disciplined for their behavior on July 29th[,]" he answered, "Not that I recall." *Id.* at 73:09–11. "Policy or custom may be inferred if, after [constitutional violations], . . . officials took no steps to reprimand or discharge [their subordinates], or if they otherwise failed to admit the [subordinates'] conduct was in error." *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986). "[S]ubsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy." *Id.* (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985), *cert. denied,* 480 U.S. 916 (1987)).

Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that there are genuine issues of material fact as to whether Chief Lewis ratified the conduct at issue and if so whether his ratification was the moving force behind the alleged constitutional violations and whether his failure to institute corrective action constituted deliberate indifference to Plaintiffs' constitutional rights.

B.    *Excessive Force*

Plaintiffs allege ratification, lack of policy, and lack of training as the bases for municipal liability on their excessive force claim. SAC ¶¶ 169–70; Pl. Resp. to City at 5–6. Chief Lewis testified that he was present at the barricade and observed the force used against Plaintiffs and other marchers including the focused blows that Officer Durrant dealt to Ford's and Jourdan's head and neck. Lewis Dep. 45:12–15. When Chief Lewis was asked whether, in his opinion, everything done at the

barricade was "done pursuant to training and policy" and whether he observed "anybody [who did] not follow their training or policy[,]" Chief Lewis answered that he observed that the officers "act[ed] appropriately[.]" *Id.* at 45:16–05.

After the July 29 march, the City commissioned an independent audit by retired Police Chief Rick Braziel to examine the July 29 events. Lewis Dep. 95:05–03; Dugan Third Decl., Ex. D, (Braziel Audit Recommendations), ECF No. 144-3. That Audit recommended that "[t]he Department . . . conduct a thorough investigation into the force used to take . . . Ford into custody." Braziel Audit Recommendation 6.6, at 46. Chief Lewis testified that although he was aware of the Braziel Report and had participated in the Braziel investigation, he did not review the Report. Lewis Dep. 95:05–96:05. He added that an internal investigation of the incident produced no concerns, *id.* at 58:02–12, and that no officers were disciplined, *id.* at 73:03–11. Officer Durrant testified that he was not subject to any discipline or even a verbal reprimand for his use of force. Dugan Third Decl., Ex. E, Durrant Dep. 33:05–12; 98:01–13, ECF No. 144-4.

During his deposition, when Chief Lewis was asked if he was "ever concerned that officers were using punches and strikes instead of other techniques," he answered, "[N]o." Lewis Dep. 74:06–12. But he also testified that he knew that several officers had filed workers' compensation claims for hand injuries caused by delivering focused blows. *Id.* at 74:12–16. Officer Durrant testified that he couldn't remember any policy or training on the use of focused blows. Durrant Dep. 48:06–49:22. But he believed that SPD policy was that focused blows could be used in any

circumstance and delivered to anywhere on the body, including the neck, and that an officer could use an open hand or closed fist. Durrant Dep. 45:14–46:04; 48:18–22. Other officers testified to the same. Dugan Third Decl., Ex. N, O'Leary Dep. 13:08–14:02, ECF No. 144-13; Ex. P, Conrad Dep. 48:02–05, ECF No. 144-15. Officer Durrant testified that he believed that the focused blows policy changed after the July 29 incident. Durrant Dep. 45:05–10. Officer Conrad also testified that after 2020 the policy on focused blows changed and that officers were still permitted to use closed fist focused blows but they must use "de-escalation stuff" first. Conrad Dep. 48:02–18.

Plaintiffs contend that this is not the first time that an independent audit has recommended changes to SPD's use of force procedures, chiefly its use of focused blows. Pl. Resp. to City at 6; Dugan Third Decl., Ex. F, (OIR Group, "Independent Critical Incident Report of the Officer-Involved Shooting Death of Stacy W. Kenny" (Mar. 2021)), at 23, ECF No. 144-5. The Kenny Report recommended that SPD "develop policy requiring its officers to deploy de-escalation techniques prior to resorting to force when feasible." And it stated that "the [Use of Force Board] could and should have either banned or restricted the use of focus[ed] blows to be more in concert with progressive principles of use of force for the safety of subject and officer alike." Although the Kenny Report was published after the July 29, 2020 march, it supports Plaintiffs' contention that SPD's use of force policy was deficient at the time of the July 2020 march.

The Ninth Circuit "consistently has found that a [local government's] lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when [that government] has other general policies in place." *Long*, 442 F.3d at 1189. "For a policy to be the moving force behind the deprivation of a constitutional right, the identified deficiency in the policy must be closely related to the ultimate injury." *Id.* at 1189 (internal quotation marks and citation omitted). And a plaintiff must show "'that the injury would have been avoided' had proper policies been implemented." *Id.* at 1190 (quoting *Oviatt*, 954 F.2d at 1478).

As to lack of training, "[t]he issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Id.* (citing *City of Canton*, 489 U.S. at 388). Such policy can be evidenced by "a deficient training program, 'intended to apply over time to multiple employees.'" *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). Further, "[t]he continued adherence by policymakers 'to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability.'" *Id.* (internal quotation marks omitted) (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 407).

Plaintiffs provide evidence that SPD lacked adequate policy and training on de-escalation tactics and the use of force (specifically as to focused blows) and that Chief Lewis ratified the officers' uses of force against Plaintiffs and other marchers on July 29. The Officers could not articulate any policy or training on the use of de-

escalation or focused blows that was in place at the time of the march. Though the Braziel Report recommended that SPD conduct an internal investigation of the issue, the officers could not articulate whether an internal investigation had been completed, what that investigation entailed, and what it found. Chief Lewis testified that an investigation found no concerns. Defendants testified that no officer received discipline for use of force on July 29. But SPD appears to have changed its use-of-force policy after the march and the Kenny incident.

A plaintiff may succeed in proving a failure-to-train claim where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations," as here. *Long*, 442 F.3d at 1186. Because the use of focused blows is a significant level of force, it is foreseeable that without adequate policy and training, its imprudent use would result in the deprivation of Fourth Amendment rights.

Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that there are genuine issues of material fact as to whether the City lacked appropriate de-escalation and use-of-force policies and trainings; whether Chief Lewis ratified the use of focused blows and other force at the July 2020 march; whether the policy and training deficiencies or Chief Lewis's ratification constituted the moving force behind the alleged constitutional injuries; and whether the policy and training deficiencies or Chief Lewis's failure to initiate corrective action constituted deliberate indifference to Plaintiffs' constitutional rights.

Page 115 – OPINION AND ORDER

C.    *Fourteenth Amendment Violation*

Plaintiffs allege ratification, lack of policy, and lack of training as the bases for municipal liability on their Fourteenth Amendment procedural due process claim. SAC ¶ 228; Pl. Resp. to City at 8–11.

To establish that there was a policy, custom, or practice of collecting data about Plaintiffs' political views, associations, or activities in violation of ORS 181A.250, Plaintiffs again cite the multi-pronged sustained efforts by numerous SPD employees to collect and maintain the proscribed data.  The Court reviewed this evidence in the previous section. "Absent a formal governmental policy, [a plaintiff] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.'" *Trevino*, 99 F.3d at 918 (quoting *Gillette*, 979 F.2d at 1346).  "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled' city policy." *Id.* (quoting *Monell*, 436 U.S. at 691).  A plaintiff "cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989). "Liability for improper custom . . . must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918.

Plaintiffs provide evidence that SPD had a custom or practice of collecting and maintaining data violative of ORS 181A.250 that was of sufficient duration, frequency, and consistency to support municipal liability.  To collect and maintain

such data required the input of a wide range of SPD employees over a sustained period of time. The participants ranged from officers—who collected license plate data from vehicles in attendance at Black Unity marches—to dispatchers, who entered that data with notes about the associated activities and shared that data with other officers—to undercover officers, who attended Black Unity marches and other Black Unity events and texted photos and videos to dispatch—to co-workers who helped access social media accounts and livestreams, which were downloaded after the marches—to Chief Lewis, who was aware of the conduct and who was aware of ORS 181A.250 but failed to stop the conduct.

The City contends that it is entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim because "[t]here is no evidence on this record that the City of Springfield was collecting or maintaining information about the Black Unity movement, other than information as to how it directly related to an investigation of criminal activities." City Mot. at 11. But Officer Lane, Detective Weaver, Officer Burke, and Dispatcher Pardee testified that there was neither criminal investigation nor reasonable suspicion that subjects were involved in criminal activity. Even assuming that misdemeanors and city ordinance violations constitute criminal conduct, the statute's criminal investigation prong is not met.

Resolving disputed facts and drawing all reasonable inferences in the non-movant's favor, the Court concludes that there are genuine issues of material fact as to whether SPD had a practice or custom of collecting and maintaining data on Plaintiffs that violated ORS 181A.250 and as to whether the breadth and on-going

nature of the violations despite knowledge of ORS 181A.250 constituted deliberate indifference to Plaintiffs' constitutional rights.

> D.    *First Amendment Retaliation or Viewpoint Discrimination*

Plaintiffs allege ratification, practice, lack of policy, and lack of training as the bases for municipal liability on their First Amendment retaliation claim.  SAC ¶ 245.

The City offers no argument specific to this claim.  The City contends only that it is entitled to summary judgment on all of Plaintiffs' *Monell* claims because "Plaintiff[s] failed to testify to *any* facts to show that a policy, custom, or practice was the cause of [the] alleged damages, as required by *Monell*."  City Mot. at 7 (emphasis in original).

The Court has already concluded that Plaintiffs have raised genuine issues of material fact as to their First Amendment retaliation claim.

Plaintiffs allege that the City permits individual officers to "arbitrarily declare[] marches" "unlawful" "based on [the officer's] own personal political opinions" and whether the officer is "offended by the opinions of protestors[.]"  SAC ¶ 244. Plaintiffs also allege that the City permits individual SPD officers to "interfere with marches and protests when [that] officer disagrees with the viewpoint of those . . . activities."  *Id.*  Plaintiffs allege that the City's ratification and deficient policy and training is responsible for the retaliatory acts that include barricading the march, declaring the march unlawful, kettling the marchers, knowingly permitting counter protester violence, collecting and maintaining data in violation of ORS 181A.250, infiltrating Black Unity marches and events with undercover officers, and using

threats of arrest and force, and the use of excessive force against Plaintiffs.  *Id.* ¶¶ 243–44.

The acts that form the basis of Plaintiffs' retaliation claim are substantially the same acts that form the bases of Plaintiffs' other *Monell* claims.  The Court need not recount the same evidence and conduct the same analysis.  "[T]o avoid summary judgment, a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) (citing *Chew*, 27 F.3d at 1444).  Given the evidence of ratification and deficient policy and training as to law enforcement conduct at protests and mass gatherings and given the predictability of constitutional violations from those deficiencies, the Court concludes that there are a genuine issues for the jury as to whether the City failed to adopt appropriate policy and training as to law enforcement conduct at protests, as to whether such deficiencies constituted the moving force behind Plaintiffs' constitutional injuries, and whether the failure to correct those deficiencies constituted deliberate indifference to Plaintiffs' constitutional rights.

In sum, the City is not entitled to summary judgment on any of Plaintiffs' *Monell* claims because there are genuine issues of material fact as to whether ratification, custom and practice, and deficiencies of city policy and training were the moving forces behind the alleged constitutional injuries.

## CONCLUSION

For the reasons explained above, Defendants' Motions, ECF Nos. 104 and 111, are DENIED; the City's Motion, ECF No. 103, is DENIED; and Plaintiffs' Motion, ECF No. 109, is GRANTED in part and DENIED in part.

It is so ORDERED and DATED this    23rd    day of January 2026.


  /s/Ann Aiken                                   

ANN AIKEN
United States District Judge